# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT
## OFFICE OF THE CLERK

Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

Elisabeth A. Shumaker
Clerk of Court

December 05, 2014

Chris Wolpert
Chief Deputy Clerk

Ms. Madeline S. Cohen
Office of the Federal Public Defender
Districts of Colorado and Wyoming
633 17th Street, Suite 1000
Denver, CO 80202

Mr. Mark Barrett
Law Office of Mark H. Barrett
111 North Peters Avenue
Suite 200
Norman, OK 73069

**RE:    13-6141, Jones v. Trammell**
        Dist/Ag docket: 5:07-CV-01290-D

Dear Counsel:

Enclosed is a copy of the opinion of the court issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. Rule 40, any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. If requesting rehearing en banc, the requesting party must file 12 paper copies with the clerk, in addition to satisfying all Electronic Case Filing requirements. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R. 35 and 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Elisabeth A. Shumaker
Clerk of the Court

EAS/as

cc:      Jennifer L. Crabb

FILED
United States Court of Appeals
Tenth Circuit

**December 5, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

JULIUS DARIUS JONES,

        Petitioner-Appellant,

v.

ANITA TRAMMELL, Warden,
Oklahoma State Penitentiary,

        Respondent-Appellee.

No. 13-6141

---

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA
## (D.C. No. 5:07-CV-01290-D)

---

Madeline S. Cohen, Assistant Federal Public Defender (Virginia L. Grady,
Federal Public Defender; O. Dean Sanderford, Assistant Federal Public Defender,
Denver, Colorado; and Mark Barrett of Barrett Law Office, Norman, Oklahoma,
with her on the briefs), Denver, Colorado, for Petitioner-Appellant.

Jennifer L. Crabb, Assistant Attorney General (E. Scott Pruitt, Attorney General
of Oklahoma, with her on the brief), Oklahoma City, Oklahoma, for Respondent-
Appellee.

---

Before **BRISCOE,** Chief Judge, **O'BRIEN** and **HOLMES**, Circuit Judges.

---

**BRISCOE**, Chief Judge.

---

This death penalty case arises out of a 1999 Oklahoma City carjacking that left the victim, Paul Howell, dead.  Petitioner Julius Darius Jones was convicted by an Oklahoma jury of Howell's murder, as well as conspiracy to commit a felony (robbery of a vehicle with firearms) and possession of a firearm after conviction of a felony.  In accordance with the jury's recommendation, Jones was sentenced to death for the murder conviction, 25 years' imprisonment for the conspiracy conviction, and 15 years' imprisonment for the possession of a firearm conviction.  The two terms of imprisonment were ordered to be served consecutively.

After exhausting his state court remedies, Jones sought federal habeas relief by filing a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The district court denied that petition and also denied Jones a certificate of appealability (COA).  Jones appealed, and we granted him a COA as to a single claim: whether Jones's trial counsel was ineffective for failing to seek evidence corroborating a confession purportedly made by Jones's coconspirator.  Now, exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reject that claim and affirm the judgment of the district court.

## I

### *Factual background*

The Oklahoma Court of Criminal Appeals (OCCA), in disposing of Jones's direct appeal, outlined the facts underlying Jones's case:

2

On Wednesday, July 28, 1999, Paul Howell was fatally shot in the driveway of his parents' Edmond home.  Howell, his sister, Megan Tobey, and Howell's two young daughters had just returned from a shopping trip in Howell's Chevrolet Suburban.  Howell pulled into the driveway and turned the engine off.  As Tobey exited from the front passenger side, she heard a gunshot.  Tobey turned to see her brother slumped over the driver's seat, and a young black male, wearing a white T-shirt, a stocking cap on his head, and bandana over his face, demanding the keys to the vehicle.  Tobey rushed to get herself and Howell's daughters out of the Suburban.  As Tobey escorted the girls through the carport, she heard someone yelling at her to stop, and then another gunshot.  Tobey got the girls inside and summoned for help.  Howell's parents ran outside to find their son lying on the driveway.  His vehicle was gone.  Howell died a few hours later from a single gunshot wound to the head.

Two days after the shooting, Oklahoma City police found Howell's Suburban parked near a convenience store on the south side of town.  Detectives canvassed the neighborhood and spoke with Kermit Lottie, who owned a local garage. Lottie told detectives that Ladell King, and another man he did not know, had tried to sell the vehicle to him the day before.  Lottie realized at the time that the vehicle matched the description given in news reports about the Howell carjacking.  Ladell King, in turn, told police that he had agreed to help Christopher Jordan and Jones find a buyer for a stolen vehicle.  On the night of the shooting, Jordan came to King's apartment driving a Cutlass; Jones arrived a short time later, wearing a white T-shirt, a black stocking cap, and a red bandana, and driving the Suburban.  King told police that Jones could be found at his parents' Oklahoma City home.

Police then drove to Jones's parents' home, called a telephone number supplied by King, and spoke to someone who identified himself as Julius Jones.  Jones initially agreed to come out and speak to police, but changed his mind.  Police made several attempts to re-establish telephone contact; eventually a female answered and claimed Jones was not there.  While some officers maintained surveillance at the home, others sought and obtained warrants to arrest Jones and search his parents' home for evidence.  Police found a .25–caliber handgun, wrapped in a red bandana, secreted in the attic through a hole in a bedroom ceiling and found papers addressed

3

to Jones in the bedroom.  Police also found a loaded, .25–caliber magazine, hidden inside a wall-mounted door-chime housing. Further investigation revealed that the bullet removed from Howell's head, and a bullet shot into the dashboard of the Suburban, were fired from the handgun found in the attic of the Jones home.

Christopher Jordan was arrested on the evening of July 30.  Jones, who managed to escape his parents' home before police had secured it, was arrested at a friend's apartment on the morning of July 31.

Jones v. State, 128 P.3d 521, 532-33 (Okla. Crim. App. 2006) (Jones I).

### Jones's state trial proceedings

Jones and Jordan were charged conjointly in the District Court for

Oklahoma County "with conspiracy to commit a felony [(robbery with firearms)],

and with the murder of Howell."  Id. at 533.  Jones was also charged with

possession of a firearm by a convicted felon.  The prosecution filed a bill of

particulars alleging two aggravating factors: (1) that Jones knowingly created a

great risk of death to more than one person; and (2) the existence of a probability

that Jones would commit criminal acts of violence that would constitute a

continuing threat to society.

In September 2001, Jordan pleaded guilty to both of the charges against

him and, as part of a plea agreement, agreed to testify against Jones.  Jordan was

sentenced to thirty years' imprisonment on the murder count and ten years'

imprisonment on the conspiracy count, with the sentences to run concurrently.

The case against Jones proceeded to trial in February 2002.  Jordan was one

of two key witnesses presented by the prosecution during the first-stage

proceedings.  Jordan testified that he and Jones

> had planned to steal a Chevrolet Suburban and sell it; that they
> followed Howell's vehicle for some time with the intent to rob
> Howell of it; that once Howell pulled into the driveway, Jordan
> stayed in their vehicle while Jones, armed with a handgun,
> approached the Suburban on foot; that after the robbery-shooting,
> Jones drove the Suburban away and told Jordan to follow him; and
> that Jones subsequently claimed his gun had discharged accidentally
> during the robbery.

Id.

The other key prosecution witness was Ladell King, who purportedly met

Jordan and Jones in early 1999.  King testified that Jordan and Jones arrived at

his apartment complex on the evening of July 28, 1999, driving different vehicles.

More specifically, King testified that Jordan arrived first in a brown Oldsmobile

Cutlass, and that Jones arrived shortly thereafter in a "goldish color Suburban."

Tr. of Jury Trial Proceedings, Vol. 5 at 144 (State v. Jones, No. CF-99-4373 (D.

Okla. Cnty. Feb. 15, 2002)).  King testified that Jones was wearing a stocking

cap, a bandanna, a white t-shirt, jogging pants, and brown cotton gloves.

According to King, Jones asked him to contact Kermit Lottie, who owned and

operated a body shop in south Oklahoma City, to see if he would be interested in

purchasing the Suburban.  King, aware that the Suburban was stolen, agreed to do

so.  King testified that on the following afternoon, July 29, 1999, he drove to the

area of Lottie's shop, followed by Jones, who was driving the Suburban.

According to King, they parked the Suburban at a grocery store near Lottie's

5

shop.  The two men then drove to Lottie's shop in King's car.  King got out of the car alone and spoke with Lottie about purchasing the Suburban.  After learning the color of the Suburban, Lottie informed King that a man had been killed the night before during the robbery of a similar Suburban, and stated that "he didn't want to be caught up in the middle of" that situation.  Id. at 179.  King testified that he returned to his car and asked Jones if he knew a man in Edmond had been killed during the robbery of a Suburban.  Jones initially declined any knowledge of that event.  But King testified that later that evening, Jones admitted involvement in the murder.  Specifically, King testified that Jones told him "the Suburban pulled up, the door came open, he saw a little girl waiving [sic] at him and the gun went off."  Id. at 190.  Lastly, King testified that early on the morning of July 30, 1999, Jones called him, said there was a $22,000 police reward to find the shooter, and indicated that he (Jones) was responsible for shooting Howell.  According to King, he asked Jones, "Man, why did you have to kill the guy?," but Jones did not respond.  Id. at 201.

At the conclusion of the first-stage evidence (Jones rested without presenting any evidence), the jury found Jones guilty of all three charges against him: first-degree felony murder, possession of a firearm after conviction of a felony, and conspiracy to commit a felony.

During the second-stage proceedings, the prosecution, in an effort to prove the continuing threat aggravator, presented evidence of similar crimes committed

by Jones within the same general time frame as Howell's murder.  To begin with, the prosecution presented evidence linking Jones to two armed vehicle robberies that occurred in the parking lot of an Oklahoma City restaurant on consecutive days in July 1999 (the same month as Howell's murder).  The witnesses to those crimes testified that the assailant in each case was a black male wearing a bandanna over his face and brandishing a handgun.  The victim in the first robbery was unable to identify his assailant, but the victim of the second robbery identified Jones as his assailant.  In addition, Jordan testified that he and Jones committed both of these robberies, and that Jones was the gunman in both instances.  The prosecution also presented evidence that a black assailant wearing a bandanna over his face and brandishing a handgun robbed a jewelry store in an Oklahoma City mall in July 1999.  Although the victim of that crime could not identify the assailant, an eyewitness saw a car that resembled Jordan's speed out of the parking lot near the time of the robbery.  And Jordan testified that Jones had borrowed his car that day and ultimately returned with gold chains he said he had stolen.

At the conclusion of the second-stage evidence, the jury found the existence of the two aggravating circumstances alleged by the prosecution and in turn fixed Jones's punishment at death for the felony-murder conviction.[1]  The

---

[1] As to the other two counts of conviction, the jury fixed punishment at 15 years' imprisonment for the possession of a firearm conviction and 25 years'

(continued...)

state trial court sentenced Jones in accordance with the jury's recommendation.

*Jones's direct appeal*

Jones filed a direct appeal with the OCCA asserting nineteen propositions of error.  Among them was a claim that Jones's trial counsel, David McKenzie, was ineffective during the first-stage proceedings by "failing to present available evidence from [an individual named] Manuel Littlejohn that Chris Jordan admitted [Jones] was not the shooter."  Original Br. at 39, <u>Jones v. State</u>, No. D-2002-534 (Okla. Crim. App. Mar. 8, 2004).  According to Jones, Littlejohn was a "death row inmate . . . to whom Chris Jordan confided before trial that [Jones] was not involved in the murder, that Jordan was the person who put the murder weapon and red bandanna in the Jones' attic, and that Jordan was implicating [Jones] to avoid getting the death penalty himself."  <u>Id.</u> at 41.  Jones argued that the presentation of Littlejohn's testimony at trial "would have significantly strengthened the defense theory that Jordan planted the murder weapon and clothing worn by the shooter at the Jones' residence after Jordan committed the murder."  <u>Id.</u>

In support of this claim, Jones presented affidavits from Littlejohn and McKenzie.  Littlejohn's affidavit stated, in pertinent part:

> In approximately late August or early September of 1999, I was an
> inmate residing at the Oklahoma County Jail in Oklahoma City,

---

[1](...continued)
imprisonment for the conspiracy conviction.

Oklahoma.  During this time, I briefly shared a cell with a person known to me as Christopher Jordan;

During this period, I observed Christopher Jordan to be frequently taken from the cell we shared for what I believed were attorney visits or meetings regarding his case;

During this time period, Christopher Jordan made statements to me about his case and about his co-defendant, Julius Jones;

Jordan stated that he felt guilty because he was going to implicate his co-defendant, Julius Jones, in a murder case to avoid getting the death penalty;

Jordan stated that he had wrapped the gun used to commit the murder in his case in a bandana and hidden it in Julius Jones' house;

Regarding the murder case, Jordan stated to me, "Julius didn't do it," and "Julius wasn't there."

Jordan further stated, "D.A.'s going to make me a deal.  I'm going to do fifteen years and go home."

During this time period, Jordan often remarked that he felt "bad" for what he was doing;

At the time that I shared a cell with Christopher Jordan, I had never met or spoken with Julius Jones;

I have never shared a cell with Julius Jones in the Oklahoma County Jail;

I first met and spoke with Julius Jones in approximately January of 2000 when I was being held in the first floor booking area of the Oklahoma County Jail.  I met Julius as he was temporarily being held in that area.  According to Julius Jones, he was being held in that area after returning from another county on a writ.  I spoke with him for approximately forty to fifty minutes at that time.  I told him that I had heard of him because I had previously shared a cell with his co-defendant, Christopher Jordan.  At this time, I also told Julius Jones the details of the statements made to me by Christopher Jordan.

Littlejohn Aff. ¶¶ 4-14, (Jan. 29, 2004).  McKenzie, in his affidavit, indicated that

he was aware of Littlejohn's statements but, after personally interviewing

Littlejohn and speaking with Littlejohn's attorneys, chose not to present

Littlejohn as a witness due to concerns about his credibility.[2]  McKenzie Aff. ¶ 15

(Jan. 21, 2004).

On January 27, 2006, the OCCA issued an opinion affirming Jones's

convictions and sentences.  The OCCA expressly rejected Jones's claim that his

trial counsel was ineffective for failing to present Littlejohn as a defense witness:

> Jones goes on to attack trial counsel's decision not to present the
> testimony of Emmanuel Littlejohn.  A multiple felon and convicted
> murderer, Littlejohn briefly shared a county jail cell with
> co-defendant Jordan while awaiting capital resentencing in his own
> first-degree murder case.  Littlejohn told defense investigators that
> Jordan admitted he was falsely throwing blame on Jones, that Jordan
> said Jones was not involved in the Howell murder at all, and that
> Jordan had even gone so far as to hide the murder weapon and other
> incriminating evidence in the Joneses' [sic] home himself.  The fact
> that defense counsel actually did investigate Littlejohn's claim before
> trial reduces Jones's argument to one over trial strategy which, as
> <u>Strickland</u> instructs, is much more difficult to attack.  Littlejohn's
> criminal history presented obvious credibility problems.  While he
> had nothing to gain from testifying on Jones's behalf, he had little to
> lose by perjuring himself with claims that were impossible to
> corroborate.  Moreover, the image of Jordan planting evidence in the
> attic of the Jones family home, without their knowledge, might have
> been somewhat difficult for the jury to believe.  We find nothing
> unreasonable about counsel's decision to forgo Littlejohn's
> assistance.

---

[2] Jones also submitted to the OCCA an affidavit from another member of
his trial defense team, third-chair attorney Robin McPhail.  According to
McPhail, "McKenzie [openly] expressed the view that Mr. Littlejohn was a
pathological liar."  McPhail Aff. ¶ 15 (Jan. 30, 2004).

Jones I, 128 P.3d at 546 (paragraph number omitted).

Jones filed a petition for rehearing and motion to recall the mandate.  The

OCCA granted Jones's petition for rehearing but ultimately concluded there was

no merit to the issues raised therein by Jones.  Jones v. State, 132 P.3d 1, 3

(Okla. Crim. App. 2006) (Jones II).  Consequently, the OCCA denied Jones's

motion to recall the mandate.  Id.

The United States Supreme Court denied certiorari on October 10, 2006.

Jones v. Oklahoma, 549 U.S. 963 (2006).

*Jones's application for state post-conviction relief*

On February 25, 2005, while his direct appeal was still pending, Jones filed

an original application for post-conviction relief with the OCCA.  Proposition

One of the application alleged various instances of ineffective assistance of trial

and appellate counsel.  In particular, Proposition One alleged the following:

> Mr. Christopher Berry was housed in the Oklahoma County Jail at
> the same time Mr. Jordan and Mr. Jones were in the jail.  Mr. Jordan
> was in the same cell pod as Mr. Berry.  Mr. Berry personally heard
> Mr. Jordan tell another jail resident that he, Mr. Jordan, was the
> shooter and not Mr. Jones.  Mr. Berry's statements corroborate Mr.
> Littlejohn's statements.  According to Mr. Littlejohn and Mr. Berry,
> Mr. Jones was not the triggerman.  Mr. Jordan was the triggerman.
> Although Mr. Littlejohn and Mr. Berry are convicted felons, their
> testimony might have created doubt in a juror's mind.  The State
> used testimony from convicted felons Mr. Kermit Lottie and Mr.
> Ladell King; therefore, the testimony of Mr. Littlejohn and Mr. Berry
> would not have been unreasonable.
>
> Mr. Jones's case was prejudiced because the trial team did not
> further investigate Mr. Littlejohn's statements.  Mr. David

> McKenzie, Mr. Jones's lead attorney, was also Mr. Christopher
> Berry's attorney.  Counsel could have easily asked Mr. Berry if he
> heard anything interesting in the jail.  Mr. McKenzie had access to
> other people in the Oklahoma County jail, but he failed to ask
> whether what Mr. Littlejohn was saying could be true.  Rather than
> corroborate what Mr. Littlejohn said, counsel chose to discount it.
> Both trial counsel and appellate counsel failed to investigate this
> further.

Original App. for Post-Conviction Relief at 28, Jones v. State, No. PCD-2002-630

(Okla. Crim. App. Feb. 25, 2005).  In support of Proposition One, Jones

submitted a two-page affidavit from Berry.  That affidavit stated, in pertinent

part:

> While I was in the Oklahoma County jail, I met a man by the name
> of Christopher Jordan.  Mr. Jordan and I were in the same cell pod at
> the Oklahoma County Jail for approximately 2 years together.
>
> While Mr. Jordan and I were in the same pod, I overheard a
> conversation between Mr. Jordan and a man that went by the name of
> "Smoke."  I do not remember Smoke's given name.  Mr. Jordan was
> bragging to Smoke about how he was the actual person who shot the
> victim in his case.  Mr. Jordan also said that because he was the first
> to talk to the police, he was getting a deal and would not get the
> death penalty.  He also said that his partner in the case was charged
> with capital murder.
>
> There were other times that I overheard Mr. Jordan telling his story.
> He seemed to like to brag about it.
>
> My meeting with Lisa Cooper [an investigator from the Capital Post-
> Conviction Division of the Oklahoma Indigent Defense System in
> December 2004] was the first time I had ever been interviewed or
> asked about this information.  I didn't tell my attorney, David
> McKenzie.  I did try to talk to him about it, but Mr. McKenzie didn't
> seem interested in it.

Berry Aff. ¶¶ 4-7 (Dec. 28, 2004).

The OCCA denied Jones's application for post-conviction relief.  Jones v. State, No. PCD-2002-630 (Okla. Crim. App. Nov. 5, 2007) (Jones III).  In doing so, the OCCA expressly rejected Jones's argument that McKenzie was ineffective for failing to investigate and present testimony from Berry.

*Jones's federal habeas petition*

Jones initiated these federal habeas proceedings on November 14, 2007, by filing a motion for appointment of counsel.  That motion was granted and, on November 3, 2008, Jones's appointed counsel filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The petition asserted eight grounds for relief.  Among those was a claim (Ground One) that McKenzie was ineffective for failing to present at trial available evidence to show that Jordan shot Howell, and that Ladell King was Jordan's accomplice in the crime.  In support, Jones noted that both Littlejohn and Berry claimed that Jordan had confessed to being the person who shot Howell.

On May 22, 2013, the district court issued an opinion denying Jones's petition.  With respect to Jones's claim that McKenzie was ineffective for failing to investigate and present testimony from Littlejohn and Berry, the district court concluded that Jones "ha[d] failed to show that the OCCA rendered a decision [on the issue] which [wa]s contrary to, or an unreasonable application of, Supreme Court precedent."  Jones v. Trammell, No. CIV-07-1290-D, slip. op. at 14 (W.D. Okla. May 22, 2013).  On that same date, the district court entered judgment and

denied Jones a COA with respect to any of the grounds for relief asserted in his habeas petition.

Jones filed a timely notice of appeal.  This court subsequently issued an order granting Jones a COA with respect to the following issue: "Whether trial counsel provided ineffective assistance by failing to investigate Littlejohn's claim that Jordan confessed to see if it could be corroborated."  Case Mgmt. Order at 1.

II

*Standard of review*

Because Jones's habeas petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we are bound by the standards of review set forth in AEDPA.  See Snow v. Sirmons, 474 F.3d 693, 696 (10th Cir. 2007).

Under AEDPA, the standard of review applicable to a particular claim depends upon how that claim was resolved by the state courts.  Id.  If a claim was addressed on the merits by the state courts, our standard of review is governed by 28 U.S.C. § 2254(d), which provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"When reviewing a state court's application of federal law" under 28 U.S.C. § 2254(d), "we are precluded from issuing the writ simply because we conclude in our independent judgment that the state court applied the law erroneously or incorrectly." McLuckie v. Abbott, 337 F.3d 1193, 1197 (10th Cir. 2003). "Rather, we must be convinced that the application was also objectively unreasonable." Id. "This standard does not require our abject deference, . . . but nonetheless prohibits us from substituting our own judgment for that of the state court." Snow, 474 F.3d at 696 (internal quotation marks omitted).

If a claim was not resolved by the state courts on the merits and is not otherwise procedurally barred, our standard of review is more searching. Because § 2254(d)'s deferential standards of review do not apply in such circumstances, we review the district court's legal conclusions de novo and its factual findings, if any, for clear error. McLuckie, 337 F.3d at 1197.

*Ineffective assistance of counsel*

At issue in this appeal is a single claim: whether McKenzie, Jones's trial counsel, provided ineffective assistance by failing to seek corroboration of Littlejohn's claim that Jordan confessed to shooting Howell. That claim necessarily incorporates Jones's assertion that McKenzie should have investigated

and presented at trial testimony from Berry.

*a) Strickland*

Jones's ineffective assistance claim is governed by the Supreme Court's

decision in Strickland v. Washington, 466 U.S. 668 (1984).  "To prevail on a

Sixth Amendment claim of ineffective assistance of counsel under Strickland . . . ,

a defendant must show both that (1) counsel committed serious errors in light of

prevailing professional norms such that his legal representation fell below an

objective standard of reasonableness [(performance prong)], and (2) there is a

reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different [(prejudice prong)]."  Grant v.

Trammell, 727 F.3d 1006, 1017 (10th Cir. 2013) (internal quotation marks

omitted).

*b) Jones's presentation of the issue to the OCCA*

As we have noted, Jones first raised this ineffective assistance claim in the

application for post-conviction relief he filed with the OCCA.  Jones argued in

that application that McKenzie "failed to investigate whether there was merit in

Mr. Littlejohn's claims" and thus "failed to search for and interview possible

defense witnesses."  Original App. for Post-Conviction Relief at 27, Jones v.

State, No. PCD-2002-630 (Okla. Crim. App. Feb. 25, 2005).  In particular, Jones

asserted that McKenzie "was also Mr. Christopher Berry's attorney" and thus

"could have easily asked Mr. Berry if he heard anything interesting in the jail."

Id. at 28.  "Rather than corroborate what Mr. Littlejohn said," Jones argued,

McKenzie "chose to discount it."  Id.  And, Jones argued, McKenzie could not be

deemed to have made a strategic decision to forego Berry's testimony because he

"failed to inquire into Mr. Berry's knowledge of [Jones's] case" and thus "could

[not] form an opinion as to the potential evidence and the potential witness[]."

Id. at 30.  Simply put, Jones was arguing that McKenzie could not have made a

strategic decision regarding testimony of which he was not aware.

   *c) The OCCA's resolution of the claim*

      In disposing of Jones's application for post-conviction relief, the OCCA

rejected Jones's claim that McKenzie was ineffective for failing to investigate and

present testimony from Berry:

> [Jones] claims trial counsel was ineffective for failing to
> investigate and present two witnesses at trial . . . .  Specifically,
> [Jones] claims the testimony of Christopher Berry . . . could have
> made a difference in the outcome of the trial.  At the time of
> [Jones's] trial, Berry was being held in the Oklahoma County Jail on
> a charge of Child Abuse Murder.  He was later convicted of that
> charge and sentenced to life in prison without possibility of parole.
> Berry claims, by affidavit, that he overheard [Jones's] co-defendant,
> Christopher Jordan, boasting that he, not [Jones], was the triggerman
> in the homicide with which they were jointly charged.
>
> [Jones] made a similar claim on direct appeal, alleging trial
> counsel was ineffective for not presenting the testimony of another
> jail inmate, Emmanuel Littlejohn, who also allegedly heard Jordan
> boast about being the triggerman.  We rejected that claim, because
> the inmate's credibility was suspect and the details of the account
> were specious.  Berry suffers from the same credibility problems that
> Littlejohn did.  Nor do we agree with [Jones's] argument that Berry's
> claim necessarily "corroborates" Littlejohn's.  Berry's affidavit

suggests that Jordan admitted [Jones] was involved in the murder, while according to Littlejohn, Jordan denied that [Jones] had any involvement.  Taken together, these inmates' claims show only one thing: that Christopher Jordan changed his story to suit his own needs.  Yet this much was already clear to the jury, through trial counsel's extensive cross-examination of Jordan, who testified against [Jones] at trial.

Jones III at 10-11 (internal citations omitted).

   *d) Jones's challenge to the OCCA's ruling*

In this appeal, Jones concedes that the OCCA's resolution of the ineffective assistance claim he raised on direct appeal—that McKenzie was ineffective for failing to call Littlejohn as a witness—"was likely reasonable."  Aplt. Br. at 28. More specifically, Jones concedes that "[t]he record shows that [McKenzie] looked into Littlejohn's claim and made an informed, strategic decision not to call him as a witness."  Id.

Jones argues, however, that "[t]he OCCA went astray . . .  in applying this same analysis to [McKenzie]'s failure to *seek corroboration* of Littlejohn's account."  Id. (emphasis in original).  "[I]n contrast to [McKenzie]'s failure to call Littlejohn as a witness," Jones argues, "there was absolutely no evidence in the state-court record that [his] failure to seek corroboration of Littlejohn's claim was strategic."  Id.  "In fact," he asserts, "there was no evidence that counsel even considered the option of looking for corroborating witnesses."  Id. at 28-29. "Indeed," Jones argues, "Berry's statement that he tried to talk to McKenzie about Jordan but that McKenzie didn't seem interested suggests the opposite—that

18

seeking corroboration was not one of the lines of investigation counsel even considered." Id. at 29.  Ultimately, Jones argues that, to the extent the OCCA concluded that McKenzie's "failure to seek corroboration was . . . founded on an informed strategic decision," that determination "was founded on a 'clear factual error' and was therefore based on an unreasonable determination of the facts." Id. (quoting Wiggins v. Smith, 539 U.S. 510, 528 (2003)).

Relatedly, Jones argues that "[t]he OCCA did not evaluate [McKenzie]'s failure to seek corroboration of Littlejohn's claim under" the proper legal standard.  Id. at 30.  The proper standard, Jones asserts, "is whether the failure to investigate was 'reasonable' under prevailing professional norms." Id. (quoting Strickland, 466 U.S. at 690-91).  "And in a capital case" such as his, Jones asserts, "'[i]t is the duty of the lawyer to conduct prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.'" Id. (quoting Rompilla v. Beard, 545 U.S. 374, 387 (2005)).  Because the OCCA did not purport to apply this standard in analyzing his claim, Jones argues, this court must "review[] de novo whether counsel's failure to investigate Littlejohn's claim constituted deficient performance." Id. at 31.

*e) Jones's failure to present his arguments to the district court*

Respondent asserts, and an examination of the district court record confirms, that Jones failed to make these same arguments in the district court.

Jones alleged in his federal habeas petition that McKenzie "was ineffective in

failing to present available witnesses," Pet. at 9, and that "Jordan had confessed

to at least two persons," id. at 10.  In support of these general allegations, Jones

offered the following details:

> During the pendency of direct appeal, the defense obtained the
> affidavit of Emmanuel Littlejohn, an Oklahoma County jail inmate
> who shared, for a brief time, a cell with Christopher Jordan.
> Jordan told Mr. Littlejohn that Julius Jones did not commit the
> murder and was not present when the murder occurred.  Jordan also
> admitted to hiding the murder weapon in Julius Jones s [sic]
> residence.  Mr. Littlejohn s [sic] affidavit, which was submitted in
> connection with the direct appeal, is attached as Appendix 5.
> Mr. Littlejohn was not called as a witness at trial.
> During post-conviction proceedings, an affidavit was obtained
> from Christopher Berry, a person who also heard Mr. Jordan confess
> to being the person who fired the fatal shot.  Mr. Berry s [sic]
> affidavit is attached as Appendix 6.

Id. at 16-17.  But Jones's petition did not address, let alone challenge, the

OCCA's analysis of his ineffective assistance claim.  More specifically, Jones did

not argue, as he does now in this appeal, that the OCCA committed errors that

would allow a federal habeas court to review de novo his ineffective assistance

claim.

   We ordinarily do not consider issues raised for the first time on appeal.

Braswell v. Cincinnati Inc., 731 F.3d 1081, 1092 (10th Cir. 2013); see also Byrd

v. Workman, 645 F.3d 1159, 1167 n.8 (10th Cir. 2011) (rejecting a habeas

petitioner's argument for application of a de novo standard of review because

petitioner raised it for the first time in his appellate reply brief).  That is, we

typically treat as waived any issue that was not raised in the district court.

Braswell, 731 F.3d at 1092.  But this rule "is not inflexible and the matter of what

questions may be taken up and resolved for the first time on appeal is one left

primarily" to our discretion, "to be exercised on the facts of individual cases."

Id. (internal quotation marks omitted).

Because the waiver issue is not outcome-determinative in this case, we

shall exercise our discretion and address on the merits the arguments raised by

Jones on appeal.  In other words, regardless of whether Jones's arguments are

treated as waived or considered on the merits, he has failed to establish his

entitlement to federal habeas relief.

*f) Analysis of Jones's arguments*

Jones's arguments in this appeal rest on the assumption that the OCCA

resolved his ineffective assistance claim on the performance prong of the

Strickland test.  That assumption, however, is incorrect.  To be sure, the OCCA

did not expressly state which prong of the Strickland test it was analyzing in

rejecting Jones's argument that McKenzie erred in failing to present Berry's

testimony.  But, affording the OCCA's decision the deference it is due under

§ 2254(d), see generally Johnson v. Williams, 133 S.Ct. 1088, 1091 (2013), we

conclude, for two reasons, that the OCCA's decision rested on Strickland's

prejudice prong.  First, it is undisputed that McKenzie was unaware at the time of

trial that Berry had purportedly overheard Jordan confess to shooting Howell, and

there is no indication that the OCCA found otherwise.  Consequently, we are unwilling to read into the OCCA's analysis an implicit finding that McKenzie made a strategic decision not to speak with Berry and present Berry's testimony at trial.[3]  Second, the language actually employed by the OCCA in assessing Berry's proffered testimony makes clear that the OCCA focused on the likely effect of that testimony on Jones's jury.  More specifically, the OCCA concluded that Berry's proffered testimony would suffer from the same credibility problems as Littlejohn's testimony and that the proffered testimony would simply have supported what "was already clear to the jury," i.e., that "Jordan changed his story to suit his own needs."  Jones III at 11.  Without question, this analysis is far more consistent with Strickland's prejudice prong than its performance prong.

Our conclusion that the OCCA rested its analysis of Jones's ineffective assistance claim on Strickland's prejudice prong effectively disposes of the arguments asserted by Jones on appeal.  To begin with, it establishes that Jones is wrong in his assertion that the OCCA clearly erred in finding that McKenzie made an informed strategic decision not to speak with Berry and present Berry's testimony at trial.  Indeed, the OCCA made no such finding.  Likewise, it establishes that Jones is wrong in his assertion that the OCCA failed to apply the

---

[3] Although the OCCA did not address McKenzie's performance, we note that Jones does not offer any explanation in his appellate brief for why McKenzie, having reasonably concluded that Littlejohn lacked credibility, should nevertheless have proceeded to seek corroboration of Littlejohn's story.

proper legal standard in assessing McKenzie's performance.  The OCCA did not

conclude that McKenzie's failure to seek out Berry and call him as a witness was

a strategic decision, but rather that McKenzie's failure to call Berry as a witness

did not prejudice Jones.  Finally, Jones has not offered an alternative critique of

the OCCA's analysis, i.e., that the OCCA's prejudice analysis was contrary to, or

an unreasonable application of, Strickland.  Instead, his appellate arguments rest

entirely on the mistaken notion that we are obligated to review his ineffective

assistance claim de novo.

Even if we were to consider the OCCA's decision in light of the standards

outlined in § 2254(d)(1), we would conclude that the OCCA's prejudice analysis

was neither contrary to, nor an unreasonable application of, clearly established

federal law.  As we have noted, Strickland's prejudice prong focuses on whether

there is a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different.  In this case, the OCCA quite

clearly concluded that there was not a reasonable probability that the result of

Jones's trial would have been different had McKenzie conducted further

investigation, discovered Berry's testimony, and presented testimony from both

Littlejohn and Berry at trial.

In our view, this conclusion, which was based on two key flaws that the

OCCA found in Berry's testimony, was entirely reasonable.  To begin with, Jones

does not, and indeed cannot, seriously dispute the OCCA's determination that

Berry, as a convicted child abuse murderer, "suffer[ed] from the same credibility

problems that Littlejohn did." Jones III at 10.  In particular, Berry, like

Littlejohn, "had little to lose by perjuring himself with claims that were

impossible to corroborate." Jones I, 128 P.3d at 546.  Further, the OCCA

accurately determined that Berry's testimony would have been different from, and

thus would not have strengthened materially, Littlejohn's testimony.  In

particular, Berry purportedly overheard Jordan tell other inmates that Jones was

involved in the robbery of Howell's Suburban (but was not the shooter),[4] whereas

Jordan purportedly told Littlejohn that Jones was not involved at all in the

robbery.[5]  Thus, it was reasonable for the OCCA to conclude that the presentation

of testimony from Berry and Littlejohn would have established simply that

"Jordan changed his story to suit his own needs," and that, consequently, it was

not reasonably likely that the result of the trial would have been different.  Jones

III at 11.

Finally, our review of the evidence presented by the prosecution at Jones's

trial bolsters our conclusion regarding the reasonableness of the OCCA's decision

---

[4] Jones has not identified, let alone presented affidavits from, any of the inmates that Jordan purportedly spoke with directly.

[5] According to Berry, Jordan described Jones as his "partner."  Although Jones argues that this reference "likely signified nothing more than that the two men were charged together," Aplt. Br. at 39, the OCCA reasonably construed the reference as signifying that the two men acted together in stealing Howell's Suburban.

on <u>Strickland</u>'s prejudice prong.  As respondent correctly notes in her appellate

brief, "the evidence that [Jones] was the shooter went far beyond the testimony of

. . . Jordan."  Aplee. Br. at 34.  For example, Ladell King testified at trial that on

the evening of Howell's murder, he observed Jones driving a gold Suburban and

wearing clothing that matched the description of the shooter given to the police

by Megan Tobey.  King further testified that, the following day, after he and

Jones attempted unsuccessfully to sell the Suburban, Jones admitted that he killed

Howell during the course of stealing the Suburban.  The prosecution also

presented testimony from a police officer who assisted in the search of Jones's

residence and found the murder weapon wrapped in a red bandanna and hidden in

an attic access point located above Jones's bedroom.  Ballistic analysis of the

bullet that killed Howell confirmed that it was fired from this weapon.  Another

police officer who assisted in the search of Jones's residence testified that he

found a loaded magazine for the murder weapon hidden in a housing unit for the

residence's doorbell.  And an FBI materials examiner who worked on the case

testified that the bullets found in that magazine, the bullet that killed Howell,

another bullet recovered from the dashboard of Howell's Suburban, and bullets

found in a box of ammunition recovered from Jones's car were chemically the

same and thus, in her opinion, originated from the same source of lead at the

point of manufacture.  In sum, the evidence of Jones's involvement in Howell's

murder, even setting aside Jordan's testimony, was quite strong, if not

Appellate Case: 13-6141   Document: 01019351601   Date Filed: 12/05/2014   Page: 26

overwhelming.

 *g) Jones's request for an evidentiary hearing*

 Finally, Jones argues that, "[s]hould [we] conclude that the existing record does not warrant relief, [we] should remand to the district court for an evidentiary hearing."  Aplt. Br. at 45.  The Supreme Court, however, has clearly held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  <u>Cullen v. Pinholster</u>, 131 S.Ct. 1388, 1398 (2011).  Thus, only if we were to determine that the OCCA's decision was contrary to, or an unreasonable application of, clearly established federal law could we then remand the claim to the district court for a federal evidentiary hearing.  Because Jones has failed to establish that the OCCA's decision was contrary to, or an unreasonable application of, <u>Strickland</u>, he is not entitled to a federal evidentiary hearing on his ineffective assistance claim.

III

 The judgment of the district court is AFFIRMED.  Jones's motion to expand the COA is DENIED.