**PUBLISH**

FILED
United States Court of Appeals
Tenth Circuit

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

November 10, 2015

Elisabeth A. Shumaker
Clerk of Court

───────────────────────────────

JULIUS DARIUS JONES,

    Petitioner - Appellant,

v.

MAURICE WARRIOR, Interim Warden, Oklahoma State Penitentiary,[*]

    Respondent - Appellee.

No. 13-6141

───────────────────────────────

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 5:07-CV-01290-D)**

───────────────────────────────

Madeline S. Cohen, Assistant Federal Public Defender, Office of the Federal Public Defender, Denver, Colorado (Virginia L. Grady, Federal Public Defender, Denver, Colorado, and Mark Barrett, Barrett Law Office, Norman, Oklahoma, with her on the briefs), for Petitioner-Appellant.

Jennifer L. Crabb, Assistant Attorney General (E. Scott Pruitt, Attorney General of Oklahoma, with her on the brief) Office of the Attorney General for the State of Oklahoma, Oklahoma City, Oklahoma, for Respondent-Appellee.

───────────────────────────────

Before **MATHESON**, **BACHARACH**, and **MORITZ**, Circuit Judges.

───────────────────────────────

**MORITZ**, Circuit Judge.

───────────────────────────────

---

[*] Pursuant to Fed. R. App. 4(c)(2) Anita Trammell is replaced by Maurice Warrior, as Interim Warden of the Oklahoma State Penitentiary, effective October 28, 2015.

An Oklahoma jury convicted Julius Jones of felony murder and sentenced him to death for shooting and killing Paul Howell in the course of stealing Howell's Chevrolet Suburban. After the Oklahoma Court of Criminal Appeals (OCCA) rejected his direct appeal and application for post-conviction relief, Jones filed a federal habeas petition challenging his conviction and sentence on the basis of ineffective assistance of counsel. Specifically, he complained that his trial counsel made no effort to corroborate a lead that Christopher Jordan—Jones' co-defendant and the State's main witness at Jones' trial—admitted to shooting Howell and pinning the crime on Jones to avoid the death penalty. The district court denied Jones' petition and his request for a certificate of appealability (COA). We granted Jones a COA on this one ineffective-assistance-of-counsel issue. But because Jones fails to satisfy 28 U.S.C. § 2254(d), we cannot grant relief. Accordingly, we affirm.

## BACKGROUND

In late July 1999, on returning from an evening of shopping for school supplies and eating ice cream with his two young daughters and sister, Howell was shot and killed in his parents' driveway while getting out of his Chevrolet Suburban. Howell's sister, Megan Tobey, heard a gunshot as she exited the passenger side of the vehicle. She turned to face her brother and saw a young black male standing beside the vehicle's open driver's side door. Tobey watched as the man—who wore a white T-shirt, a red bandana over his face, and a black stocking cap on his head—demanded that Howell give him the keys to the Suburban. Tobey could see "about a half an inch to an inch" of the man's hair between his stocking cap and "where his

ear connect[ed] to his head." Trial Tr. Vol. 4, at 117:4-5, 16. But she didn't see braids or corn rows.

Tobey quickly pulled Howell's daughters out of the Suburban's back seat. As she ran with the children through her parents' carport she heard someone yelling at her to stop, followed by a second gunshot. Howell's parents ran outside and found their son lying in the driveway. His Suburban was gone. Howell died a few hours later from a single gunshot wound to the head.

Shortly after the shooting, Jordan arrived at Ladell King's apartment driving Jordan's 1972 Oldsmobile Cutlass. Jones arrived about 15 or 20 minutes later driving Howell's Suburban and wearing a white T-shirt, a red bandana, a stocking cap, and gloves. He warned King not to touch the Suburban and asked him to find someone to buy it. King's neighbor saw Jones and King checking out the Suburban that night.

The next day, Jones drove the Suburban from King's apartment to a convenience store parking lot on the south side of Oklahoma City near Kermit Lottie's auto body shop. King hoped to sell Lottie the Suburban, but Lottie refused to buy it. The convenience store's surveillance video from that day confirmed that both King and Jones briefly entered the convenience store. Oklahoma City detectives found the Suburban in the store's parking lot the next day.

Later that night—the night after the shooting—Jones and Jordan returned to see King, and Jones confessed to shooting Howell. Jones told King that as he walked up to Howell's Suburban, a young girl in the backseat waved at him, Howell's door opened, and the gun "went off." Trial Tr. Vol. 5 at 189-90.

3

When Oklahoma City police found Howell's Suburban they canvassed the area to determine who left it there. On a hunch, officers first visited Lottie's auto body shop, just four blocks from where officers found the vehicle. Lottie told detectives that King and at least one other person attempted to sell him Howell's stolen Suburban the day after the shooting. Because Lottie recognized the Suburban from news reports describing Howell's stolen vehicle, he refused to buy it. When police tracked down King later that day, he provided them with a phone number and address for Jones at Jones' parents' house.

Upon arriving at Jones' parents' house an officer called the phone number for Jones that King had provided, and Jones answered. The officer told Jones that the Oklahoma City Police Department had surrounded the house and wanted to talk to him about Howell's murder. Jones agreed to come out and talk, but instead left the house through a second-floor window, evaded officers attempting to secure the perimeter of the house, and fled.

Officers obtained warrants to search the house and arrest Jones. In Jones' bedroom, detectives discovered a white T-shirt with black trim and a black stocking cap—items that matched both Tobey's description of the shooter's clothing and King's description of Jones' clothing shortly after the shooting. Officers also found a chrome-plated Raven .25-caliber semiautomatic pistol wrapped in a red bandana and hidden in the attic space above the ceiling of the closet in Jones' room. And hidden behind the cover of the doorbell chime, officers discovered a loaded .25-caliber magazine belonging to the gun they had just found. The gun matched Jones'

girlfriend's description of one she saw in Jones' possession during the summer of 1999. Both the bullet found lodged in Howell's head and the bullet shot into the Suburban's dashboard matched the bullets and the gun found in Jones' bedroom. They also matched bullets found in Jones' car.

Two days after the shooting, officers arrested Jordan. After an extensive citywide search, officers found and arrested Jones the following morning. The State of Oklahoma charged Jones and Jordan with first-degree felony murder and conspiring to commit a felony. The State also charged Jones with being a felon in possession of a firearm.

*Trial—Guilt Phase*

Jordan pleaded guilty and agreed to testify against Jones at trial in exchange for a life sentence, all but the first 30 years of which was suspended. Jordan testified that on the day of the shooting, he and Jones went cruising around a suburb of Oklahoma City in Jordan's Oldsmobile Cutlass, looking for a Suburban to steal. Jordan drove, while Jones rode in the passenger seat. The two spotted Howell's Suburban in the drive-through of a local Braum's ice cream shop.

Michael Ray Peterson was in Braum's parking lot around the time Howell went through the drive-through. Peterson and his wife were seated on the curb in front of the store eating ice cream when Peterson noticed two black males in their early twenties circling the lot in an Oldsmobile Cutlass. The driver's hair was in corn rows and one of the two men wore a white T-shirt. The Cutlass eventually backed

5

into a parking space, where it sat with the motor running for a few minutes before leaving in a hurry.

Jordan testified that when Jones saw someone—perhaps Peterson—"looking [their] way," the two men left Braum's parking lot and waited at a stop light for Howell's Suburban to drive past them. Trial Tr. Vol. 8, at 161. When it did, Jordan—who was still driving—followed the Suburban to Howell's parents' neighborhood. At that point, the two men possessed a clear plan: Jones would take the Suburban at gunpoint.

When it appeared Howell was about to pull into a driveway, Jordan stopped his car and Jones got out carrying a gun and wearing a stocking cap, a bandana, and gloves. Jordan heard a gunshot and ran to where he could see Howell slumped on the ground. He then heard a second shot and saw Jones patting Howell as if looking for the Suburban's keys. Jordan watched as Jones got into the Suburban and backed it out of the driveway. The two men then left the scene—Jordan in his Cutlass, Jones in Howell's Suburban—and traveled to King's apartment.

Jones' defense at trial was that Jordan shot Howell, possibly with King as his accomplice, and that Jordan was blaming Jones to save his own life. The jury convicted Jones of all three counts.

*Trial—Punishment Phase*

For the crime of first-degree felony murder, the jury imposed the death penalty after finding two aggravating circumstances: (1) Jones knowingly created a great risk of death to more than one person; and (2) "there exist[ed] the probability that [Jones]

6

would commit criminal acts of violence that would constitute a continuing threat to society." *Jones v. State*, 128 P.3d 521, 532 (Okla. Crim. App. 2006). In support of the continuing-threat aggravator, the State presented evidence of Jones' involvement in several unadjudicated crimes, including attempting to elude a police officer, unauthorized use of a motor vehicle and possession of a firearm during the commission of a felony, armed robbery of a jewelry store, two armed carjackings in July 1999 at an Oklahoma City restaurant, and a physical altercation with a detention officer.

*Direct Appeal*

Jones appealed his convictions and death sentence to the OCCA. He asserted numerous claims of error, including that his trial counsel, David McKenzie, was ineffective for failing to call Emmanuel Littlejohn as a witness. Littlejohn was a "multiple felon and convicted murderer" who briefly shared a jail cell with Jordan while Littlejohn awaited resentencing in his own capital murder case. *Id.* at 546.

Before Jones' February 2002 trial, "Littlejohn told defense investigators that Jordan admitted he was falsely throwing blame on Jones, that Jordan said Jones was not involved in the Howell murder at all, and that Jordan had even gone so far as to hide the murder weapon and other incriminating evidence in the Joneses' home himself." *Id.* Littlejohn submitted to a polygraph test regarding these statements, but the results were inconclusive. After interviewing Littlejohn and speaking to Littlejohn's attorney about his credibility, McKenzie concluded Littlejohn was a

7

"pathological liar" who lacked credibility, and declined to call him as a witness. McPhail Aff., Direct Appeal Mot. to Supplement, at 3, ¶ 15.

Because "defense counsel actually did investigate Littlejohn's claim before trial," the OCCA found that Jones' argument pertained to "trial strategy which, as *Strickland* instructs, is much more difficult to attack." *Jones*, 128 P.3d at 546. Denying Jones' claim, the OCCA found "nothing unreasonable about counsel's decision to forgo Littlejohn's assistance." *Id.*

After rejecting all Jones' claims of error, the OCCA affirmed his convictions and death sentence. *Id.* at 552. The OCCA later granted Jones' motion for rehearing but denied his request to recall the mandate. *Jones v. State*, 132 P.3d 1, 3 (Okla. Crim. App. 2006). The United States Supreme Court denied Jones' petition for certiorari. *Jones v. Oklahoma*, 127 S. Ct. 404 (2006).

*State Post-Conviction Proceedings*

Jones next sought post-conviction relief from his convictions and death sentence in state court. As relevant here, Jones' application for post-conviction relief claimed McKenzie was ineffective for failing to investigate whether anyone could corroborate Littlejohn's assertion that Jordan had confessed to being the shooter. In particular, Jones focused on Christopher Berry, an inmate who at the time of Jones' trial was being held in the Oklahoma County Jail on a charge of "Child Abuse Murder"—a crime for which he eventually received a life sentence. Opinion Denying App. for Post-Conviction Relief & Related Motions, No. PCD-2002-630 (Okla. Crim. App. Nov. 5, 2007) (OCCA Post-Con. Op.) at 10. Because McKenzie also

8

represented Berry at the time of Jones' trial, Jones argued it was particularly unreasonable for McKenzie not to ask Berry if he had heard anything about Jones' case.

In support of his ineffective-assistance-of-counsel claim, Jones submitted affidavits from Littlejohn and Berry. Littlejohn's affidavit repeated what he told McKenzie before Jones' trial—that while he and Jordan were cellmates, Jordan told him, "Julius didn't do it" and "Julius wasn't there." Littlejohn Aff., Doc. 22-5, at 1, ¶ 9. According to Littlejohn, Jordan confessed "that [Jordan] had wrapped the gun used to commit the murder in his case in a bandana and hidden it in Julius Jones' house," and that Jordan "felt guilty because he was going to implicate his co-defendant, Julius Jones, in a murder case to avoid getting the death penalty." *Id.* at ¶¶ 7, 8.

Berry's affidavit said that Berry met Jordan while the two were housed at the Oklahoma County Jail, where they shared the same cell pod[1] for about two years. Berry said he overheard Jordan tell an inmate named "Smoke" that "[Jordan] was the actual person who shot the victim in his case," and that "because [Jordan] was the first to talk to the police, he was getting a deal and would not get the death penalty" while "his partner in the case was charged with capital murder." Berry Aff., Doc. 22-6, at 1, ¶ 5. According to Berry, Jordan liked to brag about shooting Howell. Berry admitted that he "didn't tell [his] attorney, David McKenzie," about this, but stated

---

[1] A cell pod "is an inmate housing area divided into manageable size units typically with single occupancy cells clustered around a common area and secure control booth." *Hill v. Curcione*, 657 F.3d 116, 118 n.1 (2d Cir. 2011).

9

that he "did try to talk to him about it," and "Mr. McKenzie didn't seem interested in it." *Id.* at 2, ¶ 7.

The OCCA rejected Jones' claim of ineffective assistance of counsel because "Berry suffer[ed] from the same credibility problems that Littlejohn did"; his statement did not "necessarily 'corroborate[]' Littlejohn's"; and the "inmates' claims show[ed] only one thing: that Christopher Jordan changed his story to suit his own needs," which "was already clear to the jury, through [McKenzie's] extensive cross-examination of Jordan." OCCA Post-Con. Op. at 10-11.

*Federal Habeas Proceedings*

Seeking federal habeas relief from his convictions and death sentence, Jones asserted eight grounds for relief, including that McKenzie was ineffective for not attempting to corroborate Littlejohn's statement, and for not investigating Berry in particular. The district court rejected all eight grounds for habeas relief, and denied Jones' request for a COA.

We granted Jones a COA on just one issue: whether Jones' trial counsel was ineffective for failing to investigate Littlejohn's claim that Jordan confessed to determine whether it could be corroborated. Our jurisdiction is therefore limited to this issue. *See* 28 U.S.C. § 1291; 28 U.S.C. § 2253(c)(1)(A); *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).

## DISCUSSION

Jones argues that McKenzie acted unreasonably in failing to attempt to corroborate Littlejohn's statement that Jordan confessed to shooting Howell. He also

10

contends McKenzie was ineffective for not investigating Berry directly because even though Berry "didn't tell" McKenzie that he overheard Jordan claiming to be the shooter, Berry "did try to talk to [McKenzie] about it." Berry Aff., Doc. 22-6, at 2, ¶ 7. Essentially, Jones argues that a reasonable attorney in McKenzie's shoes would have attempted to corroborate Littlejohn's statement and in the process of doing so, would have discovered that Berry could corroborate Littlejohn's account. Jones further postulates that a reasonable attorney, having discovered Berry, would have called him as a witness, and might have reconsidered calling Littlejohn as a witness, which would have changed the outcome of both the guilt and sentencing phases of his trial.

To establish ineffective assistance of counsel (IAC) under the Sixth and Fourteenth Amendments, a claimant must show two things: (1) deficient performance—that trial counsel's conduct was objectively unreasonable; and (2) resulting prejudice—"a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

But to obtain federal habeas relief from a state court decision rejecting an ineffective-assistance claim on the merits, a petitioner must first show that the state-court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). In determining

11

whether Jones is entitled to habeas relief, "'we review the district court's legal analysis of the state court decision de novo' and its factual findings, if any, for clear error." *Frost v. Pryor*, 749 F.3d 1212, 1223 (10th Cir. 2014) (quoting *Byrd v. Workman*, 645 F.3d 1159, 1165 (10th Cir. 2011)). Our review is limited to the record that was before the OCCA when it adjudicated his IAC claim. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

Jones contends the OCCA's rejection of his IAC claim satisfies § 2254(d) because the court's analysis of *Strickland*'s performance prong is both (1) contrary to clearly established law and (2) based upon an unreasonable determination of the facts.[2] But we're not entirely convinced the OCCA analyzed *Strickland*'s performance prong at all. Contrary to Jones' argument, we think it more likely the OCCA rejected Jones' IAC claim solely under *Strickland*'s prejudice prong. Nevertheless, even assuming Jones is correct that the OCCA based its decision on a

---

[2] The State contends Jones "waived" his contrary-to and unreasonable-determination-of-the-facts arguments because he didn't raise them below. Aplee. Br. 13, 17. While we ordinarily decline to address arguments not raised by a habeas petitioner in district court, *Jones v. Gibson*, 206 F.3d 946, 958 (10th Cir. 2000), we have discretion to consider arguments a petitioner raises for the first time on appeal. *See United States v. Jarvis*, 499 F.3d 1196, 1201 (10th Cir. 2007). We exercise that discretion here. But we draw the line at Jones' opening brief. Thus, we decline to consider Jones' counsel's suggestion, made for the first time at oral argument, that we should treat Jones' contrary-to and unreasonable-determination-of-the-facts arguments as also raising a claim under § 2254(d)(1) that the OCCA unreasonably applied clearly established law. *See Williams v. Taylor*, 529 U.S. 362, 405 (2000) (noting that the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meaning"); *Hancock v. Trammell*, 798 F.3d 1002, 1016-17 (10th Cir. 2015) (petition for rehearing pending) (refusing to consider petitioner's "unreasonable application" argument when he raised it for first time at oral argument).

12

finding that trial counsel's performance was not deficient, we conclude Jones fails to demonstrate the OCCA's decision is either (1) contrary to clearly established law or (2) based on an unreasonable determination of the facts.

### I. Jones fails to demonstrate the OCCA's decision is contrary to clearly established Federal law.

A state-court decision is "contrary to" clearly established law if it (1) "applies a rule that contradicts the governing law set forth in [U.S. Supreme Court] cases" or (2) "confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [its] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Jones rests his contrary-to argument on the first prong of this definition. He argues that "a lawyer's failure to pursue a line of investigation calls for a very different analysis" than does "a lawyer's informed, strategic decision." Aplt. Br. 30. And he insists that rather than applying that "very different analysis" to his failure-to-investigate claim, the OCCA instead "applied the far more forgiving and deferential analysis that applies to counsel's informed strategic decisions." *Id.* at 30-31.

But a rule only "contradicts" governing law if it is "'diametrically different,' 'opposite in character or nature,' or 'mutually opposed'" to the Supreme Court's "clearly established precedent." *Williams*, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). The OCCA's articulation of *Strickland*'s performance prong doesn't fit this description.

In considering Jones' IAC claim, the OCCA correctly identified *Strickland* as the controlling legal authority. OCCA Post-Con. Op. at 2-3. And it explained that for Jones to prevail on the performance prong of his IAC claim, he had to show that "trial counsel failed to conduct a reasonably thorough investigation into witnesses potentially favorable to the defense." *Id.* at 11. This language—which focuses on the reasonableness of counsel's failure to investigate—is hardly diametrically different from the language the Court used in *Strickland*. There, the Court explained that "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 690-91. In fact, the OCCA's language doesn't even contradict Jones' own articulation of the relevant test. *See* Aplt. Br. 30 (stating that the "overarching question is whether the failure to investigate was 'reasonable' under prevailing professional norms").

The OCCA analyzed Jones' claim as follows:

> [Jones] claims trial counsel was ineffective for failing to investigate and present two witnesses at trial . . . . Specifically, [he] claims the testimony of Christopher Berry [and a longtime acquaintance of Jones'] could have made a difference in the outcome of the trial. At the time of [Jones'] trial, Berry was being held in the Oklahoma County Jail on a charge of Child Abuse Murder. He was later convicted of that charge and sentenced to life in prison without possibility of parole. Berry claims, by affidavit, that he overheard [Jones'] co-defendant, Christopher Jordan, boasting that he, not [Jones], was the triggerman in the homicide with which they were jointly charged.
>
> [Jones] made a similar claim on direct appeal alleging trial counsel was ineffective for not presenting the testimony of another jail inmate, Emmanuel Littlejohn, who also allegedly heard Jordan boast

14

about being the triggerman. We rejected that claim, because the inmate's credibility was suspect and the details of the account were specious. Berry suffers from the same credibility problems that Littlejohn did. Nor do we agree with [Jones'] argument that Berry's claim necessarily 'corroborates' Littlejohn's. Berry's affidavit suggests that Jordan admitted [Jones] was involved in the murder, while according to Littlejohn, Jordan denied that [Jones] had any involvement. Taken together, these inmates' claims show only one thing: that Christopher Jordan changed his story to suit his own needs. Yet this much was already clear to the jury, through trial counsel's extensive cross-examination of Jordan, who testified against [Jones] at trial.

OCCA Post-Con Op. at 10-11 (citations omitted).

In arguing this decision is contrary to clearly established law, Jones focuses solely on the OCCA's statement characterizing his post-conviction failure-to-investigate claim as "similar" to his direct-appeal failure-to-call claim. *Id.* at 10. He points out that on direct appeal the OCCA rejected his failure-to-call claim by noting that McKenzie "investigate[d] Littlejohn's claim before trial," which "reduce[d] Jones's argument to one over trial strategy," and made the decision "much more difficult to attack." *Jones*, 128 P.3d at 546, ¶ 82. According to Jones, the OCCA erred in treating counsel's failure to investigate as similarly "difficult to attack," *id.*, and as "'virtually unchallengeable,'" Aplt. Br. 28 (quoting *Strickland*, 466 U.S. at 690).

Despite characterizing the two claims as "similar," the OCCA demonstrated it understood the difference between them. It correctly described Jones' post-conviction claim as addressing whether "trial counsel was ineffective for failing to *investigate* and present two witnesses at trial." OCCA Post-Con. Op. at 10 (emphasis added). And it accurately restated Jones' direct-appeal claim as "alleging trial counsel was

15

ineffective for not presenting the testimony of another jail inmate." *Id.* Moreover, in rejecting his post-conviction IAC claim, the OCCA made no mention of the more deferential "virtually unchallengeable" standard Jones claims it applied. Instead, as discussed above, the OCCA correctly framed the relevant inquiry as whether "trial counsel failed to conduct a reasonably thorough investigation into witnesses potentially favorable to the defense." *Id.* at 11.

Assuming the OCCA applied *Strickland*'s performance prong at all, we see no reason to conclude it applied a test other than the correct one that it expressly stated. Thus, Jones fails to demonstrate the OCCA's rejection of his IAC claim is contrary to clearly established law.

## II. Jones fails to demonstrate the OCCA's decision is based on an unreasonable determination of the facts.

For similar reasons, we reject Jones' suggestion that the OCCA "implicit[ly]" found McKenzie made an informed strategic decision not to attempt to corroborate Littlejohn's account. Aplt. Br. 29.

Jones relies on the OCCA's statements that "Berry suffer[ed] from the same credibility problems that Littlejohn did," and that Berry's statement did not "necessarily 'corroborate[]' Littlejohn's" as support for this suggestion. OCCA Post-Con. Op. at 10. But as even Jones concedes, it's "not entirely clear from [the OCCA's] opinion" that the OCCA made a factual finding that McKenzie made a strategic decision not to interview Berry about Jordan. Aplt. Br. 29. Instead, we think the OCCA's statements about Berry's lack of credibility and the inconsistencies

16

between Berry's statement and Littlejohn's go to the OCCA's determination that McKenzie's failure to discover and call Berry as a witness did not undermine the outcome of Jones' trial. *See Wong v. Belmontes*, 558 U.S. 15, 19-20 (2009) (explaining that to show prejudice based on failure to investigate, defendant must establish reasonable probability that competent attorney aware of available evidence would have introduced the evidence and jury would have returned different verdict as a result).

Because we're not convinced the OCCA made the implicit factual finding Jones argues is unreasonable, we decline to conclude the OCCA "'plainly misapprehend[ed] or misstate[d] the record'" in addressing Jones' claim that McKenzie was ineffective for not seeking to corroborate Littlejohn's statement. *Byrd v. Workman*, 645 F.3d 1159, 1171-72 (10th Cir. 2011) (quoting *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004)). Thus, Jones has not satisfied the "'daunting standard'" for showing that the OCCA based its decision on an unreasonable determination of the facts. *Id.* at 1172 (quoting *Taylor*, 366 F.3d at 1000).

## CONCLUSION

Jones' failure to establish the OCCA's decision was contrary to clearly established law or based on an unreasonable determination of the facts prevents us from granting relief. *See Hancock v. Trammell*, 798 F.3d 1002, 1010 (10th Cir. 2015) (explaining habeas courts can't grant relief "'with respect to any claim that was adjudicated on the merits in State court'" unless state court's adjudication satisfies § 2254(d)). So we need not address whether, if we applied de novo review, we would

17

conclude McKenzie's failure to investigate Berry resulted in prejudice. *See id.* at 1006, 1024 (concluding court couldn't reach merits of petitioner's IAC claim because petitioner failed to demonstrate state court unreasonably applied *Strickland*). We therefore affirm the district court's denial of habeas relief on Jones' claim that trial counsel provided ineffective assistance of counsel by failing to investigate and develop corroboration for Littlejohn's statement.

We also deny Jones' motion to expand the COA to include several additional claims of ineffective assistance of counsel and a prosecutorial misconduct claim. After reviewing the motion, we conclude that reasonable jurists would not find the district court's decision on these issues debatable or wrong. *See Miller-El*, 537 U.S. at 335-36. Finally, because Jones fails to satisfy § 2254(d), we deny his request for an evidentiary hearing. *See Pinholster*, 131 S. Ct. at 1401.