# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT
## OFFICE OF THE CLERK
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

Elisabeth A. Shumaker                                                          Chris Wolpert
Clerk of Court                           January 12, 2017                 Chief Deputy Clerk


Mr. Dale A. Baich
Ms. Amanda C. Bass
Office of the Federal Public Defender for the District of Arizona
850 West Adams Street
Suite 201
Phoenix, AZ 85007


**RE:**      **17-6008, In re: Jones**
             Dist/Ag docket: 5:07-CV-01290-D


Dear Counsel:

The court has docketed your Motion for Permission to file a second or successive habeas
petition under 28 U.S.C. 2254. Please note the case number above. You will be notified
as soon as the court takes action on this matter.

Please contact this office if you have questions.


                                   Sincerely,

                                   *Elisabeth A. Shumaker*

                                   Elisabeth A. Shumaker
                                   Clerk of the Court


cc:      Jennifer L. Crabb



EAS/pj

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

| | |
|---|---|
| JULIUS DARIUS JONES<br><br>       Petitioner-Appellant<br><br>v.<br><br><br>TERRY ROYAL, Warden,<br>Oklahoma State Penitentiary,<br><br>       Respondent-Appellee. | CASE NO. 13-6141<br>Western District of Oklahoma<br>D.C. No. 5:07-cv-01290-D<br><br><br><br>**DEATH PENALTY CASE** |

## MOTION FOR AUTHORIZATION TO FILE A SECOND OR SUCCESSIVE PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2244(B)(2)(A)

Jon M. Sands
Office of the Federal Public Defender
District of Arizona
Dale A. Baich (Ohio Bar No. 0025070)
Assistant Federal Public Defender
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
602.382.2816 (telephone)
602.889.3690 (facsimile)
dale_baich@fd.org

Counsel for Petitioner-Appellant

January 11, 2017

Julius Darius Jones, through counsel, moves this Court pursuant to 28 U.S.C. § 2244(b)(2)(A) for authorization to file a Second or Successive Petition for Writ of Habeas Corpus.  The Anti-Terrorism and Effective Death Penalty Act (AEDPA) permits review of a claim in a second-or-successive habeas corpus petition where "the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. § 2244(b)(2)(A).  In *Hurst v Florida*, 136 S. Ct. 616 (2016), the Supreme Court announced, for the first time, that the weighing decision underlying a sentence of death, must be found by a jury beyond a reasonable doubt.  *See id.* at 621-22 (holding that the Sixth Amendment requires each element to be proven beyond a reasonable doubt and that the weighing of aggravating and mitigating factors is such a fact). Because Mr. Jones's jury was not properly instructed on the burden of proof as to his death sentence, he is now entitled to seek relief that was previously unavailable.  The *Hurst* decision creates a new and retroactive rule of constitutional law and provides grounds for Mr. Jones's request to file a second-or-successive petition pursuant to § 2244(b)(2)(A).

As required by § 2244(b)(2)(A), *Hurst* is a new rule of constitutional law. "[A] case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." *Teague v. Lane*, 489 U.S. 288, 301 (1989). In addition, "there can be no dispute that a decision announces a

1

new rule if it expressly overrules a prior decision." *Graham v. Collins*, 506 U.S. 461, 467 (1993). *Hurst* explicitly overruled previously well-settled Supreme Court precedent, *Hildwin v. Florida*, 490 U.S. 638 (1989) and *Spaziano v. Florida*, 468 U.S. 447 (1984). *Hurst*, 136 S. Ct. at 623-24. At the time Mr. Jones's sentence became final, *Hildwin* and *Spaziano* were well-settled Supreme Court precedent and foreclosed the relief recognized in *Hurst*.

*Hurst* also warrants retroactive application. "Under *Teague*, as a general matter, 'new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced.'" *Welch v. United States*, 136 S. Ct. 1257, 1264 (2016) (quoting *Teague*, 489 U.S. at 310). There are two exceptions, however, to *Teague*'s general rule. *Id.* "First, 'new substantive rules generally apply retroactively.'" *Id.* (brackets omitted) (quoting *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004). "Second, new watershed rules of criminal procedure, which are procedural rules implicating the fundamental fairness and accuracy of the criminal proceeding, will also have retroactive effect." *Id.* (internal quotation marks omitted).

*Hurst* implicates the standard of proof—proof beyond a reasonable doubt— by which the weighing finding must be made. 136 S. Ct. at 621-22. The "beyond a reasonable doubt" standard is "indispensable," *Ivan V. v. City of New York*, 407 U.S. 203, 204-05 (1972) (per curiam), and "reflects a profound judgment" about

the justice system, *Apprendi*, 530 U.S. at 478 (brackets omitted). Indeed, as rules about the standard of proof lessen the "risk that a defendant . . . faces a punishment that the law cannot impose upon him," they are substantive in nature. *Summerlin*, 542 U.S. at 351-52; *cf. In re Winship*, 397 U.S. 358, 363 (1970).

As a result, the Supreme Court has concluded that cases applying the beyond-a-reasonable-doubt standard are entitled to retroactive effect. *See Hankerson v. North Carolina*, 432 U.S. 233, 241-42 (1977) (making retroactive the requirement that the prosecution prove beyond a reasonable doubt each element of a crime); *Ivan V.*, 407 U.S. at 203-04 (making retroactive the application of that standard of proof to juvenile adjudications). Because *Hurst* extends the beyond-a-reasonable-doubt standard, it too is substantive and retroactive. *See Guardado*, 2016 WL 3039840, at *2 (distinguishing *Ring*'s retroactivity analysis from *Hurst*'s and deeming it "reasonabl[e]" to argue that *Hurst* is retroactive).

If a new rule is substantive in nature, the Supreme Court does not have to explicitly declare it to be retroactive because the general rule is that substantive rules should be given retroactive effect. *See Price v. United States*, 795 F.3d 731, 734 (allowing successive petition to be filed based upon the holding in *Johnson v. United States*, 135 S. Ct. 2551 (2015), because *Johnson* was substantive in nature, even though the Supreme Court had not explicitly declared  it retroactive in the opinion).  Because *Hurst's* rule regarding the beyond a reasonable doubt standard

is a substantive new rule, Mr. Jones should be allowed to file a successive federal petition.

Even if it is deemed procedural and not substantive, *Hurst*'s beyond-a-reasonable-doubt holding would constitute a "watershed" procedural rule under *Teague. See Powell*, --- A.3d ----, 2016 WL 7243546, at *4 (deeming *Rauf*, the state-court decision based on *Hurst*, "a new watershed procedural rule"). *Hurst* "implicate[s] the fundamental fairness and accuracy," *Welch*, 136 S. Ct. at 1264, of sentencing because it mandates a capital jury's use of the beyond-a-reasonable-doubt standard in weighing aggravation against mitigation evidence, which "is a prime instrument for reducing the risk of convictions resting on factual error." *Ivan V.*, 407 U.S. at 203. *Hurst*, if deemed procedural, would therefore constitute a watershed new rule and would be retroactive.

Because this claim is based on *Hurst*, a new, constitutional rule, it meets the requirements of § 2244(b)(2)(A). Mr. Jones therefore meets the criteria to return to federal district court present this claim in a second-or-successive petition. This Court should therefore grant Mr. Jones authorization to pursue a second-or-successive petition. *See Ochoa v. Sirmons*, 485 F.3d 538, 545-46 (10th Cir. 2007) (declining to undertake a merits determination of the underlying claim and granting "authorization to pursue a second or successive habeas petition" solely "[b]ased on satisfaction of the conditions specified in § 2244(b)(2)(A)").

Respectfully submitted this 11th day of January, 2017.

JON M. SANDS
Federal Public Defender

*By s/ Dale A. Baich*
Dale A. Baich (Ohio Bar No. 0025070)
Assistant Federal Public Defender
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
602.382.2816 (telephone)
602.889.3960 (facsimile)
dale_baich@fd.org

Counsel for Appellant-Petitioner

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
## AND TYPEFACE REQUIREMENTS

This document complies with the word limit of Fed. R. App. P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 1,356 words.

Also, this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced, 14-point serif typeface (Times New Roman).

*s/ Dale A. Baich*
Dale A. Baich
Assistant Federal Public Defender

Counsel for Petitioner-Appellant

## CERTIFICATION OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing: (1) all required privacy redactions have been made per 10th Cir. R. 25.5; (2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents; (3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Symantec[TM] Endpoint Protection Version 12.1.6 (12.1 RU6 MP5) build 7004 (12.1.7004.6500), last updated January 11, 2017, and according to the program are free of viruses.

*s/ Dale A. Baich*
Dale A. Baich
Assistant Federal Public Defender

Counsel for Petitioner-Appellant

## CERTIFICATE OF SERVICE

I hereby certify that on January 11, 2017, I electronically filed the foregoing using the Court's CM/ECF System for filing which will send notification of such filing to the following registrant:

Jennifer Crabb Assistant Attorney General  jennifer.crabb@oag.ok.us

_s/ Kelcey J. Lerner_
Kelcey J. Lerner

Assistant Paralegal
Capital Habeas Unit

# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

JULIUS DARIUS JONES

    Petitioner-Appellant

 v.

TERRY ROYAL, Warden,
Oklahoma State Penitentiary,

    Respondent-Appellee.

|  |
|---|

CASE. No. 5:07-cv-01290-D

**<u>DEATH PENALTY CASE</u>**

---

## [PROPOSED] SECOND PETITION FOR
## A WRIT OF HABEAS UNDER 28 U.S.C. § 2254

---

Jon M. Sands
Office of the Federal Public Defender
District of Arizona
Dale A. Baich (Ohio Bar No. 0025070)
Assistant Federal Public Defender
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
602.382.2816 (telephone)
602.889.3690 (facsimile)
dale_baich@fd.org

Counsel for Petitioner-Appellant

January 11, 2017

Appellate Case: 17-6008   Document: 01019749416   Date Filed: 01/12/2017   Page: 11

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ..................................................................................1

**PROCEDURAL HISTORY** ............................................................................2

A.    State Conviction ..................................................................................2

B.    Direct Appeal ......................................................................................2

C.    Application for Post-Conviction Relief ...........................................2

D.    First Federal Habeas Petition ...........................................................3

E.    Appeal to the Tenth Circuit Court of Appeals ..................................3

F.    Petition for Writ of Certiorari .........................................................3

**PRELIMINARY STATEMENT** ....................................................................4

**GROUND FOR RELIEF** ................................................................................5

**Mr. Jones's Fifth, Sixth, Eighth and Fourteenth Amendment Rights were violated when the trial court failed to instruct jurors during the penalty phase that they must find that aggravating circumstances outweigh mitigating circumstances *beyond a reasonable doubt* in order to return a death-verdict....5**

I.    *Hurst* renders Oklahoma's capital sentencing statute and Mr. Jones's sentence of death unconstitutional. ......................................................5

II.    *Hurst* is a retroactive change in the law that entitles Mr. Jones to sentencing relief. ...............................................................................10

III.    The error in Mr. Jones's capital sentencing was structural and not subject to harmless error review........................................................13

REQUEST FOR RELIEF ..................................................................................14

12 of 215

Appellate Case: 17-6008   Document: 01019749416   Date Filed: 01/12/2017   Page: 12

# PROCEDURAL HISTORY

### A.    State Conviction

Court:        District Court of Oklahoma County, State of Oklahoma
Case No:      CF-99-4373
Charge:       Count I First Degree Murder, Count II Possession of a Firearm,
              Count III Conspiracy to Commit a Felony
Date of
Offense:      07-28-1999
Plea:         Not guilty    Trial: By jury      Verdict: Guilty      Defendant did not
              testify
Trial:        Jury trial 02-11-2002 through 03-04-2002
Sentence:     Sentenced 04-19-2002 (death by lethal injection)
Judge:        District Judge Jerry D. Bass
Counsel:      David McKenzie, Malcolm Savage & Robin McPhail (Okla. Co.
              Public Defenders), 320 Robert S. Kerr Ave. #611, Oklahoma City,
              OK 73102

### B.    Direct Appeal

Court:        Court of Criminal Appeals of the State of Oklahoma
Case No:      D 2002-0534
Opinion:      Jones v. State, 128 P. 3d 521 (Okla. Crim. 2006)
Result:       Judgement and sentence affirmed January 27, 2006
Certiorari:   Denied: *Jones v. Oklahoma,* 127 S. Ct. 404 (2006)
Counsel:      Wendell Sutton, Carolyn Merritt 320 Robert S. Kerr Ave. #611,
              Oklahoma City, OK 73102

### C.    Application for Post-Conviction Relief

Court:        Oklahoma Court of Criminal Appeals
Case No:      PCD-2002-630
Opinion:      Denied: Jones v. State. Case No. PCD-2002-630 (Okla. Crim. App.
              November 5, 2007)
Counsel:      Laura Arledge, OIDS, 1660 Cross Center Drive, Norman, OK 73019

### D.   First Federal Habeas Petition

Court:       United States District Court for the Western District of Oklahoma
Case No:     CIV-07-1290-D
Opinion:     *Jones v. Trammell*, No. CIV-07-1290-D, 2013, 2013 WL 2257106
             (W.D. Okla. May 22, 2013)
Result:      Petition Denied
Counsel:     Madeline Cohen 633 17th St. Suite 1000, Denver CO 80202, Mark
             Barrett 111 North Peters Ave. Suite 200, Norman, OK 73069

### E.   Appeal to the Tenth Circuit Court of Appeals

Court:       United States Court of Appeals for the Tenth Circuit
Case No:     13-6141
Opinions:    *Jones v. Trammell*, 773 F.3d 68 (10th Cir. 2014), *rehearing granted*
             *and judgment vacated by Jones v. Trammell*, 777 F.3d 1099 (10th Cir.
             2015), *and Jones v. Warrior*, 805 F.3d 1213 (10th Cir. 2015).
Result:      Denial of Petition Affirmed
Counsel:     Madeline S. Cohen, 633 17th St. Suite 1000, Denver CO 80202, Mark
             Barrett 111 North Peters Ave. Suite 200, Norman, OK 73069

### F.   Petition for Writ of Certiorari

Court:       United States Supreme Court
Case No:     15-9624
Result:      Certiorari Denied
Counsel:     Madeline Cohen 633 17th St. Suite 1000, Denver CO 80202, Mark
             Barrett 111 North Peters Ave. Suite 200, Norman, OK 73069

Appellate Case: 17-6008   Document: 01019749416   Date Filed: 01/12/2017   Page: 14

## PRELIMINARY STATEMENT

Petitioner Julius Darius Jones is incarcerated in the Oklahoma State Penitentiary, P.O. Box 97, 1301 N. West Street, McAlester, Oklahoma 74502. Mr. Jones is incarcerated pursuant to a judgment and sentence issued in Oklahoma County District Court Case No. CF-1999-4373. Petitioner is under a sentence of death in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. As a result, Mr. Jones is entitled to have a writ of habeas corpus issue on his behalf. This is Mr. Jones's second petition for a writ of habeas corpus relief pursuant to 28 U.S.C. § 2254. *See also* 28 U.S.C. § 2244(b)(2)(A) (authorizing a petitioner to file a second or successive federal habeas petition based upon a new and retroactive rule of constitutional law).

Petitioner was convicted of one count of first degree murder (Okla. Stat. tit. 21, § 701.7(B) (Supp. 1998)) for the death of Paul Howell. (OR. 1505.) Petitioner was also convicted of one count of possession of a firearm after former conviction of a felony (Okla. Stat. tit. 21, § 1283 (Supp. 1998)) and one count of conspiracy to commit a felony (Okla. Stat. tit. 21, § 421 (Supp. 1999)). (*Id.*) The jury found two aggravating circumstances in connection with the murder conviction: (1) Petitioner knowingly presented a great risk of death to more than one person; and (2) Petitioner poses a continuing threat to society. Petitioner was sentenced to death for the murder conviction, fifteen years imprisonment for possession of a firearm

after former conviction of a felony and twenty-five years imprisonment for conspiracy. (*Id.*)

## GROUND FOR RELIEF

**Mr. Jones's Fifth, Sixth, Eighth and Fourteenth Amendment Rights were violated when the trial court failed to instruct jurors during the penalty phase that they must find that aggravating circumstances outweigh mitigating circumstances *beyond a reasonable doubt* in order to return a death-verdict.**

### I. *Hurst* renders Oklahoma's capital sentencing statute and Mr. Jones's sentence of death unconstitutional.

At the time of Mr. Jones's capital sentencing, Oklahoma's capital sentencing statute did not require jurors to find that aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt before imposing a sentence of death. *See* Okla. Stat. Ann. tit. 21, § 701.11. Significantly, Mr. Jones's jurors were not instructed that they must find, beyond a reasonable doubt, that aggravating circumstances outweigh mitigating circumstances before sentencing him to death. (*See* TR 03/01/02 at 3-14; *see also* TR 03/04/02 at 131.)

However on January 12, 2016, the United States Supreme Court issued its decision in *Hurst v. Florida*, 136 S. Ct. 616 (2016), which held that the failure to require a jury to determine the relative weight of aggravating and mitigating factors beyond a reasonable doubt violates the Sixth Amendment right to a jury trial. The Court reiterated the Sixth Amendment's basic requirement that "any fact that 'expose[s] the defendant to a greater punishment than that authorized by the

jury's guilty verdict' is an 'element' that must be submitted to a jury." *Hurst*, 136 S. Ct. at 621 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494 (2000)). The *Hurst* Court emphasized that under *Ring v. Arizona*, 536 U.S. 584 (2002), this principle applies with equal force to death penalty sentencing statutes:  "The Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death."  *Id.* at 619.  The Court also recognized that under *Alleyne v. United States*, 133 S. Ct. 2151, 2156 (2013), a defendant's Sixth Amendment right, "in conjunction with the Due Process Clause, requires that each element of a crime be proved to a jury beyond a reasonable doubt." *Hurst*, 136 S. Ct. at 621. The jury's mere involvement in capital sentencing does not, by itself, satisfy the Sixth Amendment. Rather, a jury "finding" only meets constitutional muster if it is made unanimously, based on proof beyond a reasonable doubt.  *See Apprendi*, 530 U.S. at 498 (Scalia, J., concurring) (stating that charges against the accused, and the corresponding maximum exposure he faces, must be determined "*beyond a reasonable doubt by the unanimous vote of 12 of his fellow citizens*" (emphasis in original)).

Critically, *Hurst* clarified that it is not enough that a jury find the existence of at least one aggravating factor beyond a reasonable doubt; a determination regarding the relative weight of the aggravating and mitigating circumstances is also a factual finding necessary to a defendant's eligibility for a sentence of

death.  136 S. Ct. at 622; *see also Rauf v. State*, 145 A.3d 430 (Del. 2016) (per curiam) (striking down Delaware's capital sentencing scheme on the basis of *Hurst* and determining that the Sixth Amendment requires a jury to find, beyond a reasonable doubt, each aggravating circumstance and that aggravation outweighs mitigation in order to impose a death sentence); *Hurst v. State*, 202 So. 3d 40, 57 (Fla. 2016) (finding that *Hurst* "mandates that all the findings necessary for the imposition of a death sentence are 'elements' that must be found by a jury" and holding that "before the trial judge may consider imposing a sentence of death, the jury in a capital case must unanimously and expressly find all the aggravating factors that were proven beyond a reasonable doubt . . . [and] unanimously find that the aggravating factors outweigh the mitigating circumstances"). *Hurst* built on *Ring* and *Apprendi* by making clear for the first time that the jury's weighing of aggravating versus mitigating circumstances is a finding that must be made beyond a reasonable doubt. 136 S. Ct. at 621-22.

The Supreme Court recognized that its holding in *Hurst* required it to overrule previous decisions holding that the Sixth Amendment did not require specific findings authorizing imposition of the death penalty to be made by a jury, *id.* at 623-24 (discussing *Hildwin v. Florida*, 490 U.S. 638, 640-41 (1989), and *Spaziano v. Florida*, 468 U.S. 447 (1984)), but noted that "in the *Apprendi* context, we have found that '*stare decisis* does not compel adherence to a

decision whose "underpinnings" have been "eroded" by subsequent developments of constitutional law.'" *Id.* at 623-24. The State of Florida had argued that the weighing process fell outside the ambit of *Ring* and *Apprendi*, as the defendant was death-eligible after the jury implicitly found at least one aggravating circumstance. *Id.* at 622. In rejecting this contention, *Hurst* held that the weighing decision had to be made by a jury, beyond a reasonable doubt. *Id.*

The Delaware Supreme Court agreed that *Hurst* required that capital sentencing jurors find unanimously, beyond a reasonable doubt, that aggravating circumstances outweighed mitigating circumstances before returning a death verdict. That court ruled that following *Hurst*, Delaware's capital sentencing statute was unconstitutional because jurors were not required to make the weighing finding beyond a reasonable doubt. *See Rauf*, 145 A.3d at 433-34. Likewise, the Florida Supreme Court has concluded that under *Hurst*, "the weighing of the aggravating circumstances against the mitigating circumstances [i]s [an] element[ ] of the crime that need[s] to be found by a jury to the same extent as other elements of the crime." *Asay v. State*, Nos. SC16-223, -102, -628, 2016 WL 7406538, at *8 (Fla. Dec. 22, 2016) (per curiam); *see also Hurst*, 202 So. at 57 (writing that *Hurst* "mandates that all the findings necessary for the imposition of a death sentence are 'elements' that must be found by a jury" and holding that "before a trial judge may consider imposing a sentence of death, the

jury in a capital case must unanimously and expressly find all the aggravating factors that were proven beyond a reasonable doubt … [and] unanimously find that the aggravating factors outweigh the mitigating circumstances").

Following *Hurst*, then, it is now clear that the weighing of aggravating and mitigating circumstances is a finding that must be made beyond a reasonable doubt by a jury before the sentence of death can be constitutionally imposed. *See* 136 S. Ct. at 622. Yet, Oklahoma's capital sentencing statute, much like Florida's unconstitutional capital sentencing scheme, did not require that Mr. Jones's jury make this finding beyond a reasonable doubt. *See* Okla. Stat. Ann. tit. 21, § 701.11. In light of *Hurst*, Oklahoma's standardless weighing jury instruction renders Mr. Jones's death sentence unconstitutional.

This claim was raised and preserved in Oklahoma state court on direct appeal. (DA, Appellant's Br. at 90-91, Mar. 8, 2004.) ("[T]he failure to instruct the jury that its determination that aggravation outweighs mitigation must be beyond a reasonable doubt violated the Sixth, Eighth, and Fourteenth Amendments" (citing *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000).) The state court denied the claim, ruling the instruction was constitutional. *Jones v. State*, 128 P.3d 521, 551 (Okla. Crim. App. 2006). The state court's denial of this claim was contrary to, or involved an

unreasonable application of, federal law, or involved an unreasonable determination of the facts. 28 U.S.C. § 2254.

## II.    *Hurst* is a retroactive change in the law that entitles Mr. Jones to sentencing relief.

*Hurst* is a new and substantive rule of constitutional law that is retroactive pursuant to *Teague v. Lane*, 489 U.S. 288 (1989). Under *Teague*, "a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at 301. Furthermore, "[u]nder *Teague*, as a general matter, 'new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced.'" *Welch v. United States*, 136 S. Ct. 1257, 1264 (2016) (quoting *Teague*, 489 U.S. at 310). There are two exceptions, however, to *Teague*'s general rule. *Id.* "First, new *substantive* rules generally apply retroactively." *Id.* (brackets omitted) (quoting *Schriro v. Summerlin*, 542 U.S. 348 351 (2004)). "Second, new watershed rules of criminal procedure, which are procedural rules implicating the fundamental fairness and accuracy of the criminal proceding, will also have retroactive effect." *Id.* (internal quotation marks omitted.)

*Hurst* announces a new rule because its results were not dictated by precedent in existence at the time that Mr. Jones's conviction became final. In fact, *Hurst* specifically overruled previously well-settled Supreme Court precedent, *Spaziano v. Florida*, 468 U.S. 447, 469 (1984), and *Hildwin v. Florida*, 490 U.S.

638 (1989) (per curiam). *Hurst*, 136 S. Ct. at 623-24 ("Time and subsequent cases have washed away the logic of *Spaziano* and *Hildwin*.") Furthermore, while *Summerlin*, 542 U.S. at 358, held that one of *Hurst*'s antecedents, *Ring*, was not retroactive, *Ring* concerned only *which* entity—a judge or a jury—could make the findings that rendered a defendant death-eligible. *Ring*, 536 U.S. at 588-89. Beyond the jury-trial right, *Hurst* goes further than *Ring* and implicates the standard of proof by which the jury's weighing finding must be made. *Hurst*, 136 S. Ct. at 621-22.

In addition to being new, *Hurst* is also substantive because it implicates the standard of proof—proof beyond a reasonable doubt—by which the weighing finding must be made. 136 S. Ct. at 621-22. The "beyond a reasonable doubt" standard is "indispensable," *Ivan V. v. City of New York*, 407 U.S. 203, 204-05 (1972) (per curiam), and "reflects a profound judgment" about the justice system, *Apprendi*, 530 U.S. at 478 (brackets omitted). Indeed, because rules about the standard of proof lessen the "risk that a defendant … faces a punishment that the law cannot impose upon him," they are substantive in nature. *Summerlin*, 542 U.S. at 351-52; *cf. In re Winship*, 397 U.S. 358, 363 (1970).

As a result, the Supreme Court has deemed retroactive cases applying the beyond a reasonable doubt standard. *See Hankerson v. North Carolina*, 432 U.S. 233, 241-42 (1977) (making retroactive the requirement that the prosecution prove

beyond a reasonable doubt each element of a crime); *Ivan V.*, 407 U.S. at 203-04 (making retroactive the application of that standard of proof to juvenile adjudications). As *Hurst* extends the beyond a reasonable doubt standard to a capital jury's weighing of aggravating and mitigating circumstances, it too is substantive and retroactive. *See Guardado v. Jones*, No. 4:15cv256-RH, 2016 WL 3039840, at *2 (N.D. Fla. May 27, 2016) (distinguishing *Ring*'s retroactivity analysis from *Hurst*'s and deeming it "reasonabl[e]" to argue that *Hurst* is retroactive).

Even if the Supreme Court indicated that *Hurst* was procedural and not substantive, the decision's beyond-a-reasonable-doubt holding is a "watershed" procedural rule under *Teague*. *See Powell v. State*, No. 310, 2016, 2016 WL 7243546, *4 (Del. Dec. 15, 2016) (per curiam) (deeming *Rauf*, the Delaware state court decision based on *Hurst*, "a new watershed procedural rule"). As the Supreme Court has determined, *Hurst* "implicate[s] fundamental fairness and accuracy," *Welch*, 136 S. Ct. at 1264, of sentencing determinations because it mandates a jury's use of the beyond a reasonable doubt standard, which "is a prime instrument for reducing the risk of convictions resting on factual error." *Ivan V.*, 407 U.S. at 203. The Supreme Court's rulings thus demonstrate that *Hurst* was made retroactive.

### III.   The error in Mr. Jones's capital sentencing was structural and not subject to harmless error review.

Mr. Jones was sentenced to death under an unconstitutional sentencing scheme. The error in his sentencing was structural, and thus not subject to harmless error review. Because there is no way to know how much doubt the jurors harbored when weighing aggravating circumstances against mitigating circumstances, the scope of the error is not "readily identifiable" and therefore not susceptible to harmless-error review. *See Holloway v. Arkansas*, 435 U.S. 475, 490 (1978) ("In the normal case where a harmless-error rule is applied, the error occurs at trial and its scope is readily identifiable. Accordingly, the reviewing court can undertake with some confidence its relatively narrow task of assessing the likelihood that the error materially affected the deliberations of the jury.").The lack of a beyond-a-reasonable-doubt instruction at the weighing stage permitted the jury to sentence Mr. Jones based on a lesser quantum of evidence than the Constitution requires. This structural error is per se prejudicial, and no showing of specific prejudice is required. *Sullivan v. Louisiana*, 508 U.S. 275, 281-82 (1993).

Even if such an error were subject to harmless error review, an error is only harmless if the State can demonstrate it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (Stevens, J., concurring) (stating that the *Brecht/Kotteakos*

Appellate Case: 17-6008   Document: 01019749416   Date Filed: 01/12/2017   Page: 24

standard "places the burden on prosecutors" to explain errors affecting a petitioner's substantial rights are harmless); *Fry v. Pliler*, 551 U.S. 112, 122 (2007) (Stevens, J., concurring in part and dissenting in part) ("[O]ur answer to the question whether the error was harmless would emphasize the important point that the *Brecht* standard … imposes a significant burden of persuasion on the State."); *Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015) (stating that habeas relief "is appropriate only if the prosecution cannot demonstrate harmlessness"). The failure to advise the jury as to the proper standard of review is not harmless because the State cannot show that reasonable jurors would not have harbored reasonable doubt that Mr. Jones should be sentenced to death. Mr. Jones, therefore, is entitled to relief from his sentence of death.

## REQUEST FOR RELIEF

Wherefore, Julius Darius Jones prays that this Court grant him all relief to which he may be entitled in this proceeding, including but not limited to an evidentiary hearing as to any disputed issues or matters in need of further factual development, and, ultimately, a Writ of Habeas Corpus so that he may be relieved of his unconstitutional convictions and sentences.

Respectfully submitted this 11th day of January, 2017.

JON M. SANDS
Federal Public Defender
*By s/*
Dale A. Baich (OH Bar No. 0025070)
Amanda C. Bass (AL Bar No. 1008-H16R)
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
602.382.2816 (telephone)
602.889.3960 (facsimile)
dale_baich@fd.org
amanda_bass@fd.org

Counsel for Appellant-Petitioner

# Exhibit B

Prisoner s Name: Julius D. Jones
Prison Number: 270147
Place of Confinement:   Oklahoma State Penitentiary, McAlester, Oklahoma

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **JULIUS JONES,** | ) |
| | ) |
| **Petitioner,** | ) |
| **vs.** | ) **Case No. CIV-07-1290-D** |
| | ) **DEATH PENALTY CASE** |
| | ) |
| **MARTY SIRMONS, Warden** | ) |
| **Oklahoma State Penitentiary,** | ) |
| | ) |
| **Respondent.** | ) |

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

MARK BARRETT, OBA # 557
P.O. Box 896
Norman, OK 73070
405-364-8367; 405-366-8329(fax)
barrettlawoffice@gmail.com
ATTORNEY FOR PETITIONER

November 3, 2008

TABLE OF CONTENTS

AUTHORITIES ......................................................................... iii

REFERENCES TO THE RECORD ....................................................... 1

STATEMENT OF THE CASE ............................................................. 1

STATEMENT OF FACTS ..................................................................... 2

STANDARD OF REVIEW ..................................................................... 4

FURTHER STATEMENT OF BACKGROUND INFORMATION ... 5

GROUNDS FOR RELIEF
GROUND ONE

FAILURE TO PRESENT AVAILABLE EVIDENCE TO SHOW THAT
CHRISTOPHER JORDAN WAS THE SHOOTER, AND LADELL KING
HIS ACCOMPLICE, DEPRIVED JULIUS JONES OF EFFECTIVE
ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH
AMENDMENT TO THE UNITED STATES CONSTITUTION.

TRIAL COUNSEL FURTHER WAS INEFFECTIVE BY FAILING TO
SHOW THE EXTENT OF MR. JORDAN S PREVARICATIONS AND
BY FAILING TO SHOW CONCLUSIVELY THAT THOSE LIES WERE
CONTINUING AT TRIAL AND WERE CONTINUING AS TO CENTRAL
PORTIONS OF JORDAN S TESTIMONY. ...................................... 9

GROUND TWO

TRIAL COUNSEL WAS INEFFECTIVE, IN CONTRAVENTION
OF MR,. JONES S SIXTH AMENDMENT RIGHTS, IN FAILING
TO SEEK A DELAWARE V. FRANKS HEARING AND/OR TO
OBJECT ON THE BASIS OF FRANKS V. DELAWARE TO
SUPPRESS ADMISSION OF A HANDGUN AND OTHER ITEMS
FOUND IN A RESIDENCE OWNED BY MR. JONES S PARENTS.

SINCE THE SEARCH WARRANT CONTAINED FALSE
MATERIAL INFORMATION, A PROPER OBJECTION AND
REQUEST FOR HEARING WOULD HAVE RESULTED IN THE
HANDGUN AND OTHER ITEMS BEING SUPPRESSED. ............ 24

-i-

GROUND THREE
THE PROSECUTOR SOUGHT TO SUPPLANT THE JURY S
OPINIONS WITH HERS BY GIVING HER PERSONAL OPINION
THAT MR. JONES WAS GUILTY AND VOUCHING FOR THE
CREDIBILITY OF PROSECUTION WITNESSES.  SHE ALSO
FALSELY CLAIMED THAT MR. JONES ADMITTED DRIVING
THE SUBURBAN FROM THE HOMICIDE SCENE, ENGAGED
IN SPECULATION ON EVENTS SURROUNDING THE HOMICIDE,
AND   DURING PUNISHMENT PHASE   STARTED TO
DEMONSTRATE HOW A SHOOTING OCCURRED BY POINTING
HER HAND TOWARD A JUROR S HEAD.  THESE AND OTHER
INSTANCES OF PROSECUTORIAL MISCONDUCT DEPRIVED MR
JONES OF HIS RIGHT TO DUE PROCESS OF LAW UNDER THE
EIGHTH AND FOURTEENTH AMENDMENTS TO THE FEDERAL
CONSTITUTION. ........................................................................................ 28

GROUND FOUR
REMOVAL OF JUROR McPEAK, WHO SAID HE COULD CONSIDER
ALL THREE PUNISHMENTS AND WHO WAS EXCUSED WITHOUT
DEFENSE OPPORTUNITY TO FURTHER QUESTION HIM, DEPRIVED
MR. JONES OF HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH,
AND FOURTEENTH AMENDMENTS TO THE FEDERAL
CONSTITUTION. .........................................................................................30

GROUND FIVE
THE DENIAL OF MR. JONES S RIGHT TO BE PRESENT AT ALL
CRITICAL STAGES OF THE PROCEEDINGS AGAINST HIM,
DEPRIVED MR. JONES OF RIGHTS UNDER THE DUE PROCESS
CLAUSE OF THE FEDERAL CONSTITUTION S FOURTEENTH
AMENDMENT AND PURSUANT TO THE RIGHT TO COUNSEL
CONTAINED IN THE SIXTH AMENDMENT. ......................................... 32

GROUND SIX
MR. JONES WAS DEPRIVED OF EFFECTIVE ASSISTANCE
OF APPELLATE COUNSEL THROUGH FAILURE TO INVESTIGATE
 AND INTERVIEW JURORS, FAILURE TO DETERMINE THE
EXISTENCE OF ADDITIONAL CHRISTOPHER JORDAN
CONFESSIONS, AND FAILURE TO ARGUE THE EXISTENCE OF
STRUCTURAL ERRORS IN THE CAPITAL PUNISHMENT
SYSTEM OF OKLAHOMA. CONSEQUENTLY, MR. JONES IS

ENTITLED TO RELIEF UNDER THE SIXTH, EIGHT, AND FOURTEENTH
AMENDMENTS TO THE FEDERAL CONSTITUTION. ........................  33

GROUND SEVEN
MR. JONES IS ENTITLED TO THE ISSUANCE OF A WRIT OF
HABEAS CORPUS BECAUSE THE TRIAL COURT UNCONSTITUTIONALLY
REFUSED TO DELIVER AN INSTRUCTION DEFINING LIFE WITHOUT
PAROLE. ............................................................................35

GROUND EIGHT
THE USE OF THE CONTINUING THREAT AGGRAVATING
CIRCUMSTANCE IS UNCONSTITUTIONAL BECAUSE THE AGGRAVATOR
HAS BECOME A CATCH-ALL WHICH CAN BE USED FOR ANY
CONCEIVABLE HOMICIDE.  OKLAHOMA THEREFORE DOES NOT
IN REALITY HAVE A MEANS OF NARROWING THE FIELD OF
HOMICIDES TO DETERMINE WHICH ONES ARE APPROPRIATE
FOR THE DEATH PENALTY.  THUS, OKLAHOMA S DEATH PENALTY
SYSTEM, AND MR. JONES S DEATH SENTENCE, ARE
UNCONSTITUTIONAL. ................................................................  36

CONCLUSION. ............................................................  37

CERTIFICATE OF SERVICE ...................................  38

## AUTHORITIES

Apprendi v. New Jersey, 530 U.S. 466 (2000) ................................................34

Caldwell v. Mississippi, 472 U.S. 320 (1985) ................................................29

Cargle v. Mullin, 317 F.3d 1196 (10th Cir. 2003) ..................................  22, 29, 30

Coleman v. Alabama, 399 U.S. 1 (1970) .......................................  32

Cudjo v. State, 925 P.2d 985 (Okla. Crim, 1996) ............................................31

Donnelly v. DeChristoforo, 416 U.S. 637 (1974) ............................................29

Evitts v. Lucey, 469 U.S. 387 (1985) ................................................34

Franks v. Delaware, 438 U.S. 154 (1978) .................................................... 26, 27

Gardner v. Florida, 430 U.S. 349 (1977) ........................................................ 35

Geders v. United States, 425 U.S. 80 (1976) .................................................... 32

Gray v. Mississippi, 481 U.S. 648 (1987) ........................................................ 31

Gregg v. Georgia, 428 U.S. 153 (1976) ........................................................ 36, 37

Jones v. Oklahoma, 127 S.Ct. 404 (2006)........................................................ 2, 6

Jones v. State, 128 P.3d 521 (Okla. Crim. 2006) ............................................ 2, 6

Jones v. State, 132 P.3d 1 (Okla. Crim. 2006)............................................... 2, 6

Kimmelman v. Morrison, 477 U.S. 365 (1986) ............................................... 26

Lockett v. Ohio, 438 U.S. 586 (1978) ............................................................ 29

Luna v. Cambra, 306 F.3d 954 (9th Cir. 2002) ................................................ 22

Maynard v. Cartwright, 486 U.S. 356 (1988)........................................... 36, 37

Mollett v. Mullin, 348 F.3d 902 (10th Cir. 2003) ........................................... 35

Snow v. State, 876 P.2d 291 (Okla. Crim 1994) ............................................ 36

Strickland v. Washington, 466 U.S. 668 (1984) ............................................ 23

United States v. Boling, 869 F.2d 965 (6th Cir. 1989)................................... 22

Wainwright v. Witt, 469 U.S. 412 (1985) ...................................................... 31

Williams v. Taylor, 529 U.S. 362 (2000)................................................... 23, 27

Witherspoon v. Illinois, 391 U.S. 510 (1968) ................................................ 31

## REFERENCES TO RECORD

The trial transcript will be referred to as (Tr.), the original record as (O.R.), the

preliminary hearing transcript as (P.H), the transcript of the evidentiary hearing as (E.H.),

the sentencing transcript (S Tr.), and motion hearing transcripts. (Mot. (date) Tr.)

## STATEMENT OF THE CASE

Mr. Jones was charged, in Oklahoma County Case CF-99-4373, with first-degree

robbery-murder (Count I), felonious possession of a firearm (Count II), and conspiracy to

commit a felony.(Count III).   The prosecution alleged that the offenses were committed

after former conviction of two or more felonies. (O.R. 579-80)

Petitioner and Christopher Jordan were jointly charged in Counts I and III.  (O.R.

579-80)

The charges arose from a July 28, 1999 incident in which Paul Howell was fatally

shot at 727 East Drive in Edmond, Oklahoma.  Mr. Howell s Suburban was stolen

contemporaneously with the shooting.

A bill of particulars sought the death penalty on the basis that (1) Mr. Jones was a

continuing threat to society and (2) that he created a great risk of death to more than one

person.

Co-defendant Jordan entered two guilty pleas.  In exchange for his testimony

against Mr. Jones, Mr. Jordan received a sentence of life, with all but the first thirty years

suspended, as to Count I and a sentence of ten years imprisonment as to Count III.  A

1

larceny charge against Mr. Jordan was dismissed and the two sentences he received were ordered to run concurrently.  (Tr.  VIII 94, 191-93)

Mr. Jones s jury trial took place before the Honorable Jerry D. Bass, District Judge, beginning on February 11, 2002 and concluding on March 4, 2002.

Mr. Jones was found guilty on all counts and the jury found the existence of the aggravating circumstances continuing threat to society and great risk of death to more than one person.   The jury set punishment at death as to Count I, at fifteen years imprisonment as to Count II, and at twenty-five years imprisonment as to Count III.   (Tr. XV 219-223)

Judgments and sentences against Mr. Jones were imposed on April 19, 2002. Judge Bass ordered that the sentences run consecutively.   (S Tr. 70-71)

The judgments and sentences were affirmed on direct appeal. **Jones v. State,** 128 P.3d 521 (Okla. Crim. 2006).   A petition for rehearing was granted, but recall of the mandate was denied.  **Jones v. State,** 132 P.3d 1 (Okla. Crim. 2006). Certiorari was denied on October 10, 2006). **Jones v. Oklahoma,** 127 S.Ct. 404 (2006).

An application for post-conviction relief was filed on February 25, 2005 (Court of Criminal Appeals Case No. PCD-2002-630) and was denied on November 5, 2007.

### STATEMENT OF FACTS

A man with at least a half inch of hair sticking out of his stocking cap (Tr. IV 116-117, 119) shot Paul Howell (Tr. IV 104) on July 28, 1999.

Christopher Jordan, Mr. Jones s co-defendant, could have had a half inch of hair

2

sticking out of a stocking cap. See Appendix 1, booking photograph of Christopher

Jordan on July 2, 1999; State s Exhibit 99 and 100) (Jordan testified   Tr. VII 150-51

that exhibits 99 and 100 represent the way he appeared in July of 1999). Exhibits 99 and

100 are attached as Appendix 2.

Petitioner Julius Jones, in spite of Mr. Jordan s testimony that Julius Jones fired the

shots,  could not have been the person with a half inch of hair sticking out of a stocking

cap. According to Mr. Jordan s testimony, State s Exhibits 97 and 98 reflect what

Petitioner s appearance was in July of 1999. (Tr. VII 150)  Exhibits 97 and 98 are

attached as Appendix 3. A suggestion, in the prosecution s final first-stage closing

argument  (Tr. X 130),  that Mr. Jones could have cut his hair after the time of the

homicide and thus could have matched the description provided by the shooting victim s

sister, is discredited by another booking photo of the Petitioner attached as Appendix 4.

That booking photograph, as noted on the bottom of the document, was taken on July 19,

1999   just nine days before the date of the homicide.

The defense did not present, however, the July 19, 1999 photograph, nor did it

present evidence from two of Christopher Jordan s fellow inmates (see Appendices 5 and

6) that Jordan admitted doing the shooting, then hiding the gun in Petitioner s parents

residence, so he could blame the shooting on Petitioner Jones.

Such evidence would have dovetailed with the fact that Mr. Jordan said  yeah

when a detective asked him:  So you hid the murder weapon?   Appendix 9, page 14.

3

This statement of Jordan was sandwiched within his claims that Mr. Jones told Jordan that Jones hid the gun.

No DNA or fingerprint evidence connected Mr. Jones with the homicide or the gun or the stolen Suburban. When items were DNA tested, Mr. Jordan s DNA pattern was found on a white and black bandana which was in the console of Petitioner s Buick Regal. (Tr. IX 214-15) However, authorities did not find Julius Jones s DNA on the tested items. Mr. Jones s fingerprints were not detected in any incriminating locations.

Authorities did not claim that Mr. Jones s made any incriminating statements to them.

Mr. Jordan gave multiple versions of what happened on July 28, 1999. He repeatedly lied to detectives to attempt to minimize his involvement, then repeatedly changed his account when confronted with facts contrary Mr. Jordan s original versions of events. See Ground I, Part IV below.

Additional facts will be discussed in relation to Mr. Jones s grounds for relief, particularly in relation to Ground One, involving ineffective assistance of trial counsel.

## STANDARD OF REVIEW UNDER AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d)(1)-(2), provides that an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court may be granted with respect to any claim that was adjudicated on the merits in State court proceedings if the

4

adjudication of the claim

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

## FURTHER STATEMENT OF BACKGROUND INFORMATION

1. Name and location of court which entered judgment of conviction under attack:

District Court of Oklahoma County, Oklahoma City, Oklahoma

2. Date of judgment of conviction: April 19, 2002.

3.  Length of sentence: Count I, death; Count II, 15 years imprisonment; Count III,

25 years imprisonment.

4. Nature of offenses: Count I     first-degree felony (robbery) murder; Count II

felonious possession of a firearm; Count III     conspiracy to commit a felony..

5. What was the plea?   Not guilty

6. What kind of trial?   Jury trial

7. Did Petitioner testify at trial?  No

8. Was there an appeal from the judgment of conviction?  Yes

9. If there was an appeal, answer the following:

(a) Name of Court: Oklahoma Court of Criminal Appeals

(b) Result: Judgments and sentences affirmed.

5

(c) Date of result and citation: January 27, 2006;  **Jones v. State,** 128 P.3d 521

(Okla. Crim. 2006), rehearing granted but recall of mandate denied **Jones v. State,** 132

P.3d 1 (Okla. Crim. 2006)

(d) Grounds raised     See Appendix 7

(e) Further review by higher state court     not applicable

(f) Petition for certiorari in the United States Supreme Court:

        (1) Result     certiorari denied

        (2) Date of result and citation: October 10, 2006; **Jones v. Oklahoma,** 127

S.Ct. 404 (2006).

10.  Other than a direct appeal have you previously filed any petitions, applications

or motions with respect to this judgment?

Yes

11.  If your answer was yes, give this information:

(a)(1) Name of court: Oklahoma Court of Criminal Appeals

    (2)   Nature of proceeding: application for post-conviction relief

    (3)   Grounds raised

        Proposition I  - Ineffective assistance of appellate and trial counsel in that

they failed to investigate and interview jurors, failed to conduct an investigation

into reports that co-defendant Jordan admitted being the person who did the

shooting, and were hampered by state-induced ineffective assistance due to staffing

6

and funding issues.

Further appellate counsel failed to argue structural errors in Mr. Jones s case.

Proposition II   The cumulative impact of errors identified on direct appeal and post-conviction proceedings rendered the proceeding resulting in the death sentence arbitrary, capricious, and unreliable.

(4) Did you receive an evidentiary hearing on your petition, application, or motion?

No.  (However, in conjunction with direct appeal, evidentiary hearing conducted on issue of ineffectiveness for failure to present alibi evidence.)

(c)  Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application, or motion?   Yes (application filed in Court of Criminal Appeals)

12.   Set forth grounds for relief   (Grounds for relief listed later in petition.)

13.  If any of the listed grounds were not previously presented in any other court, state or federal, state briefly what grounds were not presented and give reasons for not presenting them.

Not applicable.

14.   Does Petitioner have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?   No.

15.   Give the name and address, if known, of each attorney who represented

7

Petitioner in the following stages of the judgment under attack herein:

(a) At preliminary hearing:   Barry Albert, deceased.

(b) At arraignment and plea: Barry Albert

(c)   At trial: David McKenzie, Malcolm Savage, and Robin McPhail,

Oklahoma County Public Defenders Office, 320 Robert S. Kerr, Suite 600, Oklahoma

City,   Oklahoma 73102.

(d) At sentencing: Oklahoma County Public Defenders Office

(e) On appeal: Wendell Sutton, Oklahoma County Public Defenders Office

(f) In post-conviction proceedings, Laura Arledge, Oklahoma Indigent

Defense System, P.O. Box 926, Norman, Oklahoma 73070.

16.   Was Petitioner sentenced on more than one count of an indictment, or on more

than one indictment, in the same court at the same time?  Yes     Petitioner was sentenced

on three charges simultaneously.

17.   Does Petitioner have any future sentence to serve after completion of the

sentence imposed by the judgment under attack?  Yes     Petitioner is also incarcerated

pursuant to conviction in Oklahoma County Case 99-5144.   He received two twelve-year

sentences upon conviction of possession of firearms and robbery with firearms.

8

## GROUNDS FOR RELIEF

## GROUND ONE

**FAILURE TO PRESENT AVAILABLE EVIDENCE TO SHOW THAT CHRISTOPHER JORDAN WAS THE SHOOTER, AND LADELL KING HIS ACCOMPLICE, DEPRIVED JULIUS JONES OF EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

**TRIAL COUNSEL FURTHER WAS INEFFECTIVE BY FAILING TO SHOW THE EXTENT OF MR. JORDAN S PREVARICATIONS AND BY FAILING TO SHOW CONCLUSIVELY THAT THOSE LIES WERE CONTINUING AT TRIAL AND WERE CONTINUING AS TO CENTRAL PORTIONS OF JORDAN S TESTIMONY.**

Trial counsel was ineffective in failing to present available witnesses, available impeachment evidence, and available demonstrative evidence to demonstrate that Petitioner Julius Jones could not have been the shooter.

If the evidence had been presented in a convincing fashion, the jury would have known:

Mr. Jones s hair was too short for him to have been the person who shot Paul Howell. Co-defendant Christopher Jordan, the central witness against Mr. Jones, did have hair that could have been sticking out a half inch from a stocking cap.

Ladell King, who like Jordan implicated Jones in making incriminating statements about the homicide, fit the description of the person who was observed apparently casing an area where Suburbans ordinarily were parked with Christopher Jordan on the morning of the homicide. By showing that Mr. King was the person

planning a Suburban heist with Jordan, trial counsel would have shown that the two principal witnesses against him had a motive to construct a plan to implicate Mr. Jones. Both King and Jordan needed a way to minimize the damage to them from a robbery they had planned and perpetrated — a robbery which resulted in a death.

Christopher Jordan had confessed to at least two persons. He admitted not only that it was Jordan who did the shooting, but that he set Mr. Jones up for the fall by planting the gun in the attic of Jones s parents residence.

Mr. Jordan, in repeated instances, would not admit to facts which could incriminate him, or cast him in a bad light, until confronted with information that he was lying. He changed his story early and often — six times or more in a single interview with Edmond police detectives. His failure to admit that King, or some other accomplice was with him on the morning of July 28, 1999, showed that the lies continued during trial. The ultimate lie, of course, was that Julius Jones was the man with a half inch of hair sticking out of a stocking cap — the man who fired a fatal shot into Paul Howell.

**I. Julius Jones s Hair Was Too Short For Him to Have Been the Shooter**; **Christopher Jordan Had Hair Which Would Coincide With Megan Tobey s Description**

**A. Testimony of Megan Tobey**

Megan Tobey, Paul Howell s sister, was the only adult in the car with him when Howell parked his Suburban in an Edmond driveway on the evening of July 28, 1999.

Although the man s face was mostly covered with a bandana, she saw the person

10

who fatally shot her brother. She reported that, above the bandana, the man wore a

stocking cap. (Tr. IV 116-17)

On cross-examination, she confirmed that the man had a half inch of hair

protruding from the sides of the stocking cap:

> Q. And he had hair sticking out from the sides; is that correct?
> A. Yes.
> Q. About a half inch of hair on each side?
> A. Above his   where his ear connects to his head.
> Q. So there was about a half inch sticking out?
> A. Yes.

(Tr. IV 117)

On recross, she assured those in the courtroom that there was no room for doubt

about the hair sticking out:

> Q. Ma am, but you are sure that there was at least a half inch of hair sticking
> out from underneath the cap?
> A. Yes.

(Tr. IV 119)

### B. Other Evidence of Mr. Jones s Short Hair

The prime witnesses against Mr. Jones agreed that he had short hair in late July of

1999.

Ladell King said Mr. Jones hair was  low cut, low college cut.   He identified

State s Exhibits 97 and 98 as depicting how Julius Jones appeared in late July. (Tr. V 206)

See Appendix 3.

Christopher Jordan agreed that Mr. Jones s hair was at least  kind of short, wavy  on July

11

28, 1999. (Tr. VIII 163)

On the other hand, Jordan s hair included some braiding on July 28, 1999 and was accurately depicted in State s Exhibits 99 and 100. (Tr. V 206) See Appendix 2.

### C. Prosecutor s Explanation   Must Have Had Haircut

The prosecutor s explanations for the discrepancy between Megan Tobey s hair description were that Tobey could have been mistaken (even though she had testified to certainty about there being hair sticking out), that a videotape shot on July 29, 1999 is consistent with Mr. Jones having longer hair than he did at the time he was arrested, and that Mr. Jones may have had a haircut. (Tr. X 129-30)

The prosecutor asked jurors:

How easy is it to cut your hair, shave your sideburns, alter your hair?

(Tr. X 130)

### D. The Answer to the Prosecutor s Theory

The answer to the prosecutor  theory is the form of a booking photograph taken on July 19, 2009. Appendix 4.

Rather than having longer hair prior to the arrest and getting it cut in time for the Appendix 3 booking photograph, Mr. Jones in fact had short hair not long prior to the homicide and could not possibly have had a significant amount of hair protruding on the day William Howell was killed.

### E. Impact on Case

12

Mr. Jones s hair is inconsistent with the hair of the killer.  If it were not for the fact

that Mr. Jordan testified that Jones was the person who shot Mr. Howell, this anomaly

could be explained away: if Jones was not the shooter, he still could have been the

accomplice.

The problem with such an explanation is that it still would result in Christopher

Jordan, the principal witness in the case, lying about the central fact in the case     who did

the shooting.

If the central witness was lying about the core facts of the case     especially when

the most likely motive to lie would be to put someone else on the hook for something

Jordan really did    the prosecution s case falls apart.

As Mr. Jones s lead counsel stated:

> If the jury had known for certain (and they would have if the booking photograph
> had been presented at appropriate times) that Mr. Jordan was lying on such a central
> point as the person who performed the shooting, I believe the jury would have been
> compelled to disregard the remainder of Mr. Jordan s testimony.  Since Mr.
> Jordan s testimony was essential to the State s attempt to prove Mr. Jones was
> involved in the robbery of the Howell Suburban, an acquittal should have ensued
> from proving that Mr. Jones could not have been the shooter.

Affidavit of David McKenzie 2008, p. 2.  (Attached as Appendix 8)

## II.  Ladell King Fit the Description of Christopher Jordan s Companion

### A.  Testimony of Eckie Prater    Man Much Larger Than Mr. Jones Present When  Checking Out, on Day of Homicide, Area Where Suburbans Normally Parked

Eckie Prater    a National Cowboy Hall of Fame employee and small business

owner   was familiar with Christopher Jordan s family.   The Jordan family lived two

13

houses west of Prater in an Edmond neighborhood.(Tr. IV 68-69)

On July 28, 1999, Mr. Prater observed a vehicle driven by Christopher Jordan stop in the driveway of the Nichols family, a family living in the same neighborhood as Prater. Suburbans normally are parked in the Nichols driveway but were not there on the 28th of July. (Tr. IV 78-80)

Even though Mr. Jordan and Mr. Jones are about the same size (Tr. VII 212), the man with Christopher Jordan was noticeably larger than Jordan.   On cross-examination, Mr. Prater reported:

> Q.  Okay.  And there was somebody else with him; is that correct?
> A.  Yes.
> Q.  And would it be fair to say that that person was a muscular person?
> A.  He was larger than the other young man.
> Q.  Can you tell us how much larger he was?
> A.  Oh, it s hard to say sitting in a car.  But he would be half a head higher, probably.
> Q.  And would it be fair to say he was more muscular than Christopher Jordan?
> A.  Perhaps.
> Q.  When you spoke with Detective Pfeiffer did you tell her that the other individual in the car was more muscular with short hair?
> A.  I believe so.  Those may be her words. I was saying larger.  He was a little bit bigger.

(Tr. IV 85)

## B.  Size of Ladell King

Ladell King testified that he is 6'1" or 6'2" and has not weighed under 250 pounds in over five years.  He said he weighed about 270 pounds in late July of 1999. (Tr. V 263-64)  His size is also apparent from a booking photograph attached as Appendix 9.

14

The booking photographs of Mr. Jordan and Mr. Jones, on the other hand indicate that Mr. Jones could not have been the man significantly larger than Jordan. Compare Appendix 1 (Jordan) and Appendix 4 (Jones).

### C. Other Context Regarding the Stop in the Nichols Driveway

Christopher Jordan testified that it was about 4:30 or 5 p.m. on July 28, 1999 that he met up with Mr. Jones. (Tr. VIII 129)

When questioned about the U turn in front of the Nichols residence, Mr. Jordan first said that Mr. Jones was not with him then    that no one was with him at the time. (Tr. VIII 132-33)   After the question about someone being with Jordan was repeated, he then said that it s possible Mr. Jones was with him, but that Jordan was not looking for a Suburban at that house. (Tr. VIII 133)

The turning in the Nichols driveway was near noon on July 28. (Tr. IV 70-71)

The attempt to deny that someone was with him in the Nichols driveway was as telling as his earlier initial denial, in Jordan s interview with Edmond Detectives Fike and Pfeiffer, that he had seen the gun that was used to shoot Mr. Howell. (Jordan eventually admitted he not only saw, but also handled, the gun but only after police questioned whether his fingerprints might be on it.)

As with the gun, Mr. Jordan, in denying that a large man was with him in the Nichols driveway, was denying an obvious truth. Jordan would not have been making the denial regarding the larger man without a reason. That reason appears to be that he was

15

hiding a real July 28 accomplice   most likely Ladell King.

### D.  Impact on Case

As lead trial counsel s affidavit notes, showing that King most likely was with Jordan early in the day in the Nichols driveway was crucial in demonstrating that the two most important witnesses   King and Jordan   were lying and themselves guilty. Lead counsel McKenzie stated:

> By establishing that King was with Jordan on the morning of the homicide, I could have established that (1) both King and Jordan (the two witnesses at the heart of the State s case) were lying, (2) that King most likely was the person involved with Jordan in planning the Suburban robbery, and (3) that Jordan s lies about what happened had not ceased as he claimed, but were continuing in his trial testimony. Significantly, the only persons who claimed they saw Mr. Jones with Mr. Howell s Suburban on the day of the homicide were Jordan, King, and close friends or associates of King.

Affidavit of David McKenzie 2008, pp. 3-4, attached as Appendix 8.

## III.  Christopher Jordan Confessed to Committing the Murder

### A.  Statements of Emmanuel Littlejohn and Christopher Berry

During the pendency of direct appeal, the defense obtained the affidavit of Emmanuel Littlejohn, an Oklahoma County jail inmate who shared, for a brief time, a cell with Christopher Jordan.

Jordan told Mr. Littlejohn that Julius Jones did not commit the murder and was not present when the murder occurred.  Jordan also admitted to hiding the murder weapon in Julius Jones s residence.  Mr. Littlejohn s affidavit, which was submitted in connection with the direct appeal, is attached as Appendix 5.

16

Mr. Littlejohn was not called as a witness at trial.

During post-conviction proceedings, an affidavit was obtained from Christopher Berry, a person who also heard Mr. Jordan confess to being the person who fired the fatal shot. Mr. Berry s affidavit is attached as Appendix 6.

**B. Impact of the Confessions**

Lead trial counsel, in his affidavit, stated:

> In retrospect, I believe I was ineffective for not following up on the Littlejohn information to see if it could be corroborated. If I had, I would have been able to corroborate Littlejohn with Berry s information and perhaps with other information.
>
> Also, it did not compute to me at the time I made the decision not to call Littlejohn, that the Jordan confession was consistent with a slipup Jordan made. In the process of telling law enforcement that Jones admitted hiding the gun, Jordan at one point slipped up and seemed to admit that it was he (Jordan) that hid the gun.
>
> The information from Littlejohn and Berry also would have been consistent with the idea that Ladell King and Jordan were the true perpetrators of the robbery murder.

Appendix 8, page 5.

**IV.  Jordan s Falsehoods Followed a Pattern: He Continually Was Attempting to Minimize Any Blame on Himself, Was Attempting to Place Blame on Mr. Jones, was Telling Lies to Promote His Agenda, and Was Only Correcting the Lies When Confronted With Information Which Disproved Them**

Christopher Jordan s statements prior to trial, by his own admission, changed on numerous occasions.

While the jury did hear Mr. Jordan admit to there being many differences in his statements, the jury did not receive information which would have enabled it to fully

17

understand that Mr. Jordan repeatedly was (1) telling the version which would help him the most and cast the blame on Mr. Jones, (2) correcting the versions aimed at minimizing the damage to Jordan only when law enforcement confronted him with either known information to the contrary or the reality that his story made no sense.

Counsel failed to show the pattern of Mr. Jordan s behavior in sufficient detail to show the jury that his trial testimony was not worthy of belief. Additionally, as previously indicated, trial counsel failed to drive home the point that the falsehoods were continuing at trial. Mr. Jordan was claiming that Mr. Jones fired the shot when the Petitioner s hair was too short to fit the description provided by the victim s sister; Jordan denied there being someone with him when he was scouting out the Nichols residence for Suburbans, even though Mr. Prater clearly saw a second person in the car   a person significantly larger than Jordan.

Making an exhibit of Mr. Jordan s interview with Edmond Detectives Pfeiffer and Fike would have shown how established Mr. Jordan s pattern of lying was and that the lying focused on Jordan trying to make himself look either innocent, or at least as blameless as plausible. The interview with Edmond detectives is attached as Appendix 10. A later statement of Mr. Jordan in conjunction with plea negotiations is attached as Appendix 11.

### A.  Christopher Jordan s July 31, 1999 Statement to Edmond Detectives

#### 1.  Original version

Christopher Jordan initially told officers that he had no idea that Mr. Jones was going to steal a Suburban until Mr. Jones saw a Suburban and directed Jordan to stop and let Mr. Jones out.  According to this original version, Jordan left immediately after letting Jones out, without seeing a gun or knowing that anyone had been killed.  He said he stopped at Taco Mayo in Edmond after letting Julius Jones out.  Appendix 10, pages 4-11.

#### 2.  First change   Jordan Not Only Saw a Gun, But Handled It

After being pressed by officers about the gun, Mr. Jordan stayed firm.  He said he was sure he had never seen the gun.  Appendix 10, page 14.

However, after Jordan realized the officers might have his fingerprints on the gun, he changed his tune:

> Fike: So your fingerprints are on some of those bullets in the clip?
> Jordan: It should be on one of  em or two of  em. Cause I had touched, I had touched the clip like out of the top two I think. I touched the clip out of the top two.
> Fike: If we found the gun and your fingerprints, shouldn t be on the gun then?  You never touched the gun?
> Jordan: Uh, let me see ... I can t recall touching the gun.  I might have touched it.
> Fike: Do you recall seeing it?
> Jordan: I can t even recall (inaudible) I think I did touch the gun.
> Fike: You did? So you saw it?
> Jordan: I did touch the gun.  Yeah, I think I, black handles not that I think about it.  Black handles.  Yeah I think it had black handles on it.  It s a chrome gun.

Appendix 10, page 15

In this first revised version, however, Mr. Jordan still insisted he didn t know that Mr. Jones had the gun  that night.   Appendix 10, page 16.

### 3. Second Change   Mr. Jordan Was Looking for a Suburban

It was only after officers told him his story    about just suddenly dropping off Mr. Jones in an Edmond neighborhood made no sense    that Mr. Jordan admitted that he was looking for a Suburban on the evening of the homicide.  Appendix 10, pages 34-38.

However, Jordan continued to claim that he and Mr. Jones already were in the neighborhood and happened to see the Suburban there.  Appendix 10, page 39

### 4. Third Change    Mr. Jordan Followed the Suburban Into the Neighborhood

After Detective Fike urged Jordan to tell the truth about how he came upon the Suburban, Jordan admitted following the Suburban into the neighborhood. Appendix 10, page 43

Jordan said that he didn t wait around for Mr. Jones to get the Suburban, though. He said he dropped Julius Jones off, did not follow Mr. Jones out of the neighborhood, and instead of staying with Mr. Jones went to Taco Mayo to eat.

### 5. Fourth Change     Mr. Jordan Followed Mr. Jones Out

When Detective Fike told Mr. Jordan that it was not the truth that he didn t follow Mr. Jones, but instead went to Taco Mayo, Mr. Jordan stated:  Yeah, I followed him out sir.  Appendix 10, page 45

20

After this fourth change, Mr. Jordan still was maintaining that he never saw William Howell on the ground.  Appendix 10, page 45

### 6. Fifth Change — Mr. Jordan Saw Mr. Howell Fall Backwards

Mr. Jordan s change regarding seeing Howell was as follows:

I seen the man on the ground.  I didn t see no kids or nothin.   I seen the man on the ground.  I didn t see no kids or nothin.   I seen a man on the ground.  That s all I seen.  I seen the man fall like backwards and that s, that s all I seen.

Appendix 10, page 45

In this sixth version, Mr. Jordan still claimed he did not know that Mr. Jones had a gun when Jones went toward Howell and that Mr. Jordan in fact went to Taco Mayo after letting Mr. Jones out.  Appendix 10, page 46

### 7. Sixth Change — Mr. Jordan Didn t Go to Taco Mayo, After All

When a detective indicated it was surprising that Mr. Jordan would go get something to eat after seeing a wounded man fall to the ground, Mr. Jordan admitted he did not go to Taco Mayo.  Appendix 10, page 46

### 8. Seventh Change — Mr. Jordan Heard Mr. Jones Talk About the Incident on the Evening it Happened

After initially saying that he didn t discuss the shooting with Mr. Jones until the day after the homicide, Mr. Jordan changed to report that  right after it happened  Mr. Jones told him that  the gun went off, I couldn t help it, it went off.    Appendix 10, pages 47-48

### 9. Statement About Being Close

After having denied seeing the homicide at all, Mr. Jordan admitted being near the

homicide when it occurred:

> Fike: But you must have been pretty close, you saw him fall and heard the gunshot.
> Jordan: Yes, sir.

Appendix 10, page 54.

### B. Impact

Lead counsel David McKenzie noted:

By a combination of making exhibits of the prior testimony and conducting more thorough cross-examination of Mr. Jordan, it would have been apparent that (1) Mr. Jordan was still lying at trial, (2) in prior statements he had lied until the point he realized his exculpatory statements could be exposed as false, (3) from the point of his arrest onward he pursued a plan to implicate Julius Jones and exculpate himself. This Jordan plan was fraught with fabrications which still had not been corrected fully at the time of trial.

Appendix 8, page 5.

## V.  Legal Authority   Entitlement to Relief

Ineffective assistance relief has been predicated on failure to produce evidence that criminal activity should be attributed to a co-defendant and not to the client, **United States v. Boling**, 869 F.2d 965, 972 (6th Cir. 1989); failure to adequately investigate or present evidence that could provide exonerating evidence, **Luna v. Cambra,** 306 F.3d 954, 962-67 (9th Cir. 2002); and, in part, on failure to conduct reasonable impeachment to test the credibility of key prosecution witnesses. **Cargle v. Mullin,** 317 F.3d 1196, 1211, 1221 (10th Cir. 2003).

Because strong evidence existed that would have shown central witnesses were

22

lying and that Mr. Jones could not be guilty, the correct conclusion is that the outcome of

Julius Jones s trial would have been different if it were not for the errors of trial counsel

identified in this Ground One.  See **Strickland v. Washington,** 466 U.S. 668, 687 (1984).

Because trial counsel s omissions went to the heart of the case, because they caused

Mr. Jones to be found guilty even though he had a viable and convincing defense

available, Mr. Jones was denied his rights under the Sixth Amendment to the United States

Constitution and is entitled to relief.

## STANDARD OF REVIEW

To analyze an ineffective assistance claim presented in a federal petition for writ of

habeas corpus, a Court must determine whether counsel s performance was deficient and

whether the deficient performance prejudiced the defense.  Prejudice depends on whether

there is a reasonably probability that the outcome of the proceeding would have been

different if it were not for counsel s unprofessional errors.  **Williams v. Taylor,** 529 U.S.

362, 390-91 (2000).  The principles of **Strickland v. Washington** apply because

**Strickland,** at all times when Mr. Jones s case was pending, was clearly established

federal law as determined by the United States Supreme Court.

## PROCEDURAL DEFAULT

Counsel s ineffectiveness in defending Mr. Jones in the first stage was raised in Mr.

Jones s direct appeal brief, Proposition VIII,  and thus there is no procedural default. In

the post-conviction process, Mr. Jones s counsel presented supplemental ineffective

23

assistance of counsel argument and included reference to Chris Berry s statement, showing

that the evidence of Christopher Jordan confessing was not limited to the evidence from,

and thus the credibility of, Emmanuel Littlejohn.

**EXHAUSTION**

For the same reasons as stated under procedural default, the ineffective assistance

of trial counsel issue has been exhausted.  Mr. Jones presented the issue to the highest

possible state court, the Oklahoma Court of Criminal Appeals, in the direct appeal brief

and in the post-conviction application.

## GROUND TWO

**TRIAL COUNSEL WAS INEFFECTIVE, IN CONTRAVENTION OF MR. JONES S SIXTH AMENDMENT RIGHTS,  IN FAILING TO SEEK A DELAWARE V. FRANKS HEARING AND/OR TO OBJECT ON THE BASIS OF FRANKS V. DELAWARE TO SUPPRESS ADMISSION OF A HANDGUN AND OTHER ITEMS FOUND IN A RESIDENCE OWNED BY MR. JONES S PARENTS.**

**SINCE THE SEARCH WARRANT CONTAINED FALSE MATERIAL INFORMATION, A PROPER OBJECTION AND REQUEST FOR A HEARING WOULD HAVE RESULTED IN THE HANDGUN AND OTHER ITEMS BEING SUPPRESSED.**

The most incriminating item of physical evidence against Mr. Jones was a .25

caliber handgun which was found in the attic of a residence owned by Mr. Jones s parents.

 Even though the defense contended that Mr. Jordan placed the gun in the attic, and even

though Jordan had ample opportunity to hide the gun at the Jones residence, it remained

damaging to Julius Jones that a gun appeared to have been hidden a house where he had

24

been staying.  It also was damaging that some clothing and ammunition, allegedly connected to Julius Jones, was at the residence.

Because defense counsel failed make necessary requests and objection which would have shown that the search warrant which yielded the gun contained materially false information, Mr. Jones s trial counsel was ineffective and Mr. Jones is entitled to relief under the Sixth Amendment to the federal constitution.

The viability of the search warrant hinged on there being an articulable reason to believe the items sought   firearm, ammunition, and clothing connected to the homicide   would be found at Mr. Jones s parents address.  The affidavit for search warrant (O.R. 1-2) did not allege that anyone had seen the gun or other items at the Jones family residence. Instead, the likelihood that the items were present at the Jones residence was premised on information that Julius Jones was barricaded inside the house.

The problem with relying on Julius Jones s alleged presence in the house was that, by the time law enforcement was obtaining a warrant, police knew that Mr. Jones already had left the house.  On July 30, 1999   the day the warrant was served   police had received uncontradicted information that Julius Jones   at least by 4:30 p.m. and according to some evidence earlier   was not at the residence which was to be searched. (Mot. 8/11/00 61-2, 112-15)   The State has agreed that officers knew that the house was unoccupied by anyone beginning at about 4 p.m. on July 30.  (O.R. 212-13)

The search warrant arrived at the scene to be executed between 7:30 and 8 p.m. on

25

July 30. (Mot. 8/15/00 202) That search warrant was based on information that Petitioner had barricaded himself in the house.   The search warrant was thus based on materially false information and proper objection and request for hearing, would have resulted in the suppression of the gun and other items seized.

Federal constitutional law provides that when a seizure is based on a materially false search warrant affidavit, the items seized should be suppressed. **Franks v. Delaware,** 438 U.S. 154 (1978).

When suppression is in order, but trial counsel defaults in raising the suppression issue, a Petitioner is entitled to relief based on the denial of his Sixth Amendment right to effective assistance of counsel. **Kimmelman v. Morrison,** 477 U.S. 365 (1986).   In **Kimmelman**, a sheet was improperly seized and subsequently forensically tested to produce evidence tying the accused to assaultive behavior.  Similarly, in Mr. Jones s case, a gun was seized and subsequently tested, linking the gun to the Howell homicide. Failure to properly move to suppress the evidence in Petitioner s case was in contravention of professional standards in Mr. Jones s case, just as it was in **Kimmelman.**

Since the gun was a key piece of evidence purportedly linking Mr. Jones to the homicide, failure to suppress the gun and the other items was prejudicial to Mr. Jones and he is entitled to relief.

## STANDARD OF REVIEW

The Court must determine whether there is a reasonable probability that the outcome of Mr. Jones s trial would have been different if it were not for trial counsel s unprofessional error in failing to present the suppression issue. **Williams v. Taylor,** 529 U.S. 362, 390-91 (2000).

The Court further should determine whether Mr. Jones s search and seizure claim was meritorious and whether there is a reasonable probability the verdict would have been different if the excludable evidence were not before the jury. **Kimmelman** at 375.

## PROCEDURAL DEFAULT

This issue is not procedurally defaulted because it was raised in a subpart of Proposition I of Petitioner s direct appeal brief.  On page 14 of that brief, appellate counsel stated:  Alternatively, trial counsel was ineffective in failing to object under **Franks v. Delaware,** 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978), that the police knowingly or with reckless disregard for the truth included false or misleading information in the affidavit or omitted critical information.

The Oklahoma Court of Criminal Appeals addressed on the merits the issue of ineffective assistance in failing to properly raise the issue of suppressing the gun and the other contemporaneously seized items.

## EXHAUSTION

Because this issue was presented to and ruled upon the highest possible court in

27

Oklahoma, the issue has been exhausted.

## GROUND THREE

**THE PROSECUTOR SOUGHT TO SUPPLANT THE JURY S OPINIONS WITH HERS BY GIVING HER PERSONAL OPINION THAT MR. JONES WAS GUILTY AND VOUCHING FOR THE CREDIBILITY OF PROSECUTION WITNESSES.  SHE ALSO FALSELY CLAIMED THAT MR. JONES ADMITTED DRIVING THE SUBURBAN FROM THE HOMICIDE SCENE, ENGAGED IN SPECULATION ON EVENTS SURROUNDING THE HOMICIDE, AND DURING PUNISHMENT PHASE    STARTED TO DEMONSTRATE HOW A SHOOTING OCCURRED BY POINTING HER HAND TOWARD A JUROR S HEAD.  THESE AND OTHER INSTANCES OF PROSECUTORIAL MISCONDUCT DEPRIVED MR. JONES OF HIS RIGHT TO DUE PROCESS OF LAW UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE FEDERAL CONSTITUTION.**

The prosecutor s personal opinions that Mr. Jones was the shooter (and that Mr. Jordan was not the shooter) were as improper as her opinions vouching for the truthfulness of central prosecution witness Jordan.  (Tr. X 48, 59, 61)

She inaccurately quoted Mr. Jones s girlfriend as saying that Mr. Jones admitted driving the Suburban away from the homicide scene (Tr. X 81, 91) (although some correction of the attribution to the girlfriend was attempted (Tr. X 106-07) and speculated about what Paul Howell would have done if he had just been asked.  (Tr. X 64, Tr. XV 147) This calling attention to what Mr. Howell might have done was an encouragement to the jury to base its decisions in part on sympathy.

She also encouraged the jury to disregard mitigating evidence and offered her opinion that the aggravating evidence outweighed mitigation.  (Tr. XV 188, 189, 195)

The improper comments, especially when taken together, were in contravention of

28

Mr. Jones s rights under the Eighth and Fourteenth Amendments to the United States Constitution.   The improprieties entitle Mr. Jones to an issuance of the writ as to the determinations of guilt.  Alternatively, the death sentence should be vacated.

The comments seeking to deprive Mr. Jones of consideration of his mitigating evidence independently entitle the Petitioner to relief under **Lockett v. Ohio,** 438 U.S. 586 (1978) and **Caldwell v. Mississippi,** 472 U.S. 320 (1985).

The statements of personal opinion of guilt and vouching for the truthfulness of a witness were improper under **Cargle v. Mullin,** 317 F.3d 1196, 1218-20 (10th Cir. 2003).

Taken together, the prosecutor s improper comments, crying antics, and attempt to deprive Mr. Jones of the benefit of legitimate evidence, deprived Mr. Jones of his Fourteenth Amendment right to due process of law.  **Donnelly v. DeChristoforo,** 416 U.S. 637 (1974).

The prosecutor s behavior likely adversely affected the outcome of Mr. Jones s trial.  It should not go unanswered

**STANDARD OF REVIEW**

The Court should determine whether the comments about mitigating evidence violated the provisions of **Lockett** and **Caldwell.**   As to the remainder of the prosecutorial misconduct:  Whether habeas relief is warranted on this basis alone depends on a  fundamental fairness  assessment of the misconduct viewed in the context of the entire trial.  **Cargle v. Mullin,** 317 F.3d 1196, 1218 (10th Cir. 2003).

29

## PROCEDURAL DEFAULT

Although some of the improper comments were not met with contemporaneous objection, it would be consistent with **Cargle** to nevertheless consider the cumulative effect of the improper conduct. The **Cargle** case seems to say that where the conduct is inexcusable and prejudicial, the conduct should be noticed under either a prosecutorial misconduct heading or an ineffective assistance heading:   That is, any effort by the State to deflect responsibility for prosecutorial misconduct or to discount the resultant prejudice by blaming defense counsel for not objecting to/curing the errors would support petitioner s case for relief in connection with his associated allegations of ineffective assistance.  **Id.**  at 217.

## EXHAUSTION

These prosecutorial misconduct issues were exhausted by being raised in Proposition XI of Petitioner s direct appeal brief.

### GROUND FOUR

**REMOVAL OF JUROR McPEAK, WHO SAID HE COULD CONSIDER ALL THREE PUNISHMENTS AND WHO WAS EXCUSED WITHOUT DEFENSE OPPORTUNITY TO FURTHER QUESTION HIM, DEPRIVED MR. JONES OF HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE FEDERAL CONSTITUTION.**

Juror McPeak told the Court he could consider all three punishments (Tr. IIA 157), but also indicated a general opposition to capital punishment.  The trial court removed McPeak, nevertheless, after only brief questioning and without the defense having an

30

opportunity to ask Mr. McPeak to clarify his point of view.

Removal of a juror under such circumstances is violative of the constitution.

**Witherspoon v. Illinois,** 391 U.S. 510 (1968); **Wainwright v. Witt,** 469 U.S. 412 (1985).

In **Cudjo v. State,** 925 P.2d 895, 899 (Okla. Crim. 1996), the Court, citing **Gray v. Mississippi,** 481 U.S. 648, 668 (1987), noted:

> Removal for cause of even one venire member who has conscientious scruples against the death penalty but is nevertheless able to set aside those scruples and consider the penalty of death and is therefore eligible to serve on the jury is error of constitutional magnitude not subject to harmless error analysis.

Because of the unconstitutional removal of juror McPeak, Mr. Jones is entitled to the issuance of writ of habeas corpus.

## STANDARD OF REVIEW

As noted above, harmless error analysis does not apply. However, the Court must determine    as it must in connection with most habeas issues    whether the state court unreasonably applied federal constitutional law or unreasonably determined the facts as they apply to federal constitutional law.

## PROCEDURAL DEFAULT

The issue has been preserved. Counsel objected at trial to the removal of juror McPeak. The issue was raised in Proposition XIII, Part B of Mr. Jones s direct appeal brief.

## EXHAUSTION

The issue is exhausted in that it was presented to the highest possible court in the

31

state through its inclusion in Proposition XIII of the direct appeal brief.


## GROUND FIVE

**THE DENIAL OF MR. JONES S RIGHT TO BE PRESENT AT ALL CRITICAL STAGES OF THE PROCEEDINGS AGAINST HIM, DEPRIVED MR. JONES OF RIGHTS UNDER THE DUE PROCESS CLAUSE OF THE FEDERAL CONSTITUTION S FOURTEENTH AMENDMENT AND PURSUANT TO THE RIGHT TO COUNSEL CONTAINED IN THE SIXTH AMENDMENT.**

Trial counsel unilaterally waived, against Mr. Jones s wishes,  Mr. Jones s presence at various court proceedings, including motion hearings, discussions of various legal issues, discussions of mistrial requests, taking up issues of possible jury contamination, and conferencing regarding instructions.  (Mot. 3/8/01 3-8), (Tr. V 127-34), (Tr VI 33, 88), (Tr. VII 5-137), (Tr. X 3-49), (Tr. X 184-85), (Tr. XIII 27-91).

An accused has a right to be present at all critical stages of the proceedings.  **Coleman v. Alabama,** 399 U.S. 1 (1970).  At trial, the accused s participation is important throughout    not just while witnesses are being questioned in open court.  See **Geders v. United States,** 425 U.S. 80 (1976).

Because Mr. Jones was denied his right to be present at all critical stages he is entitled to habeas corpus relief.

**STANDARD OF REVIEW**

The standard habeas considerations of whether the state court unreasonably applied constitutional or unreasonably determined facts applies.

## PROCEDURAL DEFAULT

Trial counsel explicitly waived Mr. Jones s right to be present in most or all

instances of the denial of the right to be present. However, since Mr. Jones did not agree to

be absent, no procedural default occurred.

## EXHAUSTION

This issue was exhausted by being raised in Proposition X of Mr. Jones s direct

appeal brief to the Oklahoma Court of Criminal Appeals.

### GROUND SIX

**MR. JONES WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF APPELLATE
COUNSEL THROUGH FAILURE TO INVESTIGATE AND INTERVIEW
JURORS, FAILURE TO DETERMINE THE EXISTENCE OF ADDITIONAL
CHRISTOPHER JORDAN CONFESSIONS, AND FAILURE TO ARGUE THE
EXISTENCE OF STRUCTURAL ERRORS IN THE CAPITAL PUNISHMENT
SYSTEM OF OKLAHOMA.   CONSEQUENTLY, MR. JONES IS ENTITLED TO
RELIEF UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS
TO THE FEDERAL CONSTITUTION.**

Appellate and trial counsel together failed to discover that juror Whitmire, despite

creating the impression that he had had only minor contact with the legal system prior to

be called to jury, in fact had an extensive record of contacts including multiple offenses of

driving under the influence of alcohol.  They also failed to discover that Emmanuel

Littlejohn s report of a Christopher Jordan confession could be corroborated by at least

one other person   Christopher Berry.  See Appendix of Exhibits in Support of the

Application for Post-Conviction Relief.

Appellate counsel also failed to argue the unconstitutionality of Oklahoma s

33

determination of whether mitigating circumstances outweigh aggravators.  That failure to

argue constituted ineffectiveness because the current scheme violates **Apprendi v. New**

**Jersey**, 530 U.S. 466 (2000) in that only the first fact in the chain of aggravator-mitigator

factfinding is required to be found beyond a reasonable doubt under Oklahoma s current

scheme.

Because of these failures of appellate counsel, Mr. Jones is entitled to relief.

**Evitts v. Lucey,** 469 U.S. 387 (1985).

## STANDARD OF REVIEW

In determining whether an ineffective assistance of counsel issue is meritorious the

Court should, in the case of an omitted issue determine first, whether the issue was so

plainly meritorious that it was unreasonable to winnow it out and second, whether

counsel s performance was deficient when any omitted issues are considered in context

with the rest of the appeal. **Cargle** at 1202.

## PROCEDURAL DEFAULT

The ineffective assistance of counsel issues mentioned here were raised in Mr.

Jones s first and only post-conviction application.  Thus, they were raised at the first

available opportunity and are not procedurally defaulted.

## EXHAUSTION

The ineffective assistance of appellate counsel issues were raised in Proposition I of

Petitioner s post-conviction application and thus are exhausted.

34

## GROUND SEVEN

**MR. JONES IS ENTITLED TO THE ISSUANCE OF A WRIT OF HABEAS CORPUS BECAUSE THE TRIAL COURT UNCONSTITUTIONALLY REFUSED TO DELIVER AN INSTRUCTION DEFINING LIFE WITHOUT PAROLE.**

Despite a defense request for an instruction defining life without parole (O.R. 125-27, 301-02), the trial court refused to issue such an instruction, thus depriving Mr. Jones of rights under the Eighth and Fourteenth Amendments to the federal constitution.

An accused is entitled by the constitution to full information which would be necessary to a fair determination of whether a person should be sentenced to death. **Gardner v. Florida,** 430 U.S. 349 (1977). See **Mollett v. Mullin,** 348 F.3d 902, 905-22 (10th Cir. 2003).

Because of the omission of a critical instruction on an issue that regularly confuses jurors, Mr. Jones is entitled to the issue of a writ of habeas corpus.

## STANDARD OF REVIEW

The Court should determine whether the State court made an unreasonable determination of federal constitutional law or unreasonable application of facts to a constitutional issue.

## PROCEDURAL DEFAULT

The defense offered an instruction regarding life without parole at trial and raised the life-without-parole instruction issue in Proposition XVIII, Part A of the direct appeal brief. Thus there is no procedural default.

**EXHAUSTION**

The issue was exhausted by raising in Proposition XVIII, Part A of the direct appeal

brief.

### GROUND EIGHT

**THE USE OF THE CONTINUING THREAT AGGRAVATING CIRCUMSTANCE IS UNCONSTITUTIONAL BECAUSE THE AGGRAVATOR HAS BECOME A CATCH-ALL WHICH CAN BE USED FOR ANY CONCEIVABLE HOMICIDE. OKLAHOMA THEREFORE DOES NOT IN REALITY HAVE A MEANS OF NARROWING THE FIELD OF HOMICIDES TO DETERMINE WHICH ONES ARE APPROPRIATE FOR THE DEATH PENALTY. THUS, OKLAHOMA S DEATH PENALTY SYSTEM, AND MR. JONES S DEATH SENTENCE, ARE UNCONSTITUTIONAL.**

An Oklahoma defendant can fall subject to the continuing threat aggravating

circumstance because of his attitude. **Snow v. State,** 876 P.2d 291, 298 (Okla. Crim.

1994).

Under current Oklahoma interpretation, there is no homicide which could not be

made to be death-eligible through use of the continuing threat aggravating circumstance.

An aggravator which could be applied to any case is an unconstitutional aggravator.

**Maynard v. Cartwright,** 486 U.S. 356 (1988).

There must be some meaningful way of separating homicides in which the death

penalty is appropriate from those in which it is inappropriate. **Gregg v. Georgia,** 428 U.S.

153 (1976).

Because Oklahoma currently does not accomplish that separation, the death penalty

scheme is unconstitutional. Thus, Mr. Jones s death sentence also is unconstitutional.

36

If an aggravator means everything, it means nothing.

## STANDARD OF REVIEW

The Court should determine whether approval of the continuing threat aggravating circumstance is violative of clearly established federal law as set forth in **Maynard** and **Gregg.**

## PROCEDURAL DEFAULT

The defense objected to the use of the continuing threat aggravator at the trial level and raised the issues in Proposition XV, Part 2 of the direct appeal brief. Thus the issue has been preserved.

## EXHAUSTION

The issue has been exhausted by its presentation to the Oklahoma Court of Criminal Appeals in Proposition XV, part 2 of the direct appeal brief.

## CONCLUSION

In an Edmond police interview with Christopher Jordan, Detective Fike asked Mr. Jordan if Jordan was the one who shot Paul Howell.   We don t have this backwards, do we?,  Detective Fike asked Jordan.  Appendix 10, page 48.

An examination of the facts reveals that the prosecution and the jury may well have things backwards.  Thus, the issues in this case    especially the ineffective issues that directly relate to how well the information implicating Jordan was presented    are prejudicial.

37

Among the various issues worthy of relief, are the issues of counsel being

ineffective in a case when the identity of the perpetrator is in doubt.

A writ of habeas corpus should issue and the State should be directed to release or

retry Mr. Jones. In the alternative, a new sentencing trial and/or a vacation of the death

sentence should be ordered.

Respectfully submitted,


/s Mark Barrett
MARK BARRETT, OBA # 557
P.O. Box 896
Norman, OK 73070
405-364-8367; 405-366-8329(fax)
barrettlawoffice@gmail.com
ATTORNEY FOR PETITIONER


## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of November, 2008, I electronically transmitted
the attached document to the Clerk of Court using the ECF system for filing.  Based on the
records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to
the following ECF registrant: Jennifer L. Strickland, Assistant Attorney General, whose
service email is fhc.dcoket@oag.state.ok.us.


/s/ Mark Barrett


38

# Exhibit C

2515/2249

IN THE DISTRICT COURT OF OKLAHOMA COUNTY

FILED IN THE DISTRICT COURT
OKLAHOMA COUNTY, OKLA.

STATE OF OKLAHOMA

APR 26 2002

PATRICIA PRESLEY, COURT CLERK
by_____
Deputy

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| -vs- | ) | CF-99-4373 |
| | ) | SS#:  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 |
| JULIUS DARIUS JONES, | ) | DOB: 07/25/80 |
| | ) | |
| **Defendant.** | ) | |

## JUDGMENT AND SENTENCE

**Now,** on this 19th day of April 2002, this matter comes on before the undersigned Judge, for sentencing and the Defendant, Julius Darius Jones, appears personally and by Attorney David McKenzie, Malcom Savage and Robin McPhail, the State of Oklahoma represented by Suzanne Lister Gump, and the Defendant, having previously:

Been found guilty by jury to/of the crime(s) of:          **Statutory Reference**

| | | |
|---|---|---|
| Count 1: | Murder in the First Degree | 21 O.S. 701.7 |
| Count 2: | Possession of A Firearm AFCF (1) | 21 O.S. 1283 |
| Count 3: | Conspiracy to Commit A Felony AFCF (2) | 21 O.S. 421 _ |

The defendant has previously been convicted of two (2) felony crime(s) and the sentences in Counts 2 & 3 have been enhanced in accordance with the provisions set forth in Title 21 of the Oklahoma Statutes; and,

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** by the Court that the Defendant, Julius Darius Jones, is guilty of the above described offense(s) and is sentenced as follows:

## TERM OF IMPRISONMENT

| COUNT | SENTENCED TO A TERM OF |
|---|---|
| 1 | Death, |
| 2 | Fifteen (15) Years, |
| 3 | Twenty-Five (25) Years, |

under custody and control of the Oklahoma Department of Corrections.

Count 2 to be served consecutively to Count 1 and Count 3 to be served consecutively to Count 2.

2515/2250

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED BY THE COURT THAT IN ADDITION TO THE PRECEDING TERMS THE DEFENDANT IS ALSO SENTENCED TO:

### COSTS, FEES, VCA, RESTITUTION

The defendant shall pay costs, fees, VCA, and restitution if applicable, instanter.

**IT IS FURTHER ORDERED** that judgment is hereby entered against the Defendant as to the fines, costs and assessments set forth above.

The Court further advised the Defendant of his/her rights and procedure to appeal to the Court of Criminal appeals of the State of Oklahoma, and that if he/she desired to appeal and was unable to afford counsel and a transcript of the proceedings, that the same would be furnished by the State subject to reimbursement of the cost of representation in accordance with Sec. 1355.14 of Title 22.

In the event the above sentence is for incarceration in the Department of Corrections, the Sheriff of Oklahoma County, Oklahoma, is ordered and directed to deliver the Defendant to the Lexington Assessment and Reception Center at Lexington, Oklahoma, and leave therewith a copy of this Judgment and Sentence to serve as warrant and authority for the imprisonment of the Defendant as provided herein. A second copy of this Judgment and Sentence to be warrant and authority of the Sheriff for the transportation and imprisonment of the Defendant as herein before provided. The Sheriff to make due return to the Clerk of this Court, with his proceedings endorsed thereon.

**Witness** my hand the day and year first above mentioned.

_____
**JERRY D. BASS**
**DISTRICT JUDGE**

(SEAL)

ATTEST: Patricia Presley, Court Clerk

By: _____
**Deputy Court Clerk**

-2-

2515/2251

## CLERK'S CERTIFICATION OF COPIES

I, Patricia Presley, Clerk of the District Court of Oklahoma County, State of Oklahoma, do hereby certify the foregoing to be true, correct, full and complete copy of the original Judgment and Sentence in the case of the State of Oklahoma vs. Julius Darius Jones as the same appears of record in my office.

WITNESS my hand and official seal this ___ day of _____, 2002.

**PATRICIA PRESLEY, COURT CLERK**

BY _____

**Deputy Court Clerk**

## SHERIFF'S RETURN

I received this Judgment and Sentence the _____ day of _____, 2002, and executed it by delivering the defendant to the Warden of the Lexington Assessment and Reception Center at Lexington, Oklahoma, on the _____ day of _____, 2002. I also certify the above prisoner has served ____days in the County Jail on the present charge or charges.

**JOHN WHETSEL, SHERIFF OKLAHOMA COUNTY**

_____

**Deputy Sheriff**

-3-

# Exhibit D

## 2006 OK CR 5
## IN THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA

JULIUS DARIUS JONES,      )
                               )
      Appellant,           )      FOR PUBLICATION
                               )
v.                            )      Case No. D-2002-534
                               )
                               )
THE STATE OF OKLAHOMA,    )                **FILED**
                               )   IN COURT OF CRIMINAL APPEALS
      Appellee.           )      STATE OF OKLAHOMA

                                   JAN 2 7 2006

### O P I N I O N

**C. JOHNSON, J.:**
                                        MICHAEL S. RICHIE
                                          CLERK

¶1   Appellant, Julius Darius Jones, was tried by a jury in Oklahoma County District Court, Case No. CF 1999-4373, for First Degree Murder, in violation of 21 O.S.Supp.1998, 701.7(B) (Count 1); Possession of a Firearm after Conviction of a Felony, in violation of 21 O.S.Supp.1998, § 1283 (Count 2); and, Conspiracy to Commit a Felony, in violation of 21 O.S.Supp.1999, § 421 (Count 3). Jury trial was held February 11th – 15th, 19th – 22nd, 25th – 28th, and March 1st – 4th, 2002. The jury found Jones guilty as charged on all counts. The Honorable Jerry D. Bass, District Judge, presided at trial. On Count 1, the jury found the existence of two aggravating circumstances: the defendant created a great risk of death to more than one person[1] and there exists the probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.[2] The jury fixed punishment at death on Count 1, fifteen (15) years imprisonment on Count 2,

---

[1] 21 O.S.2001, § 701.12(2).
[2] 21 O.S.2001, § 701.12(7).

and twenty-five (25) years imprisonment on Count 3. Formal sentencing was held on April 19, 2002. Judge Bass sentenced Jones in accordance with the jury's verdicts and ordered the sentences be served consecutively. Thereafter, Jones filed this appeal.

¶2  On Wednesday, July 28, 1999, Paul Howell was fatally shot in the driveway of his parents' Edmond home. Howell, his sister, Megan Tobey, and Howell's two young daughters had just returned from a shopping trip in Howell's Chevrolet Suburban. Howell pulled into the driveway and turned the engine off. As Tobey exited from the front passenger side, she heard a gunshot. Tobey turned to see her brother slumped over the driver's seat, and a young black male, wearing a white T-shirt, a stocking cap on his head, and bandana over his face, demanding the keys to the vehicle. Tobey rushed to get herself and Howell's daughters out of the Suburban. As Tobey escorted the girls through the carport, she heard someone yelling at her to stop, and then another gunshot. Tobey got the girls inside and summoned for help. Howell's parents ran outside to find their son lying on the driveway. His vehicle was gone. Howell died a few hours later from a single gunshot wound to the head.

¶3  Two days after the shooting, Oklahoma City police found Howell's Suburban parked near a convenience store on the south side of town. Detectives canvassed the neighborhood and spoke with Kermit Lottie, who owned a local garage. Lottie told detectives that Ladell King, and another man he did not know, had tried to sell the vehicle to him the day before. Lottie realized at the time that the vehicle matched the description given in news

2

reports about the Howell carjacking.  Ladell King, in turn, told police that he had agreed to help Christopher Jordan and Jones find a buyer for a stolen vehicle.  On the night of the shooting, Jordan came to King's apartment driving a Cutlass; Jones arrived a short time later, wearing a white T-shirt, a black stocking cap, and a red bandana, and driving the Suburban.  King told police that Jones could be found at his parents' Oklahoma City home.

¶4   Police then drove to Jones's parents' home, called a telephone number supplied by King, and spoke to someone who identified himself as Julius Jones.  Jones initially agreed to come out and speak to police, but changed his mind.  Police made several attempts to re-establish telephone contact; eventually a female answered and claimed Jones was not there.  While some officers maintained surveillance at the home, others sought and obtained warrants to arrest Jones and search his parents' home for evidence.  Police found a .25-caliber handgun, wrapped in a red bandana, secreted in the attic through a hole in a bedroom ceiling and found papers addressed to Jones in the bedroom.  Police also found a loaded, .25-caliber magazine, hidden inside a wall-mounted door-chime housing.  Further investigation revealed that the bullet removed from Howell's head, and a bullet shot into the dashboard of the Suburban, were fired from the handgun found in the attic of the Jones home.

¶5  Christopher Jordan was arrested on the evening of July 30.  Jones, who managed to escape his parents' home before police had secured it, was arrested at a friend's apartment on the morning of July 31.  The two men were charged conjointly with conspiracy to commit a felony, and with the murder of

3

Howell.  Jordan agreed to testify against Jones as part of a plea agreement.  At trial, Jordan testified that the two men had planned to steal a Chevrolet Suburban and sell it; that they followed Howell's vehicle for some time with the intent to rob Howell of it; that once Howell pulled into the driveway, Jordan stayed in their vehicle while Jones, armed with a handgun, approached the Suburban on foot; that after the robbery-shooting, Jones drove the Suburban away and told Jordan to follow him; and that Jones subsequently claimed his gun had discharged accidentally during the robbery.

¶6  Additional facts will be presented as relevant to the issues discussed below.

## JURY ISSUES

¶7   In Proposition Thirteen, Jones submits that errors during jury selection violated his right to a fair and impartial jury in violation of both his federal and state constitutional rights.  Jones complains about the trial court's use of the "struck juror" method of jury selection and about the trial court's removal of a juror for cause.  Defense counsel objected to the trial court's use of the "struck juror" method of jury selection and his objection was overruled.  Appellate counsel argues this method does not comply with applicable statutes, violates Oklahoma law, and constitutes a federal procedural and/or substantive due process violation.

¶8   Oklahoma statutes do not specifically prescribe a method of jury selection.  *See* 22 O.S.2001, §§ 600, 653.  Further, the method of voir dire is discretionary with the trial court.  *Smith v. State,* 1987 OK CR 94, ¶ 53, 737

4

P.2d 1206, 1217.  The trial court's use of the "struck juror" method did not deprive Jones of a fair and impartial method of jury selection.  Jones was provided the opportunity to examine each prospective juror to determine whether grounds existed to challenge the juror for cause and was allowed to exercise all of his peremptory challenges provided for by law. *See Nelson v. State*, 1977 OK CR 224, ¶ 5, 567 P.2d 522, 524 (recognizing similar method taken from Section 575.1 of Title 12, in accordance with Title 22, Section 592).

¶9   We are not persuaded by Jones's claim that this "struck juror" procedure prejudiced him because three prospective jurors were not asked whether they knew the victim and/or any of the witnesses whose names were previously read to the other prospective jurors. Whether the trial court asked each prospective juror individually the same questions does not render the method of voir dire unfair.  Trial counsel had the opportunity to clarify the trial court's questions and to pose additional questions to any prospective juror.  It is trial counsel's duty to examine jurors on voir dire to discover any facts affecting their qualifications to sit as jurors and then reasonably raise any objection that might exist as to any member of the panel. *Wackerly v. State*, 2000 OK CR 15, ¶ 9, 12 P.3d 1, 8.  "Failure to do so waives all but plain error." *Id.*

¶10  We find no plain error.  Jones has not shown the method of voir dire affected his substantial rights or that he was prejudiced by the manner of jury selection and questioning of the potential jurors. *Valdez v. State*, 1995 OK CR 18, *f.* 6, 900 P.2d 363, 369, *f.* 6. (plain errors are errors which counsel failed to

preserve through a trial objection, but which upon appellate review, are clear from the record and affect substantial rights), *Simpson v. State*, 1994 OK CR 40, ¶ 23, 876 P.2d 690, 698 (plain error is an error which goes to the foundation of the case, or which takes from a defendant a right essential to his defense).

¶11   Jones also complains the trial court's decision to remove another juror for cause, over defense counsel's objection, violated his federal constitutional rights and warrants reversal of his convictions and sentences. Jones submits this potential juror was intentionally trying to avoid jury service by stating he would not fairly consider all punishment options and the trial court's refusal to allow counsel an adequate opportunity to rehabilitate the potential juror was error.

¶12   The record reflects the subject potential juror was initially ambiguous in his answers about whether he would be able to fairly consider all three punishment options for murder.   However, upon further questioning by the trial court, the potential juror became more firm in his responses and clearly stated he could not and would not vote for the death penalty under any circumstances.

¶13   "When reviewing cases where the answers of potential jurors are unclear or equivocal this Court traditionally defers to the impressions of the trial court who can better assess whether a potential juror would be unable to fulfill his or her oath." *Scott v. State*, 1995 OK CR 14, ¶ 10, 891 P.2d 1283, 1289.   Here, the trial court observed this potential juror's demeanor and

considered his responses, and we give deference to the trial court's decision to remove him. *Id.* This potential juror's unequivocal responses were sufficient for the trial court to dismiss him for cause. *Williams v. State,* 2001 OK CR 9, ¶ 13, 22 P.3d 702, 710. We also find no error occurred when the trial court denied defense counsel's request for an opportunity to rehabilitate the juror. *Scott,* 1995 OK CR 14, ¶ 11, 891 P.2d at 1289 (when the trial court has asked proper questions to determine whether the prospective jurors can sit in the case, it is not error to deny defense counsel an opportunity to rehabilitate the excused jurors).

¶14    In Proposition Fourteen, Jones claims improper jury influences violated his right to a fundamentally fair trial and an impartial verdict affecting both stages of trial. During first stage proceedings, three jurors received potentially threatening or hang up telephone calls, one juror's home was burglarized, and the codefendant's attorney exchanged a hand-shake greeting with one of the jurors. During second stage proceedings, two jurors allegedly engaged in premature deliberations. The trial court held *in camera* hearings and made inquiries concerning each of these incidents. This claim of error does not warrant relief for the reasons set forth below.

¶15    Those jurors who received the hang-up or unwanted telephone calls each indicated the calls would not affect their ability to be fair and impartial. They did not believe the calls were related to the trial. The trial court determined the jurors were not affected by the telephone calls to Jones's prejudice and properly denied the motion for mistrial. *See Flores v. State,* 1999

OK CR 52, ¶ 22, 994 P.2d 782, 786-787 (excused juror's sympathy towards victim's mother in front of jury did not prejudice defendant and without showing of prejudice no relief was required).

¶16   The juror whose home was burglarized over a weekend trial recess told the trial court she had gone to the District Attorney's office to file a complaint and was told she would have wait until the trial concluded.  Defense counsel's request to excuse the juror was denied.  The decision to excuse a sitting juror and replace the juror with an alternate for good cause rests within the discretion of the trial judge. *See Miller v. State*, 2001 OK CR 17, ¶¶ 23-26, 29 P.3d 1077, 1082-1083.  Here, the juror told the trial court the burglary of her home would not affect her ability to be fair and the trial court properly denied the request to excuse this juror.

¶17   The third alleged instance of improper jury conduct – the codefendant's attorney's hand-shake greeting of a juror – also does not warrant relief.  Defense counsel, after being informed of the contact by the trial court, did not ask to question the juror concerning the contact and did not ask the trial court to remove the juror.  Therefore, we review for plain error. *Simpson*, 1994 OK CR 40, ¶ 2, 876 P.2d at 692-693.

¶18   On appeal, counsel claims because a determination was not made concerning whether the juror was improperly affected, prejudice should be presumed.  We do not agree.  Here, the codefendant's attorney did not tell the juror why he was in the courtroom and did not return to the courtroom after the incident.  We will not presume prejudice from this juror's casual contact

with an attorney whose interest in the trial was not apparent to the juror.  *Cf.*
*Fields v. State*, 1961 OK CR 75, ¶ 15, 364 P.2d 723, 728 (casual contact with
attorney interested in civil aspects of the trial prior to final submission to the
jury did not constitute *prima facie* misconduct requiring reversal absent
showing of prejudice).   Jones has not shown he was prejudiced by this
occurrence and certainly has not shown he was deprived of a fair jury and a
fair trial.

¶19   Lastly, Jones complains about premature deliberations during the
second stage of trial prior to second stage deliberations.  The record shows one
of the jurors informed the trial court she overheard another juror make a
statement[3] which indicated to her that the other juror had already made up his
mind and possibly could influence other jurors if they heard it.  The trial judge
then individually questioned the other jurors to determine if anyone else heard
the statement.   All other jurors denied hearing another juror express an
opinion as to the appropriate penalty or punishment.  Juror Y, alleged to have
made the statement, denied making a statement concerning what the
punishment should be, but then later admitted he "could have said that, yes."
He also admitted he had formed a "partial" opinion on what he thought the
punishment should be but was waiting to hear the rest of the evidence.
Following inquiry of Juror Y, the trial court questioned the reporting juror
again who said she only heard part of the statement and admitted she did not
know if it was related to the case.   Defense counsel's requests to further

---

[3] Juror X told the trial court she heard Juror Y make "a comment that they should place him
in a box in the ground for what he has done."

9

question Juror Y and then to excuse the juror for cause were denied.   Jones complains the denial of those requests was improper and the premature deliberation by even one juror warrants relief.

¶20  A claim of juror misconduct before a criminal case is submitted to a jury must be established by clear and convincing evidence. *Glascow v. State,* 1962 OK CR 41, ¶ 16, 370 P.2d 933, 936; *Pennington v. State,* 1995 OK CR 79, ¶ 18, 913 P.2d 1356, 1363.   Jones must show actual prejudice from any jury misconduct and "defense counsel's mere speculation and surmise is insufficient upon which to cause reversal."   *Woodruff v. State,* 1993 OK CR 7, ¶ 13, 846 P.2d 1124, 1132, *quoting Chatham v. State,* 1986 OK CR 2, ¶ 7, 712 P.2d 69, 71.   The trial court personally observed the jurors and their responses.   We will not disturb its refusal to allow additional questioning and/or excuse the allegedly offending juror for misconduct absent an abuse of discretion. *Teafatiller v. State,* 1987 OK CR 141, ¶ 18, 739 P.2d 1009, 1012. The trial court did not abuse its discretion.   Jones has failed to show that any of his alleged misconduct was prejudicial; therefore, this proposition fails.

### FIRST STAGE ISSUES

¶21  In Proposition One, Jones claims that evidence seized from his parents' home pursuant to a search warrant was improperly admitted.   On July 30, 1999, police officers, believing Jones was present, surrounded Jones's

10

parents' home and attempted to make contact with Jones by telephone.   An

officer spoke with an individual who identified himself as Jones, and some time

later, Jones's parents, sister and brother came out of the house.   Jones's father

told police that Jones was not in the house and invited the police inside to look

for him.   The officers informed Jones's parents they would wait on a search

warrant due to safety concerns.   Thereafter, officers obtained a search warrant.

A police tactical team entered the house around 9:30 p.m. and declared it

secure by 10:00 p.m.   Jones was not inside.   After that, the search team

entered the house and conducted the search.

¶22   The search yielded items seen by the victim's sister during the

crime, clothing items that King saw Jones wearing thirty minutes after the

crime, a semi-automatic, chrome-finished pistol consistent with a gun King

said Jones habitually carried, a red bandana, the pistol's magazine and bullets,

a dark green and a black stocking cap, and a white tee shirt with black trim.

¶23   Jones filed a motion to suppress all the evidence prior to trial,

arguing the affidavit for search warrant lacked probable cause, night-time

authorization was improper under 22 O.S.Supp.1999, § 1230, and the night-

time search was improper.   The trial court denied the motion to suppress.   At

trial, Jones objected to the admission of the evidence on the basis that the

night-time search was not supported by sufficient facts.

¶24   Jones claims the information in the affidavit was insufficient to

ensure the issuing magistrate had a substantial basis for concluding that

probable cause existed.   He complains that the affidavit did not contain a

factual basis establishing that evidence would be found in Jones's parents' residence and did not include any information establishing the reliability of the statement from, or the veracity of, Ladell King.   Jones also claims his trial counsel was ineffective for failing to object to the search warrant on the basis that the affidavit contained deliberate false and/or misleading information. An argument raised in support of a motion to suppress which is not raised at trial is waived. *Young v. State*, 1998 OK CR 62, ¶ 22, 992 P.2d 332, 339.   Therefore, we review Jones's claim that the affidavit was insufficient to establish probable cause for plain error. *Cheatham v. State*, 1995 OK CR 32, ¶ 48, 900 P.2d 414, 427.

¶25   We give a magistrate's finding of probable cause great deference. *Mollett v. State*, 1997 OK CR 28, ¶ 14, 939 P.2d 1, 7.   The residence of a person suspected of a crime is a natural place for concealing evidence of that crime. *Id.*, 1997 OK CR 28, ¶ 15, 939 P.2d at 7.   Further, facts to establish the reliability of information obtained from King was not necessary, because King was named in the affidavit as the giver of the information. *Caffey v. State*, 1983 OK CR 39, ¶ 11, 661 P.2d 897, 900.   Upon review, we find the information set forth in the affidavit sufficient to support the magistrate's finding of probable cause and issuance of the search warrant.

¶26   We also find trial counsel was not ineffective for failing to object and request a *Franks*[4] hearing to determine whether the police knowingly or with reckless disregard for the truth included false or misleading information in the

---

[4] *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

affidavit or omitted critical information.   Jones submits the police intentionally omitted critical information from the affidavit -- that the police knew Jones had left the residence prior to obtaining the search warrant.   The record shows the police had Jones's residence surrounded and attempted contact with Jones, whom they believed was inside, at the time other officers were preparing the affidavit.   Around 4:30 p.m., Jones's father told police Jones was not inside. This information was not included in the affidavit which was presented to the magistrate around 7:00 p.m.

¶27   In *Franks v. Delaware*[5], the Supreme Court held that an affidavit supporting a factually sufficient search warrant might be attacked upon allegations that the affidavit contained intentional lies or reckless disregard for the truth.   If the inaccuracies are removed from consideration and there remains in the affidavit sufficient allegations to support a finding of probable cause, the inaccuracies are irrelevant. *Id.*, 438 U.S. 154, 171, 98 S.Ct. at 2684. To determine whether the inaccuracies are irrelevant, we ask whether the warrant would have been issued if the judge had been given accurate information. *Wackerly*, 2000 OK CR 15, ¶ 13, 12 P.3d at 9.   We find, even had the affidavit included Jones's parents' claim that Jones had left the home, a substantial basis for the issuance of the warrant would have existed and the warrant would have properly been issued.

¶28 The magistrate had a substantial basis for concluding that probable cause existed.   No plain error occurred.   Further, trial counsel's failure to

---

[5] *See f.* 4.

attack the sufficiency of the affidavit at trial and request a *Franks* hearing does not constitute deficient performance, as such an objection would have failed. *Phillips v. State*, 1999 OK CR 38, ¶ 104, 989 P.2d 1017, 1044.

¶29   At trial, counsel objected to admission of the evidence seized pursuant to the search warrant on the basis that the search was conducted in the night-time and that the night-time service of the warrant was improperly granted.  A search warrant for an occupied dwelling must be served between the hours of 6:00 a.m. and 10:00 p.m., unless the issuing magistrate finds there is a likelihood the property named in the search warrant will be destroyed, moved or concealed. 22 O.S.2001, § 1230.   Here, the issuing magistrate authorized service at any time, but did not provide written findings supporting his decision.  After a pre-trial hearing, the judge hearing the motion to suppress determined that actual entry into the residence was made prior to 10:00 p.m. and therefore whether the night-time authorization and service was proper was moot.   Now on appeal, Jones contends the time of the officers' initial entry into the home is not controlling; the time the officers entered the home with the intent to search and began to conduct the search is controlling for determining whether the search was conducted at night.

¶30  An otherwise valid search warrant which authorizes service at any time, but which is not supported by facts required by 22 O.S.2001, § 1230, is not void for this reason alone when the warrant is in fact served in the daytime. *State v. Stafford*, 1992 OK CR 47, ¶ 8, 845 P.2d 894, 895.  In this case, a police tactical team entered the residence around 9:30 p.m., after officers had been

14

watching the house for over six hours. The tactical team entered first to secure the residence and to serve the arrest warrant and arrest Jones, so that the search for items of evidence could proceed safely. We find this preliminary safety sweep constituted the initial execution of the search warrant. The trial court correctly found that the search commenced upon the tactical team's initial entry into the residence. Although the search for the items listed in the warrant did not begin until after 10:00 p.m., the service of the search warrant begins once an officer crosses the threshold for the purpose of beginning the search or for securing the residence for a later search. Therefore, because the search commenced prior to 10:00 p.m., Jones's complaint that the affidavit did not support night-time service is moot. The trial court did not abuse its discretion by admitting evidence recovered during the search, and this proposition fails.

¶31 In Proposition Two, Jones contends the evidence was insufficient to prove he shot and killed Mr. Howell or that he was a principal in the conspiracy to the underlying felony of armed robbery. First he asserts the physical evidence recovered during the search should not have been considered because it was not properly admitted. Secondly, Jones argues that both King and Jordan were accomplices or coconspirators as to both Counts 1 and 3 and, because their testimony was not corroborated, the jury could not properly consider it.

¶32 We review claims going to the sufficiency of the evidence by viewing the evidence in a light most favorable to the State to determine whether a

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Spuehler v. State*, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203-04.   Contrary to Jones's assertions, we find the evidence presented was sufficient on both Counts 1 and 3.

¶33   We have already determined that the admission of the physical evidence recovered during the search of Jones's parents' residence was proper. Accomplice testimony must be corroborated with evidence, which standing alone tends to link the defendant to the commission of the crime charged.   22 O.S.2001, § 742.   An accomplice's testimony need not be corroborated in all material respects; the amount of corroboration required is simply "at least one material fact of independent evidence which tends to connect the defendant with the commission of the crime." *Cummings v. State*, 1998 OK CR 45, ¶ 20, 968 P.2d 821, 830.   The test used to determine whether a witness is an accomplice is whether he or she could be indicted for the crime which the accused is being tried for. *Anderson v. State*, 1999 OK CR 44, ¶ 23, 992 P.2d 409, 418.

¶34   Corroboration of the codefendant Jordan's testimony was required as he clearly was an accomplice. However, King's testimony did not need to be corroborated, because the record does not show he was an accomplice.   King was not involved in Howell's murder in any way, and there was no evidence that he was involved in any preconceived plan to participate in the underlying felony.   Because King was not an accomplice as a matter of law, the jury could properly consider his testimony and statements without corroboration, and his

16

testimony could corroborate the accomplice/codefendant Jordan's testimony. Besides King, other witnesses corroborated Jordan's testimony and established at least "one material fact of independent evidence" that tended to connect Jones to both crimes.[6] *Cummings*, 1998 OK CR 45, ¶ 20, 968 P.2d at 830.

¶35   This Court will not disturb a jury verdict where there is sufficient evidence to support it, as it is the jury's exclusive province to weigh the evidence and determine the facts.   *Torres v. State*, 1998 OK CR 40, ¶ 38, 962 P.2d 3, 16.   From the physical evidence presented, the corroborated testimony of the codefendant Jordan, and the testimony of other witnesses at trial, in a light most favorable to the State, we find a rational trier of fact could conclude beyond a reasonable doubt that Jones was guilty of both First Degree Felony Murder and Conspiracy to Commit a Felony.

¶36   In Proposition Three, Jones contends the evidence was insufficient to prove he was in possession of a firearm.   Again, Jones presumes the physical evidence recovered during the search was inadmissible and the testimony of King and Jordan was not sufficiently corroborated, leaving insufficient evidence to prove Count 2.   We disagree.

¶37   The .25 caliber chrome-plated semi-automatic pistol which was used to kill Howell was found in Jones's home in the insulation near an attic access in Jones's bedroom, and it was properly admitted.   Jones admitted to

---

[6] For example, besides King, another witness testified he saw Jones in the parking lot of his apartment complex, shortly after Howell was shot, with a brown Suburban matching the description of Howell's stolen Suburban.   Another witness testified he saw the codefendant's vehicle, with two young black males, circling the Braum's parking lot at approximately the same time the victim and his family were at the Braum's drive-through.

his girlfriend prior to Howell's murder that he had a .25 caliber chrome semi-automatic pistol which he kept for protection.   The codefendant Jordan testified that Jones had a gun, that Jones planned to use it when they planned to rob Howell and take his Suburban, and that he saw Jones with the gun in hand at the time Jones approached Howell.   Jordan testified that he was with Jones when he bought the pistol and saw Jones in possession of the gun days prior to the murder.   Further, the evidence established that Jones had a prior felony conviction.   In a light most favorable to the State, a rational trier of fact could have found the essential elements of possession of a firearm after a felony conviction beyond a reasonable doubt. *Spuehler,* 1985 OK CR 132 at ¶ 7, 709 P.2d at 203-04.

¶38  In Proposition Four, Jones argues the trial court's refusal to give his requested first-stage jury instructions deprived him of a fundamentally fair trial.   From the record, it appears the trial court did not refuse Jones's requested instructions on Voluntary Statement by Defendant (OUJI-CR 2d. 9-12) and Necessity for Corroboration of Confessions (OUJI-CR 2d. 9-13), but rather inadvertently omitted them from the final instructions given to the jury.

¶39  Whether or not omission of these instructions was inadvertent, trial counsel did not object to the missing instructions and our review is for plain error. *Phillips,* 1999 OK CR 38, ¶ 66, 989 P.2d at 1036.   Even if error occurred in the inadvertent omission of these instructions, we find the error was harmless beyond a reasonable doubt. *See Davis,* 1999 OK CR 48, ¶ 15, 993 P.2d at 127 (failure to give OUJI-CR 2d 9-12 harmless in light of the entire

18

record).  The evidence was clear and uncontested that Jones's admissions to Jordan and King were voluntary.   Furthermore, there was overwhelming evidence introduced to corroborate them.

¶40   Jones also submits the trial court's refusal to give his requested instructions on Accessory (OUJI-CR 2d 2-1, 2-2, 2-3, 2-4) and a version of the non-unanimous instruction (OUJI-CR 2d 10-27) as modified in *Graham v. State*, 2001 OK CR 18, ¶ 6, 27 P.3d 1026, 1027-1028.  The determination of which instructions shall be given to the jury is a matter within the discretion of the trial court and absent an abuse of that discretion, this Court will not interfere with the trial court's judgment if the instructions as a whole, accurately state the applicable law.  *Patton v. State*, 1998 OK CR 66, ¶ 49, 973 P.2d 270, 281-282.

¶41   The evidence in this case clearly showed that Jones's participation in the murder and robbery of Howell was more than simply an accessory after the fact.   He participated as a principal, and accessory after the fact instructions were neither required nor warranted under the facts of this case.  *See Cummings*, 1998 OK CR 45 at ¶ 40, 968 P.2d at 834.  The trial court did not abuse its discretion by refusing these requested instructions.

¶42   In Proposition Five, Jones claims the improper admission of evidence and a flight instruction violated his right to remain silent and his right to due process and a fundamentally fair trial.  Trial counsel moved, *in limine*, to preclude the admission of evidence that he left his home after the police requested that he come out of the residence and talk about the murder.  He

19

contends this evidence violated his fundamental right to remain silent and the trial court improperly denied the motion. The State introduced testimony showing Jones left the house *via* second story window because police were everywhere and that he left the area so that he could hire an attorney and get things straightened out. The trial court then gave the flight instruction, OUJI-CR 2d 9-8, during first stage over defense objection.

¶43 We find no Fifth Amendment violation here where Jones neither testified nor was asked questions about his pre-arrest silence, and this Court's holding in *Farley v. State*, 1986 OK CR 42, ¶¶ 4-6, 717 P.2d 111, 112-113 is not applicable. Flight instructions are appropriate where defendant's statements concerning departure are made in a voluntary confession. *Mitchell v. State*, 1993 OK CR 56, ¶ 8, 876 P.2d 682, 684. Under these circumstances, the defendant either admits to the alleged crime and/or places himself at the scene, thus removing any assumptions. *Id*. In this case, Jones told Vickson McDonald that he had to leave his house through a second story window, and he told Analiese Presley that he was leaving to get a lawyer. These statements explained or controverted the State's evidence of flight which showed Jones fled from a second story window after an officer talked to him by phone and asked him to come out of the house. The flight instruction was properly given. *Mitchell*, 1993 OK CR 56, ¶ 9, 876 P.2d at 684.

¶44   Prior  to trial, the trial court sustained Jones's motion *in limine* regarding the use of evidence relating to the "Hideaway robbery events."[7]  As to use of the term "carjacking," the trial court ruled the witnesses would be able to testify in their  own words and the State agreed to limit the police officers to use of the term  "robbery" instead of "carjacking." In Proposition Six, Jones argues the improper admission of other crimes evidence through witness testimony during  first stage of trial violated the ruling *in limine* and his right to a fair trial.  Trial  counsel objected in several instances and his objections were sustained, curing  any error which may have occurred. *Young v. State,* 2000 OK CR 17, ¶ 50, 12 P.3d 20, 37. Those instances which were not met with a timely objection, we review for plain error. *Simpson,* 1994 OK CR 40, ¶ 2, 876 P.2d at 692-693.

¶45   Of those errors not receiving contemporaneous objections, Jones claims the use of the word "carjacking" by Kermit Lottie violated the court's pre-trial ruling.   The ruling by the trial court at the motion hearing was that non-police witnesses, such as Kermit Lottie, would be able to describe events in their own words.   Therefore, we find no error.   Jones complains Flowers' testimony about gang violence, gang investigations and the prevalence of gangs in the area where the Suburban was found was unfairly prejudicial, but we disagree and find no plain error.

---

7 About a week before Howell's murder, two vehicle robberies, or "carjackings," took place near a Hideaway Pizza restaurant in north Oklahoma City.  Once Jones and Jordan were arrested for Howell's murder, police began to focus on the two men as the perpetrators in the Hideaway crimes as well.  The State was permitted to use the Hideaway crimes in the capital sentencing phase of Jones's trial, to show that he posed a continuing threat to society.

21

¶46  Jones objected to the codefendant Jordan referring to Jones getting out of the Cleveland County jail.  The trial court sustained the objection and admonished the jury.  We find that the admonishment to the jury was sufficient to cure any error and no plain error occurred.  Jones objection to the prosecutor's statement that Jones was "afforded an opportunity to escape that residence" was also sustained, the jury admonished, and we find the admonishment was sufficient to cure any error.

¶47  Lastly, Jones complains King's testimony improperly introduced other crimes evidence.  King testified Jones and Jordan told him they had a "hookup" on some cars and asked him if he knew anyone who would buy them.  After a lengthy hearing, the trial court ruled that the evidence was *res gestae*.

¶48  Evidence of other crimes or bad acts is generally inadmissible, but may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."  12 O.S.2001, § 2404(B).  Other crimes evidence may also be admissible where it is part of the *res gestae* of the crime charged.  *Pickens v. State*, 2001 OK CR 3, ¶ 20, 19 P.3d 866, 876; *Neill v. State*, 1994 OK CR 69, ¶¶ 35-36, 896 P.2d 537, 550-51.  The *res gestae* exception differs from the other listed exceptions to the evidence rule; in the other exceptions, the other offense is intentionally proven, while in the *res gestae* exception, the other offense incidentally emerges. *Neill, id*.  The final decision on the admissibility of evidence is left to the sound discretion of the trial court, and absent a clear

showing of abuse and resulting prejudice, this Court will not disturb the trial court's ruling. *Pickens*, 2001 OK CR 3, ¶ 21, 19 P.3d at 876.

¶49   Here, we find no abuse of discretion in the admission of King's testimony.   It showed Jones's conduct in the conspiracy as an occurrence forming an integral part of the transaction which completed the picture of the offense charged. *Van White v. State*, 1999 OK CR 10, ¶ 75, 990 P.2d 253, 273. The probative value of the evidence was not substantially outweighed by the danger of unfair prejudice as required by 21 O.S. 2001 § 2403.   Jones could not have been surprised by the testimony as providing essential background to the conspiracy charge.

¶50   In Proposition Seven, Jones argues the State's failure to disclose, or defense counsel's failure to adequately investigate, obtain and use, available *Brady* material violated his rights to confrontation, due process, and to effective assistance of counsel.   Specifically, Jones contends the State's failure to disclose a letter written to the federal court concerning Lottie's cooperation as a witness, King's pending Oklahoma County bogus check charge, and its knowledge of the owner of cigarettes found in the victim's Suburban violated the provisions of *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215 (1963).   Alternatively, Jones argues his trial counsel was ineffective for failing to discover the information.

¶51   "Due process requires the State to disclose exculpatory and impeachment evidence favorable to an accused. *See United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), *Giglio v. United States*,

23

405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d [104] (1972), *Brady v. Maryland*, 373

U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *Napue v. Illinois*, 360 U.S.

264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)." *Wright v. State*, 2001 OK CR 19, ¶

22, 30 P.3d 1148, 1152.   To establish a *Brady* violation, a defendant must

show that the prosecution suppressed evidence that was favorable to him or

exculpatory, and that the evidence was material. *Paxton v. State*, 1993 OK CR

59, ¶ 15, 867 P.2d 1309, 1318.   In *Bagley*, the Supreme Court established a

single test for materiality:

> The evidence is material only if there is a reasonable probability
> that, had the evidence been disclosed to the defense, the result of
> the proceeding would have been different.  A reasonable probability
> is a probability sufficient to undermine confidence in the outcome.

*Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383.   The question is not whether the

verdict more likely than not would have been different, but "whether in its

absence [the defendant] received a fair trial, understood as a trial resulting in a

verdict worthy of confidence." *Kyles*, 514 U.S. at 434, 115 S.Ct. at 1566.

¶52   The evidence relating to Lottie and King was impeachment evidence

which should have been disclosed to Jones prior to trial. *Bagley*, 473 U.S. at

676, 105 S.Ct. at 3380.   However, the additional criminal charges were

discovered during the trial and King and Lottie were recalled to testify about

most of the other charges.   Jones was not unduly prejudiced by the untimely

disclosure of this impeachment information and was not denied a fair trial.  As

Jones cannot show prejudice from the untimely disclosure of this impeachment

evidence, we also find he has not shown his trial counsel was ineffective for

failing to discover the evidence. *Strickland v. Washington,* 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984) (when a claim of ineffective counsel can be disposed of on the ground of lack of prejudice, that course should be followed).

¶53   The letter to federal courts concerning Lottie's cooperation as a witness[8] was not discovered until shortly after trial although it was written more than one year before trial.  Jones claims the letter could have been used to impeach Lottie who testified he had no expectation of receiving any lenient treatment in his federal case in exchange for his testimony against Jones. Jones asserts  the information that King was previously an informant also could have been used to attack his credibility.  The prosecution had a duty to discover and disclose the letter written by Detective Fike.  *Kyles,* 514 U.S. at 437, 115 S.Ct. at 1567 (it is the duty of the prosecution to ascertain any favorable evidence known to those acting on behalf of the State, including the police).

¶54   Lottie's plea agreement and a motion for continuance filed in the federal case was introduced at trial and the jury was aware of the pending federal proceeding and the charges against Lottie.   Trial counsel cross-examined Lottie about any deals which might have been made on his behalf. As the trial court noted, Lottie's testimony was the same before and after the

---

[8] The letter was authored by Detective Fike, was written on Edmond Police Department stationery, was dated 1/25/2001 and was addressed to Assistant U.S. Attorney Mary Smith. The letter stated, in pertinent part:  "If Kermit had not cooperated with my investigation I believe the homicide would be unsolved to this day.  Thus, I am writing you due to a request from Kermit to help him in his upcoming sentencing hearing. ... If there is anything that you can do to help Kermit I would appreciate it."  The letter also said, "I knew [Mr. King] because he had been an informant of mine when I worked on the D.A.'s task force."

100 of 215

federal charges were filed; its consistency demonstrated his testimony was unaffected by what he thought would or would not happen to him at his federal sentencing.     The record demonstrates the jury knew Lottie had federal charges against him for which he would be sentenced and knew his testimony at Jones's trial was the basis for the continuance request in the federal trial.

¶55  The possibility that an item of undisclosed information might have helped the defense or affected the outcome does not establish materiality. *Knighton v. State*, 1996 OK CR 2, ¶ 43, 912 P.2d 878, 890.  We find the letter was not material.  Had Lottie's testimony not been admitted at all, the evidence presented against Jones was overwhelming.  Even had the letter been disclosed and known to defense counsel at the time of trial, we cannot say its use as impeachment evidence would have affected the outcome of the trial.

¶56  Jones also claims evidence that cigarettes found in the victim's Suburban belonged to the victim's friend should have been disclosed prior to trial and was not.   As a result, defense counsel attempted to show the cigarettes belonged to King.  Jones contends that because the owner of the cigarettes was not disclosed timely, the prosecution unfairly undermined the credibility of the defense for wasting time on a non-issue.

¶57  The State did not use the cigarettes as evidence linking Jones to the crime.  As Jones admits, who owned the cigarettes was a non-issue and this information was not material.

¶58  After careful review, we find the cumulative effect of the *Brady* violations does not warrant relief.   Jones received a verdict worthy of

26

confidence even in the absence of the letter pertaining to Lottie and the evidence of additional criminal charges against witnesses Lottie and King. Any error pertaining to the non-disclosure of this information does not raise a reasonable probability sufficient to undermine confidence in the outcome of this trial and was harmless beyond a reasonable doubt. *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3384; *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

¶59  FBI examiner Lundy testified at trial that all the bullets recovered as physical evidence in this case were "analytically indistinguishable and chemically the same" and would have come from the same source of lead at Remington. She also admitted there were likely upwards of three million other boxes of ammunition with the same chemical composition.  In Proposition Nine, Jones argues his inability to confront Lundy on cross-examination with her prior, but unknown at trial, perjurious expert testimony, violated her right of confrontation and due process under both the federal and Oklahoma Constitutions.

¶60  Over a year after Jones's trial concluded, Lundy, no longer employed with the FBI, pled guilty to a misdemeanor count of false swearing in Kentucky relating to expert testimony on bullet lead composition which she gave in a pretrial hearing shortly before Jones's trial.  Jones argues his counsel's inability to confront Lundy with this prior perjurious testimony was fundamentally unfair and constituted a due process violation.

27

¶61   We disagree.   We will not find Jones's confrontation and due process rights violated by something that had not occurred at the time of his trial. Jones cannot show he was prejudiced by the inability to cross-examine Lundy on this claim.   *Derosa v. State*, 2004 OK CR 19, ¶ 53, 89 P.3d 1124, 1145.   Lundy's testimony was not highly compelling, particularly when one considers her admission that over three million boxes of ammunition would have the same chemical makeup, and the other strong evidence – particularly the tool-mark evidence showing the recovered bullets were all fired from the same gun – which was admitted at trial.   Jones cannot demonstrate the outcome of his trial would have been different had trial counsel known Lundy's testimony in an unrelated proceeding was later found to be perjurious.

¶62   In Proposition Twelve, Jones argues his convictions for both Conspiracy to Commit Robbery (Count 3) and Robbery-Murder (Count 1) violate State or federal constitutional prohibitions against double jeopardy and the Oklahoma statutory provision against double punishment. Jones concedes prior cases hold that a conviction for conspiracy and the substantive offense ordinarily do not violate double jeopardy, but argues that because the conspiracy was based on the underlying felony of armed robbery, the same underlying felony for the felony murder, the conspiracy count should be dismissed. Jones asks this Court to reconsider its holding in *Davis v. State*, 1999 OK CR 48, 993 P.2d 124.

¶63   Oklahoma law provides that "an act or omission which is made punishable in different ways by different provisions of this code may be

punished under either of such provisions ... but in no case can it be punished under more than one[.]" 21 O.S.2001, § 11A.   The proper analysis of a Section 11 claim focuses on the relationship between the crimes. *Davis*, 1999 OK CR 48, ¶ 13, 993 P.2d at 126.   "One act that violates two criminal provisions cannot be punished twice, absent specific legislative intent. This analysis does not bar the charging and conviction of separate crimes which may only tangentially relate to one or more crimes committed during a continuing course of conduct." *Id.*, 1999 OK CR 48, ¶ 13, 993 P.2d at 127.   Section 11 is not violated where offenses arising from the same transaction are separate and distinct and require dissimilar proof. *Hale v. State*, 1995 OK CR 7, ¶ 4, 888 P.2d 1027, 1029; *see also Doyle v. State*, 1989 OK CR 85, ¶ 16, 785 P.2d 317, 324 (where a single act constitutes a violation of two statutory provisions, dissimilar proof of the elements is required if the elements of the several offenses are identical).   A traditional double jeopardy analysis is only conduct if Section 11 does not apply. *Mooney v. State*, 1999 OK CR 34, ¶ 14, 990 P.2d 875, 882-883.

¶64   Conspiracy is a crime, separate and distinct, from the underlying crime contemplated.   *Littlejohn v. State*, 1998 OK CR 75, ¶ 30, 989 P.2d 901, 909-10; *Huckaby v. State*, 1990 OK CR 84, 804 P.2d 447, 450.   Conspiracy to commit a crime requires an agreement between two or more people to commit an unlawful act, and some overt act by one or more of the parties in furtherance of this agreement.   *Jones v. State*, 1998 OK CR 36, ¶ 3, 965 P.2d 385, 386.

¶65   Here, the act of plotting with Jordan to steal a Suburban, and following the victim in his Suburban from Braum's parking lot to his Edmond home, is what led to Jones's conviction for Conspiracy to Commit a Felony. The agreement and overt act were complete before any act giving rise to Count 1 was carried out. Two separate acts were clearly committed; punishment for both is not prohibited under Section 11A. *Littlejohn, id.*

¶66   Because Section 11 does not apply, we now conduct a traditional double jeopardy analysis. This Court exclusively applies the "same evidence" test in its analysis of a double jeopardy claim. *Mooney*, 1999 OK CR 34, ¶ 17, 990 P.2d at 883; *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed.2d 306, 309 (1932). The crimes of Conspiracy to Commit a Felony and First Degree (Felony) Murder are separate and distinct crimes with totally dissimilar elements; each requires proof of elements not contained in the other. Accordingly, Jones's double jeopardy claim fails.

### ERRORS AFFECTING BOTH STAGES OF TRIAL

¶67   Jones argues, in Proposition Ten, that he is entitled to a new trial because he was deprived of the right to be present at all critical stages of his trial in violation of due process and Oklahoma statute. Jones claims he did not knowingly and voluntarily waive his right to be present at various hearings conducted during the course of his trial. Jones states his trial counsel unilaterally waived his right to be present during certain court proceedings and on numerous other occasions the record is silent as to Jones's presence or waiver by trial counsel. Jones claims his absence on these occasions

30

prevented him from consulting with counsel which constitutes a due process violation and a structural flaw in the proceedings against him.

¶68   A defendant's right to be present "at the trial" is protected by statute.  22 O.S.2001, § 583; *Dodd v. State*, 2004 OK CR 31, ¶ 20, 100 P.3d 1017, 1027; *Ryder v. State*, 2004 OK CR 2, ¶ 29, 83 P.3d 856, 864; *Perry v. State*, 1995 OK CR 20, ¶ 25, 893 P.2d 521, 527-28.  The "right to be present" that Jones claims was violated is rooted primarily in a defendant's Sixth Amendment right to confront the witnesses against him. *Dodd, id.* A defendant's Fifth Amendment due process right is violated only if the defendant's absence from some portion of the proceedings is shown to have impaired his ability to defend himself. *Id.*; *see United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985); *Snyder v. Massachusetts*, 291 U.S. 97, 105-106, 54 S.Ct. 330, 332-33, 78 L.Ed. 674 (1934).  This "right to be present" has limitations, however. *Dodd, id.*

> An accused does not have an absolute constitutional right to be present at every *in camera* discussion between court and counsel, even during the trial itself. *Davis v. State*, 1988 OK CR 153, ¶ 12, 759 P.2d 1033, 1036. Nor does the statutory right to be present "at the trial" extend to *in camera* hearings or other matters outside the jury's presence. *Reid v. State*, 1970 OK CR 149, 478 P.2d 988, 999-1000, *modified* 507 P.2d 915.

*Dodd*, 2004 OK CR 31, ¶ 20, 100 P.3d at 1027-1028.

¶69   The record shows Jones was present for all critical stages.  Jones was present at all times the jury was in the courtroom, except for one occasion when the jury was brought into the courtroom for the sole purpose being dismissed for the day.  A knowing and voluntary waiver of his presence was not

necessary for the pretrial hearings, motion hearings or the *in camera* hearings. *Dodd, id.* Trial counsel for Jones was always present at these hearings.

¶70   A defendant must be allowed to be present where his presence "bears, or may be fairly assumed to bear, a relation, reasonably substantial, to his opportunity to defend." *Lockett v. State*, 2002 OK CR 30, ¶ 9, 53 P.3d 418, 423, *quoting Snyder v. Massachusetts*, 291 U.S. 97, 106, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934). In *Lockett*, this Court said "it did not intend to hold in any way that 'the Fourteenth Amendment assures the privilege of presence when presence would be useless, or the benefit but a shadow.'" *Id. (quoting Snyder*, 291 U.S. at 106-107, 54 S.Ct at 332). Appellant here has not specifically shown how his presence was necessary at these various hearings or how he was deprived of his opportunity to defend his case by his absence. We find no statutory violation, no due process violation and no error.

¶71   In Proposition Eleven, Jones argues various trial errors and prosecutorial misconduct deprived him of a fair trial and a reliable sentencing proceeding and warrants a new trial or modification of his sentences. Jones's complaints include: improper display of emotion, improper personal opinion, misstating evidence, misleading comments, arguing guilt by association, speculation, going outside record, inflammatory demonstration, arguing that Jones committed unadjudicated crimes without a reliable basis, evoking emotional response, misstatement of applicable law and improper argument.

¶72   Many of the errors claimed by Jones were not objected to at trial; therefore, we review those claims for plain error. *Banks v. State*, 2002 OK CR

9, ¶ 41, 43 P.3d 390, 401.  After carefully reviewing the arguments and record, we find no plain error.  Some of the errors claimed by Jones were objected to at trial and the objections were sustained by the trial court, most with instructions or admonishments, which cured any error that may have occurred.  *Slaughter*, 1997 OK CR 78, ¶ 110, 950 P.2d at 869.

¶73  Some of the instances Jones complains of were proper comments on the evidence, reasonable inferences based on the evidence, or evidentiary rulings by the trial court that were not an abuse of discretion.  *Bland v. State*, 2000 OK CR 11 ¶ 97, 4 P.3d 702, 728.  The jury was properly instructed that it was the finder of fact and that attorney argument was not evidence.  Juries are presumed to follow their instructions.  *Turrentine v. State*, 1998 OK CR 33, ¶ 26, 965 P.2d 955, 968.  The comments were the typical sort of comments made during the normal course of closing argument and, as such, these instances of alleged improper comment fall within the broad parameters of effective advocacy and do not constitute error.  *Matthews v. State*, 2002 OK CR 16, ¶ 38, 45 P.3d 907, 920.

¶74   We address one complaint concerning an inflammatory demonstration by the prosecutor.   During sentencing stage final closing argument, the prosecutor, in describing how the victim was killed, stated Jones held the gun to Howell's head while simultaneously pointing her finger at a juror's head, as if demonstrating a gun pointed towards the juror's head.  Trial counsel objected, but the prosecutor continued the demonstration using co-counsel as the victim.

¶75  This Court has previously upheld demonstrations that are based on the evidence presented at trial and not theatrical demonstrations. *Gilbert v. State*, 1997 OK CR 71, ¶ 94-95, 951 P.2d 98, 121.  This demonstration was an attempt to illustrate the shooting based upon the evidence presented at trial; however, the conduct involving a juror cannot be condoned.  Still, we find it was not so egregious as to elicit an emotional response rather than a rational judgment from the juror or the jury and it was not so prejudicial as to deprive Jones of a fair sentencing proceeding.

¶76  "Allegations of prosecutorial misconduct will not cause a reversal of judgment or modification of sentence unless their cumulative effect is such as to deprive the defendant of a fair trial and fair sentencing proceeding." *Spears v. State*, 1995 OK CR 36, ¶ 60, 900 P.2d 431, 445.  This Court looks at the entire record to determine whether the cumulative effect of improper conduct by the prosecutor prejudiced an appellant causing plain error. *Romano v. State*, 1995 OK CR 74, ¶ 54, 909 P.2d 92, 115.  Having reviewed the entire record, we find neither reversal nor modification is warranted on this proposition.

### INEFFECTIVE ASSISTANCE OF COUNSEL

¶77  In Proposition Eight, Jones complains that he was denied his right to effective assistance of trial counsel, guaranteed by the Sixth Amendment to the United States Constitution and corresponding provisions of the Oklahoma Constitution.  Jones cites several instances of allegedly deficient performance in both the guilt-innocence phase of the trial as well as the capital sentencing

phase of the trial. Jones also timely filed a motion to supplement the appeal record with information supporting his ineffective-counsel claims, and requested an evidentiary hearing thereon. *See* Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18 App. (2003). We granted the motion to supplement and remanded the case to the district court for an evidentiary hearing on only one of the issues raised by Jones. The particulars of that claim are discussed in more detail below.

¶78 The analysis for each of Jones's claims is the same. To prevail on a claim of ineffective assistance of trial counsel, Jones must demonstrate (1) that trial counsel's performance was deficient under prevailing professional norms, and (2) that Jones was prejudiced by the deficient performance. *Black v. State*, 2001 OK CR 5, ¶ 65, 21 P.3d 1047, 1070; *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d 674. As to the first part of this test, we indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. This presumption is due, in large part, to the many strategic choices counsel must make in any given case. So long as the choices are informed ones, counsel's decision to pursue one strategy over others is "virtually unchallengeable." *Id.* at 690-91, 104 S.Ct. at 2066. As to the second part of the test, Jones must demonstrate a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. at 2068. This test need not be applied mechanistically, however. If Jones fails to demonstrate any prejudice from trial

counsel's performance, then we need not determine whether the performance was in fact "deficient." *Id.* at 697, 104 S.Ct. at 2069.

¶79 As to the guilt-innocence stage of the trial, Jones claims his counsel was ineffective in failing to adequately investigate and present alibi witnesses. Specifically, appellate counsel alleges that trial counsel should have called Jones's mother, father, brother, and/or sister, who were prepared to swear that Jones was at home with them at the time Howell was murdered. We remanded the case for an evidentiary hearing on this aspect of Jones's ineffective-counsel claim. The district court received evidence on the issue and submitted its own findings of fact and conclusions of law. The parties also filed supplemental briefs after the hearing.

¶80 The evidentiary hearing established (1) that Jones's defense team was aware, before trial, that members of his family were prepared to afford him an alibi; (2) that investigation by Jones's defense team revealed a witness, Brenda Cudjoe, who plainly discredited that alibi defense[9]; and (3) that Jones told his counsel that he was not at home at the time of the shooting, and that his parents were mistaken. Lead defense counsel testified to his concerns, at the time of trial, that the family's "alibi" testimony would be soundly impeached, thereby ruining any credibility they might have in the punishment phase of the trial. Notably, Appellant did not testify at the evidentiary hearing. He did not claim to have ever advanced an alibi defense consonant with his

---

[9] Members of Jones's family claimed that Cudjoe could corroborate the alibi because she was also at their home at the time Howell was shot. Cudjoe told a defense investigator that this was not true, and she reiterated this denial at the evidentiary hearing.

family's claims.  He did not deny telling lead counsel that his family's version of events was wrong.[10]

¶81  At trial, Jones's girlfriend testified that Jones claimed to have been somewhere on the south side of Oklahoma City – *i.e. not* at his parents' home – when Howell was murdered.   This testimony was, in fact, elicited by the defense.  Jones thus appears to argue that trial counsel should have presented evidence of conflicting alibis.  Appellate counsel repeatedly states that it is the jury's province to determine whether witnesses are credible and defense theories are viable.   This truism, however, ignores counsel's most basic function: to make informed choices among an array of alternatives, in order to achieve the best possible outcome for the client.  Effective assistance of counsel means more than tossing up every conceivable argument in the client's defense, in hopes that some part will fly – or worse yet, that the sheer quantity of disorganized, unevaluated information will simply confuse the jury to the point of acquittal.  The trial court concluded that counsel's decision not to present the Jones family alibi evidence was a sound trial strategy, based on sufficiently thorough investigation and evaluation of the circumstances presented, and we agree.

---

[10]  On appeal, Jones argues that trial counsel was ineffective for not personally interviewing Brenda Cudjoe.   We disagree.   One reason that investigators, rather than attorneys, are routinely assigned the task of interviewing witnesses is to ensure that, if the witness changes her story on the witness stand, the attorney is not placed in the position of being an impeachment witness.   On learning that Cudjoe's claim squared with his own client's claim, there was no need for counsel to investigate further.   At the evidentiary hearing, Cudjoe reiterated that the Jones family alibi was not true.   Furthermore, *Strickland* requires not just deficient performance but prejudice; appellate counsel offers nothing to show how the outcome would have been affected if counsel had personally questioned Cudjoe before trial.

¶82   Jones goes on to attack trial counsel's decision not to present the testimony of Emmanuel Littlejohn.   A multiple felon and convicted murderer, Littlejohn briefly shared a county jail cell with co-defendant Jordan while awaiting capital resentencing in his own first-degree murder case.   Littlejohn told defense investigators that Jordan admitted he was falsely throwing blame on Jones, that Jordan said Jones was not involved in the Howell murder at all, and that Jordan had even gone so far as to hide the murder weapon and other incriminating evidence in the Joneses' home himself.   The fact that defense counsel actually did investigate Littlejohn's claim before trial reduces Jones's argument to one over trial strategy which, as *Strickland* instructs, is much more difficult to attack.   Littlejohn's criminal history presented obvious credibility problems.   While he had nothing to gain from testifying on Jones's behalf, he had little to lose by perjuring himself with claims that were impossible to corroborate.   Moreover, the image of Jordan planting evidence in the attic of the Jones family home, without their knowledge, might have been somewhat difficult for the jury to believe.   We find nothing unreasonable about counsel's decision to forgo Littlejohn's assistance.

¶83   Next, Jones claims that trial counsel should have cross-examined Jordan  more thoroughly, in both the guilt and punishment stages of trial, with the aim of showing the jury that Jordan was slanting his testimony in hopes of bettering his own situation.   Counsel did cross-examine Jordan at length, pointing out inconsistencies in his story and otherwise attacking his credibility. Jones's arguments on appeal are nothing more than complaints about exactly

how that impeachment should have been accomplished. Jordan admitted in guilt-stage cross-examination that many of the details he had previously given to police and his own attorney were false; Jones's defense counsel methodically went over many of these untruths. Jordan also admitted, on cross-examination, that he had previously lied about his involvement in this case to help himself out. In the punishment stage, trial counsel cross-examined Jordan again about his plea negotiations, and how he stood to gain from helping the State convict Jones. The fact that counsel did not ask every question Jones is now able to formulate on appeal is not proof of deficient performance.

¶84 Jones also complains that trial counsel was ineffective for failing to object to the admission of expert testimony comparing the chemical compositions of lead bullets. The State presented such testimony suggesting that the bullets fired at the crime scene, bullets found in a vehicle shared by Jones and Jordan, and bullets found in the Jones home, were chemically indistinguishable, thereby suggesting that they all came from the same box of ammunition. Jones points to research casting some doubt on the validity of such analyses, and argues that counsel should have challenged the reliability of lead-bullet comparison pursuant to *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). We rejected a similar argument in *Bryan v. State*, 1997 OK CR 15, ¶ 43, 935 P.2d 338, 360, concluding that the defendant in that case "ha[d] not shown that this type of materials analysis amounts to a novel scientific procedure which would trigger

*Daubert* scrutiny." We need not decide whether the supplemental materials provided by Jones in support of his ineffective-counsel claim require a different result here, because even if counsel's failure to challenge this evidence could be considered substandard performance, we find no prejudice. An altogether different and well-established forensic procedure – a procedure which Jones does not attack – established that, regardless of the source of the bullets, the handgun hidden in the attic of Jones's parents' home fired the bullet that killed Howell.

¶85  Jones also complains that counsel rendered deficient performance by advising him not to testify on his own behalf. An accused certainly has the right to testify in his own defense. During trial, Jones acknowledged his right to testify and elected not to. Jones does not allege that counsel in fact forced, threatened, or misled him into making this decision. He does not specify any particular information that he wished to testify about, or how such would have affected the outcome of the case. Jones points out that no additional record was made on the decision not to testify in the punishment stage; yet, again, he fails to support his claims with any information about how these decisions were actually made. We will not presume deficient performance based on such bald allegations. Because Jones has not offered any specific, convincing information as to why his decision was "involuntary," we cannot say that counsel was ineffective. *Hooks v. State*, 1993 OK CR 41, ¶ 36, 862 P.2d 1273, 1283.

¶86   Jones alleges further punishment-stage error in counsel's failure to "effectively" impeach a witness's in-court identification of Jones as the perpetrator of a prior robbery.  To support the "continuing threat" aggravator, the State presented, *inter alia*, evidence that Jordan and Jones committed other "carjacking" crimes in Oklahoma City just days before a similar offense left Howell dead.   Jones complains that trial counsel did not attack the testimony of one carjacking victim more thoroughly.  Counsel did, in fact, point out weaknesses in the victim's identification of Jones as one of the perpetrators, as well as evidence suggesting that Jordan, not Jones, could have been the assailant.   However, substantial evidence linked Jones (acting in concert with Jordan) to the carjacking, which occurred just days before the instant offenses.  The stolen vehicle, a Mercedes, was recovered from a Norman apartment complex where Jones lived.  After Jordan and Jones were arrested for Howell's murder, the key to the stolen Mercedes was found in the Cutlass shared by the two men.  Jordan himself testified that he and Jones committed the carjacking, and Jones's girlfriend testified that Jones had talked to her about his involvement in that crime.  Given this evidence, counsel may well have concluded that any more quibbling over the carjacking victim's ability to accurately gauge the height and weight of the perpetrator was not the best use of his energies.  We find nothing professionally unreasonable about this course of action.

¶87   For similar reasons, we reject Jones's claim that counsel should have highlighted the factual dissimilarities between the Howell carjacking and

the prior carjackings.  Jones relies on a list of "uncommon facts" prepared by trial counsel, which he submits in his supplementary materials.  Jones fails to support his one-sentence claim with any analysis or authority whatsoever.  Even still, the utility of this list is not apparent because Jones never admitted involvement in any of the carjacking crimes.  There is no basis for concluding counsel acted unreasonably.

¶88   Jones also complains that trial counsel should have exposed an "erroneous embellishment" that a prior crime he committed was a robbery when in fact, he claims, it was merely a larceny.  According to Jordan, Jones admitted to taking jewelry from a shopping mall establishment in the summer of 1999.  Jordan specifically clarified that it was a robbery, not a larceny.  The record simply does not support Jones's claim that the severity of this prior offense, relevant to the continuing threat aggravator, was "embellished."

¶89   Jones further contends that trial counsel was ineffective in advancing mental health evidence in mitigation of sentence.  Jones claims that expert testimony showing he may suffer from an impulse-control disorder was "at best weakly supported and at worst unsupported and implausible."  Jones does not elaborate on why this mitigation evidence was "implausible," except to imply that it is *per se* unreasonable to deny culpability in the guilt stage of a capital trial, only to tacitly admit guilt in the punishment stage (*e.g.* through evidence mitigating the defendant's role in the offense, or casting doubt on his ability to control or appreciate the nature of his conduct).  We reject this broad assumption.  Mitigating evidence that at least recognizes and accepts the jury's

finding of guilt, despite the defendant's claims of innocence, seems to us more likely to be entertained than evidence which disrespects the jury's first-stage findings.   A mitigation strategy is not professionally unreasonable simply because it was unsuccessful.   Jones has failed to demonstrate that the mental-health component hopelessly conflicted with, or undermined, other evidence presented in mitigation.   Trial counsel's decision to include it was not deficient performance.

¶90   Jones makes three final arguments: (1) that trial counsel was ineffective because "he failed to present exculpatory statements in letters to Ms. Presley [his girlfriend] under the doctrine of completeness"; (2) that counsel was ineffective because he "failed to ... call [Jones's] brother and sister in mitigation"; and (3) that his entire trial defense team was unqualified to try a capital case.   As to the first claim, Jones presents no argument or authority, other than the allegation quoted above and a reference to an affidavit from Presley contained in Jones's supplementary materials.   It is unclear whether the bald denials of culpability excerpted in the affidavit were in the same letters referred to at trial, or whether they were indeed admissible at all.   Because we are unable to discern the specifics of Jones's argument, we decline to review it further.   *Bernay v. State*, 1999 OK CR 37, ¶ 21, 989 P.2d 998, 1007.   The second claim suffers from similar deficiencies.   Jones makes no attempt to explain how the testimony of his brother and sister about his good character would have been qualitatively different from the testimony given by Jones's mother and father in the punishment stage.

43

¶91 Finally, Jones's complaints about the qualifications of his trial team imply that counsel who has not been out of law school for a certain number of years, tried a certain number of capital cases, spent a certain number of hours preparing for a capital trial, *etc.*, is *per se* unable to render effective assistance to a capital defendant. We reject this notion. The ultimate test for effective assistance of counsel in any particular case remains the two-pronged test of *Strickland*: deficient performance under the circumstances at hand, and prejudice undermining confidence in the outcome of the proceeding. Jones had three attorneys, investigators, and other resources of the county public defender's office behind him. This team faced several difficult challenges: a co-defendant who directly implicated Jones, eyewitness identification, incriminating statements made by Jones after the crime, flight from police, damning physical evidence hidden in Jones's parents' home, and an interlocking web of other physical and testimonial evidence consistent with the State's theory. Jones faults his trial team for failing to present a "cohesive and coherent strategy" at trial, but does not hint at just what such a strategy might have looked like.

¶92 In summary, neither the record on appeal, nor Jones's supplementary materials, establish that Jones's trial counsel was ineffective. Proposition Eight is denied.

## SECOND STAGE ISSUES

¶93 The jury set punishment at death on Count 1 after finding two aggravating circumstances existed beyond a reasonable doubt: (1) the

defendant created a great risk of death to more than one person, and (2) there exists the probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. In Proposition Fifteen, Jones claims his death sentence must be vacated because errors relating to the aggravating circumstances violated his rights under the federal and Oklahoma constitutions. With reference to the continuing threat aggravator, Jones asks this Court to reconsider its prior holdings addressing the constitutionality of the aggravator, to reconsider its position on the use of unadjudicated acts in support of the aggravator and to find the evidence presented was insufficient to support this aggravator.

¶94 This Court has repeatedly upheld the constitutional validity of the continuing threat aggravator and we will not revisit the issue. *Fitzgerald v. State*, 2002 OK CR 31, ¶ 15, 61 P.3d 901, 906. We also decline to reconsider our position on unadjudicated acts offered in support of this aggravator, and continue to hold such unadjudicated acts of violence are relevant to determining whether a defendant is likely to commit future acts of violence that would constitute a continuing threat to society. *Lockett*, 2002 OK CR 30, ¶ 34, 53 P.3d at 428-29.

¶95 In support of the continuing threat aggravating circumstance, the State incorporated all first-stage evidence into the sentencing stage and presented evidence Jones had prior convictions, based upon guilty pleas, to unlawful use of a fictitious name, false declaration to a pawnbroker, concealing stolen property, and larceny from a retailer. The State also presented evidence

45

of various unadjudicated acts which included attempting to elude a police officer, unauthorized use of a motor vehicle and possession of a firearm during the commission of a felony, armed robbery of a jewelry store at Quail Springs Mall, two armed carjackings in July 1999 at the Hideaway Pizza, and a physical altercation with a detention officer.

¶96   Jones contends his conviction for larceny from a retailer was void because he was juvenile at the time and the trial court did not have jurisdiction to convict and sentence him.   He argues use of evidence of the two armed carjackings and the jewelry store robbery based upon the testimony of his coconspirator, was not sufficiently corroborated and was not reliably proven by the State.   Jones submits that had this evidence not been admitted, the remaining evidence would not have sufficiently supported the jury's finding of the continuing threat aggravator.

¶97   When the sufficiency of the evidence of an aggravating circumstances is challenged on appeal, we review the evidence in a light most favorable to the State to determine whether there was any competent evidence to support the State's charge that the aggravating circumstance existed. *Ryder v. State*, 2004 OK CR 2, ¶ 74, 83 P.3d 856, 873.   To support this aggravator, the State must present evidence showing the defendant's behavior demonstrated a threat to society and a probability that threat would continue to exist in the future. *Wackerly*, 2000 OK CR 15, ¶ 52, 12 P.3d at 16.   Prior unadjudicated acts of violent conduct are admissible and relevant to the determination whether the defendant is likely to commit future acts of violence

46

that would constitute a continuing threat to society. *Id.* Evidence of the callous nature of the crime and the defendant's blatant disregard for the importance of human life supports this aggravating circumstance as well. *Id.*

¶98  Jones complains his larceny conviction was void, because it should have been adjudicated through the juvenile system and counsel's failure to object was ineffective assistance of counsel.  We review this claim for plain error. *Simpson,* 1994 OK CR 40, ¶ 2, 876 P.2d at 692-693. Even if this larceny conviction were void and should not have been admitted, we find, in light of the other strong evidence supporting this aggravator, its admission was harmless beyond a reasonable doubt. *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828. Jones cannot show he was prejudiced by counsel's failure to object and his claim of ineffectiveness fails. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064.

¶99  In assessing his claim of insufficient evidence of the continuing threat aggravator, Jones asks this Court to ignore evidence of the armed robberies (jewelry store and Hideaway Pizza robberies) because the testimony of his accomplice was used to introduce this evidence and it was not sufficiently corroborated.  Oklahoma law requiring corroboration of accomplice testimony, 21 O.S.2001, § 742, on its face, applies to convictions and not to proceedings to determine punishment.  *McCarty v. State,* 1998 OK CR 61, ¶ 57, 997 P.2d 1116,  1132.  Even though the State was not required to corroborate Jordan's testimony about these unadjudicated offenses, it did so.  Three victims testified and corroborated Jordan's testimony as to various parts of the crimes.  All were

subjected to cross-examination, and it was the jury's job to determine the weight of the evidence and the credibility of the witnesses.

¶100    In addition to the evidence showing the callous nature of the Howell murder and Jones's obvious disregard for human life, the State presented evidence that Jones had on at least three occasions taken property by force and by gunpoint.  The evidence presented was sufficient to support the continuing threat aggravator.

¶101    Jones also complains the State's evidence did not sufficiently prove the great risk of death aggravator.    This aggravating circumstance is established by showing acts which created a great risk of death to another person or persons in close proximity to the homicidal acts in terms of time, location and intent. *Harris v. State*, 2004 OK CR 1, ¶ 53, 84 P.3d 731, 751. Evidence that the defendant killed one person and threatened to kill others with the apparent ability to do so sufficiently supports this aggravator. *Id.*

¶102    The evidence showed Jones killed Mr. Howell while Howell was sitting in his Suburban with his sister Ms. Tobey, with his two young daughters.  After he killed Howell, Jones yelled at Tobey and the children as they ran for safety and then fired another shot.  The evidence showed Jones knew of the presence of others when he killed Howell, and then he threatened them with the same gun he used to kill Howell.  Clearly, in this case, the State's evidence with regard to the great risk of death aggravator was sufficient. *Black v. State*, 2001 OK CR 5, ¶ 76, 21 P.3d at 1073.  That Tobey and the children were not injured matters not and this aggravator was properly applied

48

in this case. *See Salazar v. State*, 1996 OK CR 25, ¶ 9, n.4, 919 P.2d 1120, 1123-1124, n.4 (referencing cases where this aggravator upheld when other persons present were not injured).

¶103   In Proposition Seventeen, Jones contends the sentencing stage victim impact testimony denied him a fundamentally fair and reliable sentencing proceeding.   In the sentencing stage of a capital murder trial, the State may present evidence "about the victim and about the impact of the murder on the family of the victim." 21 O.S.2001, § 701.10(C).   This evidence may include information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and a recommendation as to the appropriate sentence. *See generally* 22 O.S.2001, §§ 984, 984.1.   In *Cargle v. State*, 1995 OK CR 77, ¶ 75, 909 P.2d 806, 828, this Court concluded that "victim impact evidence should be restricted to those unique characteristics which define the individual who has died, the contemporaneous and prospective circumstances surrounding that death, and how those circumstances have financially, emotionally, psychologically, and physically impacted on members of the victim's immediate family."

¶104   Jones complains that the victim impact testimony unduly emphasized the emotional impact and, taken together, was unfairly prejudicial and cumulative.   However, we find the evidence properly fits within the parameters of *Cargle*. The trial court properly sustained counsel's objection to the use of the word "violent," and we find no error in the trial court's denial of

49

the motion for mistrial. We find no error in the victim impact evidence offered in this case, and therefore no relief is warranted on this proposition.

¶105   In Proposition Eighteen, Jones asks this Court to reconsider whether previously adjudicated issues violated his rights to a fair trial, an impartial jury, due process, or a reliable sentencing proceeding. We decline to revisit these issues and find their prior adjudications did not have an effect on the fairness of Jones's trial or sentencing.[11] We also deny Jones's request for an evidentiary hearing and request for funds relating to his claim on the cost effectiveness of the death penalty and its value as a deterrent.

¶106   Proposition Nineteen also warrants no relief. A cumulative error argument does not require relief and has no merit when this Court does not sustain any other errors raised by the appellant. *Dodd*, 2004 OK CR 31, ¶ 116, 100 P.3d at 1051.

### MANDATORY SENTENCE REVIEW

¶107   Jones claims in Proposition Sixteen that his death sentence must be vacated under this Court's Mandatory Sentence Review and the Eighth Amendment prohibition against cruel and unusual punishment. In support of this proposition, Jones argues that his sentence of death was improperly imposed due to the various errors he claims occurred at his trial. We have

---

[11] *McCracken v. State*, 1994 OK CR 68, ¶ 49, 887 P.2d 323, 334 (meaning of life without parole is self-explanatory and no instruction required); *Smallwood v. State*, 1995 OK CR 60, ¶ 62, 907 P.2d 217, 233 (cost effectiveness of death penalty is irrelevant and denial of request to present evidence of it was proper); *Harris v. State*, 2004 OK CR 1, ¶ 52, 84 P.3d 731, 751 (trial court did not err in refusing to allow allocution before the jury or to allow defense to argue last); *DeRosa v. State*, 2004 OK CR 19, ¶ 83, 89 P.3d 1124, 1153 (rejecting victim impact as "super aggravator" argument); *Bernay v. State*, 1999 OK CR 37, ¶ 50, 989 P.2d 998, 1012 (no requirement that residual doubt is a mitigator).

reviewed each of Jones's propositions of error and have found none which warrant relief and we will not re-address each of those claims here.

¶108   Two of the jurors told the trial court they had close friends or family members who had been killed in violent crimes. Jones's counsel did not challenge either of these jurors for cause and we will not find these jurors' past experiences somehow injected a fundamental unfairness or arbitrariness into the sentencing determination.

¶109   Jones also complains his death sentence violates the Eighth Amendment because it was an accident and not the type of crime warranting the death penalty. The jury considered the State's evidence of aggravating circumstances and decided Jones's conduct warranted a penalty of death. We find no evidence that race played any role in the jury's sentencing determination. We are not persuaded to vacate Jones's sentence of death and reconsider our prior holding that the jury was not required to specifically find the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. *Torres v. State,* 2002 OK CR 35, ¶¶ 6-7, 58 P.3d 214, 215. Lastly, we decline to find Oklahoma's method of lethal injection constitutes cruel and unusual punishment. *See Romano v. State,* 1996 OK CR 20, ¶ 30, 917 P.2d 12, 18.

¶110   In accordance with 21 O.S.2001, §701.13(C), we must determine whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and whether the evidence supports the jury's finding of aggravating circumstances. The jury found the existence of two

aggravating circumstances: (1) that Jones knowingly created a great risk of death to more than one person, and (2) the existence of a probability that Jones would commit criminal acts of violence that would constitute a continuing threat to society. We found the evidence sufficiently supported each of those aggravating circumstances. Upon review of the record, we cannot say the sentence of death was imposed because the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.2001, § 701.13(C).

¶111   After carefully weighing the aggravating circumstances and all mitigating evidence, we find the aggravating circumstances outweigh the mitigating evidence and that the sentence of death is factually substantiated and appropriate.

### DECISION

¶112   We find no error warranting either reversal or modification of Jones's sentences. Accordingly, the Judgment and Sentences imposed in Oklahoma County District Court, Case No. CF 99-4373, for Counts 1, 2 and 3, are hereby **AFFIRMED**. Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2006), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

| **APPEARANCES AT TRIAL** | **APPEARANCES ON APPEAL** |
|---|---|
| DAVID McKENZIE | WENDELL B. SUTTON |
| MALCOLM SAVAGE | ASSISTANT PUBLIC DEFENDER |
| ROBIN McPHAIL | OKLAHOMA COUNTY PUBLIC |
| ASSISTANT PUBLIC DEFENDERS | DEFENDER'S OFFICE |
| 320 ROBERT S. KERR, SUITE 600 | 611 COUNTY OFFICE BUILDING |
| OKLAHOMA CITY, OK 73102 | OKLAHOMA CITY, OK 73102 |
| ATTORNEYS FOR DEFENDANT | ATTORNEY FOR APPELLANT |

SANDRA HOWELL-ELLIOTT
SUZANNE LISTER-GUMP
ASSISTANT DISTRICT ATTORNEYS
320 ROBERT S. KERR, SUITE 505
OKLAHOMA CITY, OK 73102
ATTORNEYS FOR THE STATE

W. A. DREW EDMONDSON
ATTORNEY GENERAL OF OKLAHOMA
PRESTON SAUL DRAPER
ASSISTANT ATTORNEY GENERAL
112 STATE CAPITOL BUILDING
OKLAHOMA CITY, OK 73105
ATTORNEYS FOR APPELLEE

**OPINION BY:  C. JOHNSON, J.**

| | |
|---|---|
| **CHAPEL, P.J.:** | **CONCUR** |
| **LUMPKIN, V.P.J.:** | **CONCURS IN RESULTS** |
| **S. TAYLOR, J.:** | **CONCUR** |

53

**LUMPKIN, VICE- PRESIDING JUDGE:  CONCURRING IN RESULTS**

¶1    I concur in the Court's decision and analysis in affirming the judgments and sentences in this case.   However, in Proposition Eighteen, I would find Appellant has waived review of his claim as he has failed to cite any legal authority supporting his argument for this Court's reconsideration of previously adjudicated legal issues.   *See* Rule 3.5(C), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2006).

# Exhibit E

# IN THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA

| | | |
|---|---|---|
| JULIUS DARIUS JONES, | ) | NOT FOR PUBLICATION |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. PCD-2002-630 |
| | ) | |
| THE STATE OF OKLAHOMA, | ) | |
| | ) | |
| Respondent. | ) | |

FILED
IN COURT OF CRIMINAL APPEALS
STATE OF OKLAHOMA
NOV - 5 2007

MICHAEL S. RICHIE
CLERK

## OPINION DENYING APPLICATION
## FOR POST-CONVICTION RELIEF AND RELATED MOTIONS

**JOHNSON, C., VICE-PRESIDING JUDGE:**

Petitioner, Julius Darius Jones, was convicted by a jury in Oklahoma County District Court, Case No. CF-1999-4373, of Count 1: First Degree Felony Murder (21 O.S.Supp.1998, § 701.7), Count 2: Possession of a Firearm after Conviction of a Felony (21 O.S.Supp.1998, § 1283), and Count 3: Conspiracy to Commit a Felony (21 O.S.Supp.1999, § 421). The jury found the existence of two aggravating circumstances[1] and fixed punishment at death on Count 1, fifteen years imprisonment on Count 2, and twenty-five years imprisonment on Count 3. The trial court sentenced Petitioner in accordance with the jury's recommendation on April 19, 2002. We affirmed Petitioner's conviction and sentence on direct appeal in *Jones v. State*, 2006 OK CR 5, 128 P.3d 521. We subsequently granted rehearing but denied relief. *Jones v. State*, 2006 OK CR 10, 132 P.3d 1. The United States Supreme Court denied *certiorari*. *Jones v.*

---

[1] The two aggravating circumstances found by the jury were (1) that Petitioner knowingly created great risk of death to more than one person, and (2) there exists the probability that Petitioner will commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.Supp1991, § 701.12 (2) and (7).

*Oklahoma,* ___ U.S. ___, 127 S.Ct. 404 (2006). Petitioner filed the instant Application for Post-Conviction Relief in February 2005. This Court directed a response from the State, which was filed in April 2007.[2]

Petitioner's instant application is governed by the Post-Conviction Procedure Act, 22 O.S.Supp.2004, § 1080 *et seq.* Our consideration of his claims is limited by the provisions of that Act in several ways. Foremost is the idea that a post-conviction proceeding is not intended as a substitute for a direct appeal, nor is it intended to be used as a second direct appeal. *Browning v. State,* 2006 OK CR 37, ¶ 2, 144 P.3d 155, 156. The Act provides applicants with very limited grounds upon which to attack their convictions. Claims which could have been raised on direct appeal, but were not, are generally considered waived. Claims which were raised and addressed on direct appeal are barred from being relitigated by the doctrine of *res judicata.* Furthermore, claims which are properly raised in a post-conviction application may only afford relief if they "[s]upport a conclusion either that the outcome of the trial would have been different but for the errors or that the defendant is factually innocent." 22 O.S.Supp.2004, § 1089(C).

The Act recognizes that claims not timely raised in prior proceedings may be considered if prior counsel rendered constitutionally deficient performance by failing to timely raise them. 22 O.S.Supp.2004, § 1089(D)(4)(b). However, counsel can only be found constitutionally ineffective (*i.e.* in violation of the Sixth Amendment right to counsel) if his errors or omissions can reasonably be

---

[2] On May 7, 2007, Petitioner requested leave to file a reply brief. That request is **GRANTED**.

said to undermine confidence in the outcome of the prior proceeding. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Thus, any claim raised in a post-conviction proceeding – whether or not it involves an allegation of ineffective assistance of prior counsel – requires the petitioner to demonstrate a reasonable likelihood that the claim was outcome-determinative.

Petitioner raises two propositions of error. First, he claims that he was denied the effective assistance of counsel, as guaranteed by the Sixth Amendment to the United States Constitution and corresponding provisions of the Oklahoma constitution, by the deficient performance of his trial and appellate counsel. Second, he claims that the cumulative impact of errors raised on direct appeal and in this action denied him a fair capital sentencing proceeding. In his first claim, Petitioner offers a list of arguments that appellate counsel could have made, but failed to make, about alleged errors during trial and trial counsel's own deficient performance. Because this omnibus claim hinges on alleged deficient performance by direct appeal counsel, it is cognizable in this post-conviction proceeding, as it could not have been raised previously. 22 O.S. § 1089(D)(4)(b)(2). We address each subclaim separately, and then address Petitioner's cumulative-error claim.

## A.   Failure to investigate and interview jurors after trial.

Petitioner claims his direct appeal counsel was ineffective for not investigating and interviewing jurors after the trial. As for post-trial juror interviews, Petitioner concedes that questionnaires were sent to the jurors after

trial, but claims "very few" jurors were contacted by telephone or in person; he asserts that appellate counsel's efforts were not "comprehensive." Petitioner offers affidavits from two of the jurors, and claims these affidavits demonstrate appellate counsel's deficient performance. Yet Petitioner fails to explain just what meritorious issues appellate counsel could have uncovered from more thorough interviews with these jurors. These affidavits offer only general criticism of trial counsel's performance, which is of little help to this Court. *Harris v. State*, 2007 OK CR 32, ¶ 13, — P.3d —. This claim is denied.

Petitioner also faults direct appeal counsel for failing to thoroughly investigate the jurors' backgrounds. He claims that one juror, Juror W., gave false or misleading answers in *voir dire*, chiefly about his prior dealings with the judicial system. During *voir dire*, the trial court asked if any of the panel had appeared in a court of law under any circumstances as a witness, plaintiff, or defendant. Juror W.'s answer was "[t]raffic-related offenses." Petitioner claims this answer was "misleading at best" because, according to documents appended to Petitioner's Application, Juror W. (1) had been a defendant in a 1986 Oklahoma County civil lawsuit; (2) had sought bankruptcy protection in 1989; (3) had been the subject of two emergency protective orders in 1999; and (4) had been convicted several times of Driving Under the Influence, including two felony convictions for that crime in 1984. Petitioner also presents evidence suggesting that Juror W. embellished or misrepresented the nature of his employment, claiming that he was a physical therapist, when in fact he was a physical therapist's assistant.

Regarding his apparent felony convictions, Juror W.'s answer was literally true; as Petitioner concedes, Driving Under the Influence is defined and punished in the Oklahoma Highway Safety Code, 47 O.S. § 11-902. Regarding his other contacts with the judicial system, the State points to the lack of evidence that Juror W. actually had to appear in court on any of them. Whether Juror W.'s answer was deliberately intended to be misleading or untruthful is debatable.[3] Nevertheless, Petitioner has failed to show that Juror W. could not be a fair and impartial juror in this case.

Certain classes of persons – including, among others, practicing attorneys, law enforcement officers, and felons who have not had their civil rights fully restored – may be excused from jury service "for cause." 38 O.S.2001, § 28; 22 O.S.2001, § 658. Like most jurisdictions, including the United States Supreme Court, Oklahoma has long held that statutory qualifications for jury service are not fundamental or constitutional in nature. Rather, the overarching concern is whether the juror in question could be fair and impartial. *See Kohl v. Lehlback*, 160 U.S. 293, 301-03, 16 S.Ct. 304, 307, 40 L.Ed. 432 (1895); *Queenan v. Territory*, 11 Okl. 261, 71 P. 218, 219-220 (1901), *aff'd*, 190 U.S. 548, 23 S.Ct. 762, 47 L.Ed. 1175 (1903). "[T]he general rule is to the effect that statutes providing for the selection of electors for jury

---

[3] The documents Petitioner submits indicate that Juror W. did not appear in the civil action and that a default judgment was entered against him. It is not clear whether Juror W. was ever required to appear in court on the bankruptcy matter. As to the protective orders, emergency orders are issued *ex parte* without the subject party being required to appear. 22 O.S.2001, § 60.3. However, in his reply brief, Petitioner includes an appearance docket for one of the protective-order cases, which suggests Juror W. did appear in court on the day the temporary order against him was rescinded.

service have never been regarded as an essential element of the right of trial by jury, and the method of selection is entirely within the control of the Legislature, provided only that the fundamental requisite of impartiality is not violated." *Brown v. State*, 14 Okl.Cr. 609, 618, 174 P. 1102 (1918).[4]

As we stated in Petitioner's direct appeal (regarding a different challenge to the jury-selection process), it is ultimately trial counsel's responsibility to use *voir dire* to determine whether those selected for the jury are acceptable to him. *Jones*, 2006 OK CR 5 at ¶ 9, 128 P.3d at 533. Challenges to a juror's qualifications must be raised at the first available opportunity, or they are waived. *Johnson v. State*, 1988 OK CR 242, ¶ 17, 764 P.2d 197, 201; *Cooper v. State*, 27 Okl.Cr. 278, 282, 226 P. 1066, 1067-68 (1924). Absent evidence that the juror was biased, a trial court's decision to grant a new trial is generally

---

[4]   In *Queenan*, the Court noted that challenges based on a prospective juror's status or relationship (*propter defectum*) and challenges for actual bias (*propter affectum*) received different treatment under the common law:

> The fact that a juror is an alien, or that he is an infant, or that he has been convicted of a felony, or that he is not a freeholder, or that he is not an elector, or that he entertains bias or prejudice in a case, are grounds for the exercise of a challenge for cause to such juror, but the right to make a challenge for such cause may be waived. In other words, it is not a constitutional right or privilege that the accused cannot waive, but it is a common-law or statutory right of challenge. ... The power to fix the qualifications of jurors is not a constitutional right, but has always been considered and regarded as a power which has been delegated to the various states and territories of the Union. ... It must therefore follow that the right to challenge a juror on account of his incompetency, by reason of the fact that he had been convicted of a felony, may be waived by a person who is on trial for a felony, and even in a capital case.

*See also* 38 O.S.2001, § 29 (substantial compliance with statutory guidelines on juror qualification are all that the law requires, unless the complaining party was deprived of some substantial right); 20 O.S.2001, § 3001.1 (procedural errors only warrant relief if they "probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right").

reviewed for an abuse of discretion.[5]   *Johnson*, 1988 OK CR 242 at ¶ 19, 764

P.2d at 202.[6]   This rule applies even when the juror's answers to *voir dire*

questions appear to have been deliberately misleading.   *Raub v. Carpenter*, 187

U.S. 159, 23 S.Ct. 72, 73, 47 L.Ed. 119 (1902); *McDonough Power Equipment,*

*Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663

(1984) ("The motives for concealing information may vary, but only those

reasons that affect a juror's impartiality can truly be said to affect the fairness

of a trial"); *United States v. Currie*, 609 F.2d 1193, 1194 (6th Cir. 1979).

Petitioner presents no affidavits as to whether, and if so, when, either

trial or appellate counsel ever became aware of Juror W.'s contacts with the

judicial system.   In essence, he asks this Court to presume deficient

performance from a silent record.   *Strickland* requires us to presume that

counsel acted competently, exploring all reasonable avenues of inquiry.

*Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *Jones*, 2006 OK CR 5 at ¶ 78,

---

[5]   Although a prospective juror's employment as a sheriff, deputy, or other law enforcement officer may be viewed as strictly a matter of status (*propter defectum*), *see* 38 O.S. § 28, that status takes on greater importance to the accused in criminal cases; failure to disclose that status has sometimes justified a new trial, without any additional showing of actual bias.   *See e.g. Reeson v. State*, 41 Okl.Cr. 298, 272 P. 1033 (1928) (prejudice to defendant shown where defendant was charged with violating liquor laws, and juror failed to disclose he had been actively engaged in enforcing prohibition laws).

[6]   Appellant's reliance on *Neumann v. Arrowsmith*, 2007 OK 10, 164 P.3d 116 as persuasive authority is best explained in this context.   In *Neumann*, one of the parties in a medical malpractice case learned after trial that a juror had not disclosed the fact that he had once been the plaintiff in a civil action.   The juror's answers in *voir dire* prevented the party from making further inquiry into the attitudes about the case.   The trial court granted a new trial based on the juror's failure to disclose.   The Oklahoma Supreme Court did not hold that the complaining party had been denied a constitutional right; it merely held that the trial court's ruling was not an abuse of discretion.   *See also Kohl*, 160 U.S. at 302, 16 S.Ct. at 307 (fact that one juror was an alien did not void defendant's conviction on constitutional grounds; "Whether, where the defendant is without fault, and may have been prejudiced, a new trial may not be granted on such a ground, is another question.   That is not the inquiry here...").

128 P.3d at 545. The fact that a juror may be excusable "for cause" does not necessarily mean that either party wishes to have him removed.[7]   Indeed, defense counsel may have sound strategic reasons for keeping a panelist with a criminal record. *See Jackson v. State*, 1998 OK CR 39, ¶¶ 14-18, 964 P.2d 875, 884 (on appeal, defendant claimed the trial court erred in excusing a prospective juror for cause, even though he was a convicted felon).[8]   However, we do not reach the issue of reasonable strategy, because we simply cannot tell, from the record before us, whether or not Petitioner's prior counsel were aware of Juror W.'s past legal affairs.   We will not find counsel to have performed deficiently on such unsupported allegations.[9]   Rule 9.7(B)(2), (D), *Rules of the Oklahoma Court of Criminal Appeals*, 22 O.S., Ch. 18, App. (2007); *Jones*, 2006 OK CR 5 at ¶ 85, 128 P.3d at 547; *see also Conover v. State*, 1997 OK CR 39, ¶ 14, 942 P.2d 229, 233 (failure to raise juror's felony record on direct appeal did not, standing alone, establish ineffective assistance of appellate counsel).   Moreover, Petitioner has failed to show that Juror W. was unable to be fair and impartial – the prejudice prong of the *Strickland*

---

[7]  For example, in Petitioner's trial, one panelist was excused for cause because he claimed he could not consider all three punishment options fairly.  On appeal, Petitioner argued that the panelist should not have been excused, as he might simply have been "intentionally trying to avoid jury service."  *Jones*, 2006 OK CR 5 at ¶¶ 11-13, 128 P.3d at 534.  The strategic motivation here seems to be that a juror's aversion to the death penalty is worth more to the defense than a juror's willingness to serve at all.

[8]  *See also United States v. Boney*, 977 F.2d 624, 633 (D.C.Cir. 1992) ("A *per se* rule [that a convicted felon on a criminal jury always violated the Sixth Amendment] would be appropriate, therefore, only if one could reasonably conclude that felons are always biased against one party or another.  But felon status, alone, does not necessarily imply bias").

[9]  Petitioner does not claim appellate counsel was completely unaware of Juror W.'s background, only that the information was "not reasonably or comprehensively pursued." (Application at p. 17)

analysis.[10]  *Harris*, 2007 OK CR 32 at ¶ 15.

Alternatively, Petitioner claims that prior counsel's failure to object to Juror W. was "state induced," *i.e.*, a form of prosecutorial bad faith, because the State did not inform trial counsel of Juror W.'s record.  The trial court directed the State to provide any information it had about panelists' records to defense counsel.  (The State agreed to do so, over objections that the public defender's office had the ability to gather the same information themselves.)  However, Petitioner presents no evidence that the prosecutors deliberately withheld Juror W.'s record from trial counsel.  In fact, he concedes it is equally possible that the prosecutors inadvertently forgot to relate information about Juror W. to trial counsel, or were themselves unaware of Juror W.'s prior contacts with the judicial system.  Furthermore, we reject Petitioner's attempt to saddle *prosecutors* with a Sixth Amendment duty to fill trial counsel's shoes and conduct reasonable investigation on prospective jurors for the defense.  We also reject Petitioner's claim that Juror W.'s participation on the jury amounts to "structural error," requiring reversal absent any showing of prejudice.  Petitioner offers no case law to support this assertion, and it is contrary to the Oklahoma and Supreme Court authority previously discussed.  Petitioner's

---

[10]  Petitioner reads *Gann v. State*, 1964 OK CR 122, 397 P.2d 686 as requiring a new trial whenever a juror has been untruthful about his qualifications in *voir dire*.  We disagree.  In *Gann*, the defendant learned, apparently after his trial, that one juror had served time in the penitentiary for a felony conviction in another state.  *Gann* refers to prior Oklahoma case law (*e.g. Queenan v. Territory*), but fails to apply the rule, consistently found in those cases, that the complaining party who does not challenge the juror's qualifications until after trial must present evidence of actual bias.  Moreover, *Gann* clearly does not hold that an untruthful juror is automatic grounds for a new trial.  Rather, the juror issue in *Gann* was one of several issues that the Court found to have worked together, in a cumulative fashion, to deny the defendant a fair trial.  *Id.*, 1964 OK CR 122 at ¶¶ 11-12, 38, 397 P.2d at 689-690, 693.

challenges to Juror W.'s presence on his jury are denied.

**B.    Failure to investigate potential defense witnesses overlooked by trial counsel.**

Next, Petitioner claims trial counsel was ineffective for failing to investigate and present two witnesses at trial, and that appellate counsel was ineffective for not recognizing and advancing this claim on direct appeal. Specifically, Petitioner claims the testimony of Christopher Berry and James Lawson could have made a difference in the outcome of the trial. At the time of Petitioner's trial, Berry was being held in the Oklahoma County Jail on a charge of Child Abuse Murder. He was later convicted of that charge and sentenced to life in prison without possibility of parole. Berry claims, by affidavit, that he overheard Petitioner's co-defendant, Christopher Jordan, boasting that he, not Petitioner, was the triggerman in the homicide with which they were jointly charged.

Petitioner made a similar claim on direct appeal, alleging trial counsel was ineffective for not presenting the testimony of another jail inmate, Emmanuel Littlejohn, who also allegedly heard Jordan boast about being the triggerman. We rejected that claim, because the inmate's credibility was suspect and the details of the account were specious. *Jones*, 2006 OK CR 5 at ¶ 82, 128 P.3d at 546. Berry suffers from the same credibility problems that Littlejohn did. Nor do we agree with Petitioner's argument that Berry's claim necessarily "corroborates" Littlejohn's. Berry's affidavit suggests that Jordan admitted Petitioner was involved in the murder, while according to Littlejohn, Jordan denied that Petitioner had any involvement. *See id.* Taken together,

these inmates' claims show only one thing: that Christopher Jordan changed his story to suit his own needs. Yet this much was already clear to the jury, through trial counsel's extensive cross-examination of Jordan, who testified against Petitioner at trial. *See id.* at ¶ 83, 128 P.2d at 546-47.

The posture of this case requires Petitioner to demonstrate not only that trial counsel failed to conduct a reasonably thorough investigation into witnesses potentially favorable to the defense, but that appellate counsel did as well. Petitioner claims appellate counsel "failed to investigate whether others heard Mr. Jordan's confessions in the jail," but he does not present specifics to show how a reasonable investigation would have uncovered Berry's current claim. Berry does not aver that he ever attempted to contact Petitioner's appellate counsel, and Petitioner does not explain how appellate counsel was supposed to find out about Berry's claims in any other way. If Berry had information he believed to be relevant to Petitioner's case, then he had a responsibility to reveal it timely.[11] We will not find appellate counsel deficient for failing to be clairvoyant. Petitioner has failed to show either (1) that appellate counsel's investigation was not reasonable, or (2) that such investigation would have uncovered information that undermines confidence in the outcome of the trial. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

Petitioner also claims that James Lawson, a longtime acquaintance, could have made a difference in mitigation of the death sentence. Lawson was

---

[11]  In his affidavit, Berry claims he tried to talk to his trial counsel (who was also Petitioner's trial counsel) about what Jordan had been saying, but that counsel "didn't seem interested."

apparently available to testify that Petitioner had been raised in a religious home, that he had been a good student, and that his involvement in the homicide was completely out of character. We say "apparently," because the only information Petitioner provides about Lawson is found in an affidavit, not from Lawson himself, but from a defense investigator who interviewed Lawson. Petitioner's trial counsel presented the same type of mitigating testimony from several different witnesses at the trial. Because Lawson's information would not have added materially to the defense, appellate counsel was not deficient for failing to present this argument on direct appeal. *Strickland, id.* This claim is denied.

**C.   Failure to allege state-induced ineffective assistance of trial counsel.**

Conceding that his appellate counsel did challenge trial counsel's performance on several fronts, *see Jones,* 2006 OK CR 5 at ¶¶ 77-92, 128 P.3d at 545-549, Petitioner now claims appellate counsel was ineffective for not casting his arguments as "state-induced" ineffectiveness of trial counsel. In other words, Petitioner claims appellate counsel failed to identify the *cause* of trial counsel's deficiencies. Petitioner has confused the cause of deficient performance with the fact of deficient performance. Cause is not a discrete part of the *Strickland* analysis. If no deficient performance is found, that is the end of the inquiry. Whether or not trial counsel's inexperience was the product of budget constraints, as Petitioner now claims, counsel's overall performance was fully explored on direct appeal. *Jones,* 2006 OK CR 5 at ¶ 91, 128 P.3d at 548-49; *see also Conover,* 1997 OK CR 39 at ¶¶ 7-11, 942 P.2d at 232-33

12

(rejecting general claim that prior counsel's agency was underfunded, absent a specific showing of deficient performance).  This claim is denied.

**D.   Failure to argue various claims as "structural errors."**

Petitioner claims direct appeal counsel was ineffective for not arguing that certain aspects of his case amounted to "structural error."  Defining structural errors as those which "infect the entire trial process" (quoting *Brecht v. Abramson*, 507 U.S. 619, 630, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353 (1993)), and which, by definition, cannot be deemed harmless (*see Arizona v. Fulminante*, 499 U.S. 279, 309, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991)), Petitioner uses the term in an attempt to avoid the procedural hurdles of waiver and prejudice.

Petitioner argues that several aspects of Oklahoma's capital trial procedure constitute structural defects in the judicial process: (1) permitting prosecutors, at their discretion, to determine when the death penalty will be sought; (2) permitting aggravating circumstances in support of the death penalty to be added after preliminary hearing; (3) allowing the same jury to decide both guilt and punishment in a capital case; and (4) not requiring the jury to find that aggravating circumstances outweigh mitigating circumstances "beyond a reasonable doubt."  Constitutional challenges to all of these claims have been repeatedly considered and rejected by this Court.  *Harris*, 2007 OK CR 32 at ¶ 19; *Hogan v. State*, 2006 OK CR 19, ¶ 84, 139 P.3d 907, 935; *Rojem v. State*, 2006 OK CR 7, ¶¶ 59-60, 66-67, 130 P.3d 287, 299, 300; *Matthews v. State*, 2002 OK CR 16, ¶ 56, 45 P.3d 907, 924.  Attempting to label them as

"structural error" adds nothing new to the analysis.

Petitioner also claims that the cumulative effect of alleged prosecutorial misconduct, and alleged juror misconduct, during trial amounted to structural error. We rejected both claims of misconduct on direct appeal. *Jones*, 2006 OK CR 5 at ¶¶ 71-76, 128 P.3d at 544-45 (cumulative effect of prosecutor's conduct did not deny Petitioner a fair trial); *id.* at ¶¶ 19-20, 128 P.3d at 535 (rejecting claim of alleged juror misconduct). Petitioner offers no new reasoning or authority requiring automatic reversal on these claims, and they are denied.

## E.   Cumulative error.

In his second and final proposition of error, Petitioner argues that the cumulative effect of all claims raised herein, and on direct appeal, deprived him of a fair trial. We rejected a cumulative-error claim in Petitioner's direct appeal. *Jones*, 2006 OK CR 5 at ¶ 106, 128 P.3d at 551. Because the instant application reveals no error either, this argument fails again. *Harris*, 2007 OK CR 32 at ¶ 20.

### DECISION

Petitioner's Application for Post-Conviction Relief, and his requests for discovery and an evidentiary hearing, are hereby **DENIED**. Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2007), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

AN APPEAL FROM THE DISTRICT COURT OF OKLAHOMA COUNTY
THE HONORABLE JERRY D. BASS, DISTRICT JUDGE

APPEARANCES ON POST-CONVICTION

LAURA ARLEDGE
INDIGENT DEFENSE SYSTEM
P. O. BOX 926
NORMAN, OK  73070
ATTORNEY FOR PETITIONER

W. A. DREW EDMONDSON
ATTORNEY GENERAL OF OKLAHOMA
PRESTON SAUL DRAPER
ASSISTANT ATTORNEY GENERAL
313 N.E. 21st ST.
OKLAHOMA CITY, OK  73105
ATTORNEYS FOR THE STATE

**OPINION BY C. JOHNSON, V.P.J.**
LUMPKIN, P.J.:       CONCURS
CHAPEL, J.:          CONCURS
A. JOHNSON, J.:  CONCURS
LEWIS, J.:              CONCURS IN RESULTS

PA

# Exhibit F

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

JULIUS JONES,                              )
                                           )
          Petitioner,                      )
                                           )
vs.                                        )          Case No. CIV-07-1290-D
                                           )
ANITA TRAMMELL, Warden,[1]                 )
    Oklahoma State Penitentiary,           )
                                           )
          Respondent.                      )

### MEMORANDUM OPINION

Petitioner, a state prisoner currently facing execution of a sentence of death, appears

with counsel and petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254,

challenging his convictions in the District Court of Oklahoma County, Case No. CF-1999-

4373, of one count of first-degree felony murder, one count of felonious possession of a

firearm, and one count of conspiracy to commit a felony.  Respondent has responded to

Petitioner's *Petition for a Writ of Habeas Corpus* (hereinafter "Petition"),[2] and Petitioner has

replied.  The State court record has been supplied.[3]

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Anita Trammell is hereby substituted for Marty Sirmons as Respondent in this case.

[2] References to the parties' pleadings shall be as follows: Petitioner's *Petition for a Writ of Habeas Corpus* shall be cited as (Pet. at __.); Respondent's *Response in Opposition to Petition for Writ of Habeas Corpus* shall be cited as (Resp. at __.); and, Petitioner's *Reply Regarding Petition for Writ of Habeas Corpus* shall be cited as (Reply at __.).

[3] The trial court's original record shall be cited as (O.R. at __.).  The trial transcript shall be cited as (Tr., Vol. ___, p. __.).

## PROCEDURAL HISTORY

Petitioner was convicted by a jury in the District Court of Oklahoma County, State of Oklahoma, Case No. CF-1999-4373, of one count of first-degree felony murder for the death of Paul Howell, one count of felonious possession of a firearm, and one count of conspiracy to commit a felony.  For the crime of first-degree felony murder, the jury recommended the imposition of a sentence of death, finding the existence of two aggravating circumstances: (1) that the defendant knowingly created a great risk of death to more than one person; and (2) that there exists the probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.  Petitioner was also sentenced to fifteen years imprisonment on the felonious possession of a firearm count and twenty-five years imprisonment on the conspiracy count.

Petitioner appealed his convictions and his sentences to the Oklahoma Court of Criminal Appeals (hereinafter "OCCA").  The OCCA affirmed Petitioner's convictions and sentence of death in a published opinion dated January 27, 2006. Jones v. State, 128 P.3d 521 (Okla. Crim. App. 2006).  The OCCA granted Petitioner's petition for rehearing, but denied recall of the mandate. Jones v. State, 132 P.3d 1 (Okla. Crim. App. 2006).  Certiorari was denied on October 10, 2006. Jones v. Oklahoma, 127 S.Ct. 404 (2006).  Petitioner filed an Application for Post-Conviction Relief which was denied by the OCCA in an unpublished opinion. Jones v. State, No. PCD-2002-630 (Okla. Crim. App. Nov. 5, 2007).

## FACTUAL BACKGROUND

Under 28 U.S.C. § 2254(e), when a federal district court addresses "an application for

2

a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a

determination of a factual issue made by a State court shall be presumed to be correct." 28

U.S.C. § 2254(e)(1).  For the purposes of consideration of the present Petition, the Court

provides and relies upon the following synopsis from the OCCA's opinion summarizing the

evidence presented at Petitioner's trial.  Following review of the record, trial transcripts, and

the admitted exhibits, the Court finds this summary by the OCCA to be adequate and

accurate.  The Court therefore adopts the following summary of the facts as its own:

> On Wednesday, July 28, 1999, Paul Howell was fatally shot in the driveway of his parents' Edmond home.  Howell, his sister, Megan Tobey, and Howell's two young daughters had just returned from a shopping trip in Howell's Chevrolet Suburban.  Howell pulled into the driveway and turned the engine off.  As Tobey exited from the front passenger side, she heard a gunshot.  Tobey turned to see her brother slumped over the driver's seat, and a young black male, wearing a white T-shirt, a stocking cap on his head, and bandana over his face, demanding the keys to the vehicle.  Tobey rushed to get herself and Howell's daughters out of the Suburban.  As Tobey escorted the girls through the carport, she heard someone yelling at her to stop, and then another gunshot.  Tobey got the girls inside and summoned for help.  Howell's parents ran outside to find their son lying on the driveway.  His vehicle was gone.  Howell died a few hours later from a single gunshot wound to the head.
>
> Two days after the shooting, Oklahoma City police found Howell's Suburban parked near a convenience store on the south side of town.  Detectives canvassed the neighborhood and spoke with Kermit Lottie, who owned a local garage.  Lottie told detectives that Ladell King, and another man he did not know, had tried to sell the vehicle to him the day before.  Lottie realized at the time that the vehicle matched the description given in news reports about the Howell carjacking.  Ladell King, in turn, told police that he had agreed to help Christopher Jordan and Jones find a buyer for a stolen vehicle.  On the night of the shooting, Jordan came to King's apartment driving a Cutlass; Jones arrived a short time later, wearing a white T-shirt, a black stocking cap, and a red bandana, and driving the Suburban.  King told police that Jones could be found at his parents' Oklahoma City home.

3

Police then drove to Jones's parents' home, called a telephone number supplied by King, and spoke to someone who identified himself as Julius Jones. Jones initially agreed to come out and speak to police, but changed his mind. Police made several attempts to re-establish telephone contact; eventually a female answered and claimed Jones was not there. While some officers maintained surveillance at the home, others sought and obtained warrants to arrest Jones and search his parents' home for evidence. Police found a .25–caliber handgun, wrapped in a red bandana, secreted in the attic through a hole in a bedroom ceiling and found papers addressed to Jones in the bedroom. Police also found a loaded, .25–caliber magazine, hidden inside a wall-mounted door-chime housing. Further investigation revealed that the bullet removed from Howell's head, and a bullet shot into the dashboard of the Suburban, were fired from the handgun found in the attic of the Jones home.

Christopher Jordan was arrested on the evening of July 30. Jones, who managed to escape his parents' home before police had secured it, was arrested at a friend's apartment on the morning of July 31. The two men were charged conjointly with conspiracy to commit a felony, and with the murder of Howell. Jordan agreed to testify against Jones as part of a plea agreement. At trial, Jordan testified that the two men had planned to steal a Chevrolet Suburban and sell it; that they followed Howell's vehicle for some time with the intent to rob Howell of it; that once Howell pulled into the driveway, Jordan stayed in their vehicle while Jones, armed with a handgun, approached the Suburban on foot; that after the robbery-shooting, Jones drove the Suburban away and told Jordan to follow him; and that Jones subsequently claimed his gun had discharged accidentally during the robbery.

Jones, 128 P.3d at 532-33.

Additional facts and testimony were submitted to the jury at trial but are not contained in the OCCA's summary. Additional facts necessary for a determination of Petitioner's claims will be set forth in detail throughout this Opinion where applicable.

## PETITIONER'S CLAIMS FOR RELIEF

### STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter

4

"AEDPA"), in order to obtain federal habeas relief once a State court has adjudicated a

particular claim on the merits, Petitioner must demonstrate that the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of
> the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1-2).

The Supreme Court has defined "contrary to" as a State court decision that is

"substantially different from the relevant precedent of this Court." Williams v. Taylor, 529

U.S. 362, 405 (2000) (O'Connor, J., concurring and delivering the opinion of the Court). A

decision can be "contrary to" Supreme Court precedent "if the state court applies a rule that

contradicts the governing law set forth in [Supreme Court] cases" or "if the state court

confronts a set of facts that are materially indistinguishable from a decision of this Court and

nevertheless arrives at a result different from [Supreme Court] precedent." Id. at 405-06.

The "unreasonable application" prong comes into play when "the state court identifies the

correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the

facts of the particular state prisoner's case" or "unreasonably extends a legal principle from

[Supreme Court] precedent to a new context where it should not apply or unreasonably

refuses to extend that principle to a new context where it should apply." Id. at 407. In

ascertaining clearly established federal law, this Court must look to "the holdings, as opposed

to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court

decisions." Yarborough v. Alvarado, 541 U.S. 652, 660-61 (2004) (quoting Williams, 529

at 412.

The "AEDPA's purpose [is] to further the principles of comity, finality, and federalism.  There is no doubt Congress intended AEDPA to advance these doctrines." Williams v. Taylor, 529 U.S. 420, 436 (2000).  "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007).  The deference embodied in Section 2254(d) "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington v. Richter, ___ U.S. ___, 131 S. Ct. 770, 786 (2011)(citation omitted).

### GROUNDS FOR RELIEF

Ground 1:    Ineffective Assistance of Trial Counsel Regarding Failure to Present Evidence and Failure to Effectively Cross-Examine Witnesses.

In his first ground for relief, Petitioner complains about the effectiveness of his trial counsel.  Petitioner faults his trial counsel for failing to (1) show the jury that Petitioner's hair was too short for him to be the one identified by Megan Tobey as the person who shot Mr. Howell; (2) argue that Mr. King, and not Petitioner, was most likely the one seen earlier in the day with Mr. Jordan; (3) present evidence of Mr. Jordan's confessions to the crime; and (4) demonstrate to the jury Mr. Jordan's pattern of falsehoods.  Petitioner asserts that all of these complaints were presented to the OCCA either on direct appeal or in his post-conviction relief application. (Pet. at 23-24.) Respondent argues that only the third complaint

6

is exhausted and that the OCCA's disposition of the third complaint is neither contrary to nor an unreasonable application of Supreme Court law. As to the remaining complaints, Respondent argues for the application of the doctrine of anticipatory procedural bar. In his Reply, Petitioner, with reference to the Rule 3.11 Motion presented by his appellate counsel on direct appeal, has taken issue with Respondent's characterization of his complaints as unexhausted.

On direct appeal, appellate counsel presented numerous claims regarding trial counsel's ineffectiveness. Brief of Appellant, Case No. D-2002-534, pp. 39-57. In support of the claim set forth in direct appeal Proposition VIII, appellate counsel also filed 39 supplementary materials in an extensive Rule 3.11 Motion. Completely absent from his direct appeal brief is any reference to trial counsel's actions (or inactions) relating to the length of Petitioner's hair and who, besides Petitioner, may have been with Mr. Jordan on the day Mr. Howell was murdered (Petitioner's first and second complaints raised here). Relative to Petitioner's third complaint, appellate counsel argued on direct appeal that trial counsel was ineffective for failing to present the testimony of Emmanuel Littlejohn concerning statements Mr. Jordan allegedly made to him about the murder of Mr. Howell. Id. at 41. In Petitioner's application for post-conviction relief, post-conviction counsel expanded the claim, arguing that trial counsel was ineffective for not presenting the testimony of Christopher Berry, who, like Mr. Littlejohn, allegedly heard Mr. Jordan make statements about the murder of Mr. Howell. Original Application for Post-Conviction Relief,

7

Case No. PCD-2002-630, pp. 27-31.[4]  Relative to his fourth complaint, appellate counsel

argued on direct appeal that trial counsel was ineffective for failing to "effectively and fully"

impeach Mr. Jordan with prior inconsistent statements.  Appellate counsel cited inconsistent

preliminary hearing testimony, and also noted that trial counsel did not interview Mr. Jordan

before trial.  Appellate counsel additionally argued that

> trial counsel failed to methodically and exhaustively go through Mr. Jordan's
> plea agreement, his prior inconsistent statements to Mr. Littlejohn and in his
> plea negotiation proffer dated September 12, 2000, his motivation for
> testifying falsely to avoid the death penalty, his motivation to obtain and retain
> the lenient treatment set forth in his plea agreement, his relation with
> Mr. King, and his subjective belief, whether true or untrue, that he would serve
> not more than 15 years on a life sentence with all but 30 years suspended.

Brief of Appellant, pp. 45-46 (citations omitted).

Having thoroughly reviewed the state court record, the Court agrees with Respondent

that Petitioner's first and second complaints are unexhausted.  Petitioner's citations to the

direct appeal record do not show that these complaints were raised therein.[5]  If Petitioner

---

[4]  Relative to this claim, Petitioner also claimed in his post-conviction application that his
appellate counsel was ineffective for failing to raise this claim of trial counsel ineffectiveness.
Petitioner has presented the appellate counsel portion of this claim in his Ground Six.

[5] The only citations made by Petitioner (Reply at 5-6) which have any relation to his first and
second complaints are very broad, general statements about trial counsel's alleged failures.  See
Rule 3.11 Motion, p. 2 (As an introduction to the list of supplementary materials, reference to "a
failure by trial counsel to effectively use all available evidence and/or to adequately investigate to
identify evidence which was available and should have been presented or otherwise utilized at trial. .
. .") and p. 4 ("Trial counsel was ineffective in failing to fully and fairly subject the prosecution's
evidence at trial to the crucible of meaningful adversarial testing through cross-examination.").
These generalized statements, which are completely devoid of the factual bases of Petitioner's first
and second complaints, in no way alert the OCCA to Petitioner's claims regarding trial counsel's
actions relating to the length of Petitioner's hair and who, besides Petitioner, may have been with
Mr. Jordan on the day Mr. Howell was murdered.  See Bland v. Sirmons, 459 F.3d 999, 1011 (10th
Cir. 2006) (citing Picard v Connor, 404 U.S. 270, 275 (1971) (claim is unexhausted when it has not

8

were to return to State court with these claims now, it is clear, as Respondent alleges, that they would be procedurally barred due to Petitioner's failure to present them in his initial post-conviction application. See Anderson v. Sirmons, 476 F.3d 1131, 1139 n.7 (10th Cir. 2007) ("'Anticipatory procedural bar' occurs when the federal courts apply procedural bar to an unexhausted claim that would be procedurally barred under state law if the petitioner returned to state court to exhaust it.").

The only way for Petitioner to circumvent this anticipatory procedural bar is by making one of two showings: he may either demonstrate "cause and prejudice" for his failure to raise the claims in his initial application for post-conviction relief, or he may show that failure to review his claims will result in a "fundamental miscarriage of justice." Id. at 1240. Petitioner has not alleged cause and prejudice, but has attempted to satisfy the fundamental miscarriage of justice exception by asserting his innocence. (Reply at 6-7.)  The fundamental miscarriage of justice exception addresses those rare instances "where the State has convicted the wrong person of the crime." Sawyer v. Whitley, 505 U.S. 333, 340 (1992).  Thus, to meet the exception, a petitioner must make "a colorable showing of factual innocence." Beavers v. Saffle, 216 F.3d 918, 923 (10th Cir. 2000).  This requires Petitioner to "show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." Schlup v. Delo, 513 U.S. 298, 327 (1995).  Petitioner has failed to demonstrate facts to satisfy this demanding burden.  The length of Petitioner's hair compared to Mr. Jordan's is not a persuasive showing of actual innocence.  Further, the identity of someone

---

been "fairly presented" to the state courts)).

possibly seen earlier in the day with Mr. Jordan also lacks persuasiveness as to the identity

of the shooter and his accomplice in a different location hours after the crime. These facts,

even if accepted, do not persuasively show Petitioner is actually innocent of the crimes in

light of the amount of evidence pointing to his guilt and, thus, do not justify a circumvention

of an anticipatory procedural bar to his first and second complaints.

Regarding Petitioner's fourth complaint, the Court disagrees with Respondent that this

complaint is unexhausted. While Petitioner's fourth complaint does not mirror the claim

raised by appellate counsel on direct appeal regarding the impeachment of Mr. Jordan, it is

in essence the same claim. On direct appeal, appellate counsel argued that trial counsel was

ineffective in his cross-examination of Mr. Jordan in that he did not fully and effectively

discredit him as he could have from available evidence. Here, although Petitioner cites to

some additional available evidence which might have been used to discredit Mr. Jordan, the

underlying claim is the same.

To prevail on a claim of ineffective assistance of counsel under the Sixth Amendment,

Petitioner must first show that his counsel's representation fell below an objective standard

of reasonableness. See Strickland v. Washington, 466 U.S. 668, 688 (1984). In so doing,

Petitioner must overcome the "strong presumption" that his counsel's conduct fell within the

"wide range of reasonable professional assistance" that "'might be considered sound trial

strategy.'" Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101

(1955)). He must, in other words, overcome the presumption that his counsel's conduct was

constitutionally effective. United States v. Haddock, 12 F.3d 950, 955 (10th Cir. 1993). A

claim of ineffective assistance "must be reviewed from the perspective of counsel at the time," Porter v. Singletary, 14 F.3d 554, 558 (11th Cir. 1994), and, therefore, may not be predicated on "'the distorting effects of hindsight.'"  Parks v. Brown, 840 F.2d 1496, 1510 (10th Cir. 1987) (quoting Strickland, 466 U.S. at 689).

If constitutionally deficient performance is shown, Petitioner must then demonstrate that "there is a 'reasonable probability' the outcome would have been different had those errors not occurred." Haddock, 12 F.3d at 955 (citing Strickland, 466 U.S. at 688, 694, and Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993)).  In the specific context of a challenge to a death sentence, the prejudice component of Strickland focuses on whether "the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695; quoted in Stevens v. Zant, 968 F.2d 1076, 1081 (11th Cir. 1992).  Petitioner bears the burden of establishing both that the alleged deficiencies unreasonably fell beneath prevailing norms of professional conduct and that such deficient performance prejudiced his defense.  Strickland, 466 U.S. at 687; Yarrington v. Davies, 992 F.2d 1077, 1079 (10th Cir. 1993).  In essence, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686.  "Counsel's performance must be 'completely unreasonable' to be constitutionally ineffective, 'not merely wrong.'" Welch v. Workman, 639 F.3d 980, 1011 (10th Cir. 2011) (quoting Hoxsie v.Kerby, 108 F.3d 1239, 1246 (10th Cir. 1997)).  "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky,

11

559 U.S. 356, __, 130 S. Ct. 1473, 1485 (2010).

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," [Strickland] at 689, 104 S.Ct. 2052; Lindh v. Murphy, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, Knowles, 556 U.S. at ___, 129 S.Ct. at 1420. The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ___, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Harrington v. Richter, 562 U.S. __, __, 131 S. Ct. 770, 788 (2011).

In addressing the merits of Petitioner's fourth complaint, the OCCA held as follows:

> Next, Jones claims that trial counsel should have cross-examined Jordan more thoroughly, in both the guilt and punishment stages of trial, with the aim of showing the jury that Jordan was slanting his testimony in hopes of bettering his own situation. Counsel did cross-examine Jordan at length, pointing out inconsistencies in his story and otherwise attacking his credibility. Jones's arguments on appeal are nothing more than complaints about exactly how that impeachment should have been accomplished. Jordan admitted in guilt-stage cross-examination that many of the details he had previously given to police and his own attorney were false; Jones's defense counsel methodically went over many of these untruths. Jordan also admitted, on cross-examination, that he had previously lied about his involvement in this case to help himself out. In the punishment stage, trial counsel cross-examined Jordan again about his plea negotiations, and how he stood to gain from helping the State convict Jones. The fact that counsel did not ask every

12

question Jones is now able to formulate on appeal is not proof of deficient performance.

Jones, 128 P.3d at 546-47.[6]  Petitioner has failed to show that this determination by the

OCCA is contrary to, or an unreasonable application of, clearly established Supreme Court

precedent.  Accordingly, relief is denied as to this claim.

Petitioner's third complaint was aptly addressed by the OCCA on both direct appeal

and on consideration of his post-conviction application.  On direct appeal, the OCCA held

as follows:

> Jones goes on to attack trial counsel's decision not to present the testimony of Emmanuel Littlejohn. A multiple felon and convicted murderer, Littlejohn briefly shared a county jail cell with co-defendant Jordan while awaiting capital resentencing in his own first-degree murder case. Littlejohn told defense investigators that Jordan admitted he was falsely throwing blame on Jones, that Jordan said Jones was not involved in the Howell murder at all, and that Jordan had even gone so far as to hide the murder weapon and other incriminating evidence in the Joneses' home himself. The fact that defense counsel actually did investigate Littlejohn's claim before trial reduces Jones's argument to one over trial strategy which, as Strickland instructs, is much more difficult to attack. Littlejohn's criminal history presented obvious credibility problems. While he had nothing to gain from testifying on Jones's behalf, he had little to lose by perjuring himself with claims that were impossible to corroborate. Moreover, the image of Jordan planting evidence in the attic of the Jones family home, without their knowledge, might have been somewhat difficult for the jury to believe. We find nothing unreasonable about counsel's decision to forgo Littlejohn's assistance.

Jones, 128 P.3d at 546.  On consideration of Petitioner's post-conviction application, the

---

[6] On direct appeal, Petitioner challenged trial counsel's cross-examination of Mr. Jordan in both stages of his bifurcated trial.  As shown by this citation to the OCCA's opinion, the OCCA addressed both aspects of the claim in a single disposition. In his petition for habeas relief, however, Petitioner only challenges trial counsel's performance in the guilt stage.

13

OCCA held as follows:

> Next, Petitioner claims trial counsel was ineffective for failing to investigate and present [a witness] at trial, and that appellate counsel was ineffective for not recognizing and advancing this claim on direct appeal. Specifically, Petitioner claims that the testimony of Christopher Berry . . . could have made a difference in the outcome of the trial. At the time of Petitioner's trial, Berry was being held in the Oklahoma County Jail on a charge of Child Abuse Murder. He was later convicted of that charge and sentenced to life in prison without the possibility of parole. Berry claims, by affidavit, that he overheard Petitioner's co-defendant, Christopher Jordan, boasting that he, not Petitioner, was the triggerman in the homicide with which they were jointly charged.

> Petitioner made a similar claim on direct appeal, alleging trial counsel was ineffective for not presenting the testimony of another jail inmate, Emmanuel Littlejohn, who also allegedly heard Jordan boast about being the triggerman. We rejected that claim, because the inmate's credibility was suspect and the details of the account were specious. Berry suffers from the same credibility problems that Littlejohn did. Nor do we agree with Petitioner's argument that Berry's claim necessarily "corroborates" Littlejohn's. Berry's affidavit suggests that Jordan admitted Petitioner was involved in the murder, while according to Littlejohn, Jordan denied that Petitioner had any involvement. Taken together, these inmates' claims show only one thing: that Christopher Jordan changed his story to suit his own needs. Yet this much was already clear to the jury, through trial counsel's extensive cross-examination of Jordan, who testified against Petitioner at trial.

Jones, No. PCD-2002-630, slip op. at 10-11 (citations to the direct appeal opinion omitted).

Once again, Petitioner has failed to show that the OCCA rendered a decision which is contrary to, or an unreasonable application of, Supreme Court precedent. Accordingly, relief is denied as to this claim.

In sum, the Court finds that Petitioner is not entitled to relief on Ground One. For the reasons set forth above, Petitioner's first and second complaints are procedurally barred and his third and fourth complaints are denied.

14

Ground 2:        Ineffective Assistance of Trial Counsel Regarding Suppression of Evidence.

In his second ground for relief, Petitioner makes an additional claim regarding his trial counsel's alleged ineffectiveness.  He claims that because trial counsel failed to make necessary requests and objections which would have shown that a search warrant contained materially false information, counsel was ineffective and habeas relief is warranted.[7] Respondent responds that the OCCA's determination that counsel was not ineffective for failing to move to suppress the evidence pursuant to Franks v. Delaware, 438 U.S. 154 (1978), is neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court.

The facts leading up to the search of Petitioner's home and the underlying basis for his claim are best summarized by the OCCA's thorough analysis and determination of Petitioner's claim on direct appeal:

> In Proposition One, Jones claims that evidence seized from his parents' home pursuant to a search warrant was improperly admitted.  On July 30, 1999, police officers, believing Jones was present, surrounded Jones's parents' home and attempted to make contact with Jones by telephone.  An officer spoke with an individual who identified himself as Jones, and some time later, Jones's parents, sister and brother came out of the house.  Jones's father told police that Jones was not in the house and invited the police inside to look for him.  The officers informed Jones's parents they would wait on a search warrant due to safety concerns.  Thereafter, officers obtained a search warrant. A police tactical team entered the house around 9:30 p.m. and declared it secure by 10:00 p.m.  Jones was not inside.  After that, the search team entered the house and conducted the search.

---

[7]  The search warrant ultimately lead to the discovery of the gun used in the shooting and some of its ammunition.

15

The search yielded items seen by the victim's sister during the crime, clothing items that King saw Jones wearing thirty minutes after the crime, a semi-automatic, chrome-finished pistol consistent with a gun King said Jones habitually carried, a red bandana, the pistol's magazine and bullets, a dark green and a black stocking cap, and a white tee shirt with black trim.

Jones filed a motion to suppress all the evidence prior to trial, arguing the affidavit for search warrant lacked probable cause, night-time authorization was improper under 22 O.S.Supp.1999, § 1230, and the night-time search was improper. The trial court denied the motion to suppress. At trial, Jones objected to the admission of the evidence on the basis that the night-time search was not supported by sufficient facts.

Jones claims the information in the affidavit was insufficient to ensure the issuing magistrate had a substantial basis for concluding that probable cause existed. He complains that the affidavit did not contain a factual basis establishing that evidence would be found in Jones's parents' residence and did not include any information establishing the reliability of the statement from, or the veracity of, Ladell King. Jones also claims his trial counsel was ineffective for failing to object to the search warrant on the basis that the affidavit contained deliberate false and/or misleading information. An argument raised in support of a motion to suppress which is not raised at trial is waived. Young v. State, 1998 OK CR 62, ¶ 22, 992 P.2d 332, 339. Therefore, we review Jones's claim that the affidavit was insufficient to establish probable cause for plain error. Cheatham v. State, 1995 OK CR 32, ¶ 48, 900 P.2d 414, 427.

We give a magistrate's finding of probable cause great deference. Mollett v. State, 1997 OK CR 28, ¶ 14, 939 P.2d 1, 7. The residence of a person suspected of a crime is a natural place for concealing evidence of that crime. Id., 1997 OK CR 28, ¶ 15, 939 P.2d at 7. Further, facts to establish the reliability of information obtained from King was not necessary, because King was named in the affidavit as the giver of the information. Caffey v. State, 1983 OK CR 39, ¶ 11, 661 P.2d 897, 900. Upon review, we find the information set forth in the affidavit sufficient to support the magistrate's finding of probable cause and issuance of the search warrant.

We also find trial counsel was not ineffective for failing to object and request a Franks hearing to determine whether the police knowingly or with reckless disregard for the truth included false or misleading information in the affidavit or omitted critical information. Jones submits the police intentionally

16

omitted critical information from the affidavit – that the police knew Jones had left the residence prior to obtaining the search warrant. The record shows the police had Jones's residence surrounded and attempted contact with Jones, whom they believed was inside, at the time other officers were preparing the affidavit. Around 4:30 p.m., Jones's father told police Jones was not inside. This information was not included in the affidavit which was presented to the magistrate around 7:00 p.m.

In Franks v. Delaware, the Supreme Court held that an affidavit supporting a factually sufficient search warrant might be attacked upon allegations that the affidavit contained intentional lies or reckless disregard for the truth. If the inaccuracies are removed from consideration and there remains in the affidavit sufficient allegations to support a finding of probable cause, the inaccuracies are irrelevant. Id., 438 U.S. 154, 171, 98 S.Ct. at 2684, 57 L.Ed.2d 667. To determine whether the inaccuracies are irrelevant, we ask whether the warrant would have been issued if the judge had been given accurate information. Wackerly, 2000 OK CR 15, ¶ 13, 12 P.3d at 9. We find, even had the affidavit included Jones's parents' claim that Jones had left the home, a substantial basis for the issuance of the warrant would have existed and the warrant would have properly been issued.

The magistrate had a substantial basis for concluding that probable cause existed. No plain error occurred. Further, trial counsel's failure to attack the sufficiency of the affidavit at trial and request a Franks hearing does not constitute deficient performance, as such an objection would have failed. Phillips v. State, 1999 OK CR 38, ¶ 104, 989 P.2d 1017, 1044.

Jones, 128 P.3d at 535-37 (footnotes omitted).

As stated previously, Petitioner bears the burden when claiming ineffective assistance of counsel of demonstrating that the OCCA's determination was unreasonable. He must establish both that the alleged deficiencies unreasonably fell beneath prevailing norms of professional conduct and that such deficient performance prejudiced his defense. Strickland, 466 U.S. at 686. In the case of a claim of ineffectiveness for failing to present a Fourth Amendment claim, Petitioner's burden increases even more:

17

> Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice.

Kimmelman v. Morrison, 477 U.S. 365, 375 (1986).

Petitioner claims that at the time law enforcement were obtaining the search warrant, the police had "uncontradicted information" he was not at the residence. In support of this allegation, Petitioner cites to his parents' testimony at the suppression hearing.[8] His parents testified they looked throughout the house and then told law enforcement that Petitioner was not at their residence. Petitioner further claims the State later agreed in its Response to Defendant's Motion to Suppress (O.R. at 213) that the officers knew the house was unoccupied beginning at or about 4:00 p.m. on July 30. (Pet. at 25.)[9]

Petitioner has not demonstrated the OCCA's determination to be unreasonable, nor has he shown that law enforcement made false statements in the affidavit. In Franks, the

---

[8] This is not an instance where trial counsel completely failed to attempt to suppress the evidence obtained pursuant to the search warrant. Prior to trial, trial counsel moved to suppress the evidence on the grounds that the search was improperly conducted on a residence during the night and that the magistrate judge did not make and articulate specific findings necessary to authorize a night-time search. Trial counsel specifically agreed with the prosecutor, however, that the hearing was not a Franks hearing. (Tr., 8/11/2000 and 8/15/2000, p. 25.)

[9] The State objects to Petitioner's characterization of its Response. One of the State's arguments against the claim that the warrant was improperly executed at night was that the statute requiring warrants on occupied dwellings to be served during the day was not violated because the house was not occupied when the warrant was served. Respondent states that the Response did not contain an admission the police knew Petitioner was not there. Instead, in hindsight, the prosecutors knew at the time of the filing of the Response that Petitioner had fled the house and that the search was actually conducted on an unoccupied dwelling.

18

Supreme Court held that a defendant is entitled to a hearing regarding a warrant's sufficiency to sustain probable cause if allegations of deliberate falsehood or of reckless disregard for the truth on the part of an affiant are specifically identified in the affidavit and accompanied by a statement of supporting reasons. If these requirements are met, and when the allegedly false or reckless material is set to one side there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. Alternatively, if the remaining content is insufficient, the defendant is entitled to a hearing. Franks, 438 U.S. at 171-72.[10] "Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant." Id. at 171.

The testimony and arguments offered in support of his claim were considered by the State court, along with Detective Flowers' testimony at the suppression hearing and at the trial. Detective Flowers testified at trial that when he first arrived at Petitioner's parents' home he called Petitioner's phone number and spoke with someone who identified himself as Petitioner. Detective Flowers told Petitioner the house was surrounded and requested that he come outside. The front door opened and someone looked out, but then the door was shut. Despite later being told otherwise by Petitioner's parents, Detective Flowers was concerned that Petitioner was still in the house. According to his testimony, Detective Flowers did not know Petitioner was not in the house until after the tactical team entered the home and

---

[10] "Whether he will prevail at that hearing is, of course, another issue." Id.

completed their sweep of the premises. (Tr., Vol. VII, pp. 177-88, 206.)[11] Detective Flowers'

trial testimony was consistent with the concerns he expressed in his testimony at the

suppression hearing – concerns that at the time, Petitioner was armed and barricaded in the

house. (Tr., 8/11/2000 and 8/15/2000, pp. 164-65.)

Petitioner has also failed to demonstrate the OCCA's determination was unreasonable

that, even had the affidavit included Petitioner's parents' statements he had left the home, a

substantial basis for the warrant would have existed and the warrant would have been

properly issued.  Further, as determined by the OCCA, since an objection based on Franks

to the affidavit would have failed, trial counsel's failure to request such a hearing does not

constitute deficient performance.  As Petitioner has failed to demonstrate the OCCA's

determination is unreasonable as to both his Fourth Amendment claim and his Sixth

Amendment claim, his second ground for relief is denied in its entirety.

Ground 3:    Prosecutorial Misconduct.

In his third ground for relief, Petitioner claims that during closing arguments the

prosecutor improperly gave her personal opinion of his guilt, vouched for the credibility of

witnesses, misstated testimony, engaged in speculation, and started a demonstration as to

how the shooting occurred by pointing her finger at a juror's head.[12]  He claims these and

---

[11]   Indeed, it seems illogical that law enforcement would utilize a tactical team and a negotiator if they knew the house was unoccupied.

[12]   Petitioner's claim regarding the prosecutor's demonstration with a juror is included only in the caption to his ground for relief.  It was neither identified nor argued in the body of his claim.

other instances of prosecutorial misconduct deprived him of his right to due process of law

under the Eighth and Fourteenth Amendments. (Pet. at 28-30)[13]

Petitioner raised these claims of prosecutorial misconduct on direct appeal.  The

OCCA held:

> In Proposition Eleven, Jones argues various trial errors and prosecutorial misconduct deprived him of a fair trial and a reliable sentencing proceeding and warrants a new trial or modification of his sentences.  Jones's complaints include: improper display of emotion, improper personal opinion, misstating evidence, misleading comments, arguing guilt by association, speculation, going outside record, inflammatory demonstration, arguing that Jones committed unadjudicated crimes without a reliable basis, evoking emotional response, misstatement of applicable law and improper argument.

> Many of the errors claimed by Jones were not objected to at trial; therefore, we review those claims for plain error. Banks v. State, 2002 OK CR 9, ¶ 41, 43 P.3d 390, 401.  After carefully reviewing the arguments and record, we find no plain error.  Some of the errors claimed by Jones were objected to at trial and the objections were sustained by the trial court, most with instructions or admonishments, which cured any error that may have occurred. Slaughter, 1997 OK CR 78, ¶ 110, 950 P.2d at 869.

> Some of the instances Jones complains of were proper comments on the evidence, reasonable inferences based on the evidence, or evidentiary rulings by the trial court that were not an abuse of discretion. Bland v. State, 2000 OK CR 11 ¶ 97, 4 P.3d 702, 728.  The jury was properly instructed that it was the finder of fact and that attorney argument was not evidence.  Juries are presumed to follow their instructions. Turrentine v. State, 1998 OK CR 33, ¶ 26, 965 P.2d 955, 968.  The comments were the typical sort of comments made during the normal course of closing argument and, as such, these instances of alleged improper comment fall within the broad parameters of effective advocacy and do not constitute error. Matthews v. State, 2002 OK CR 16, ¶ 38, 45 P.3d 907, 920.

> We address one complaint concerning an inflammatory demonstration

---

[13]  Petitioner does not identify the "other instances" he refers to in his claim for relief.

by the prosecutor. During sentencing stage final closing argument, the prosecutor, in describing how the victim was killed, stated Jones held the gun to Howell's head while simultaneously pointing her finger at a juror's head, as if demonstrating a gun pointed towards the juror's head. Trial counsel objected, but the prosecutor continued the demonstration using co-counsel as the victim.

This Court has previously upheld demonstrations that are based on the evidence presented at trial and not theatrical demonstrations. Gilbert v. State, 1997 OK CR 71, ¶ 94–95, 951 P.2d 98, 121. This demonstration was an attempt to illustrate the shooting based upon the evidence presented at trial; however, the conduct involving a juror cannot be condoned. Still, we find it was not so egregious as to elicit an emotional response rather than a rational judgment from the juror or the jury and it was not so prejudicial as to deprive Jones of a fair sentencing proceeding.

"Allegations of prosecutorial misconduct will not cause a reversal of judgment or modification of sentence unless their cumulative effect is such as to deprive the defendant of a fair trial and fair sentencing proceeding." Spears v. State, 1995 OK CR 36, ¶ 60, 900 P.2d 431, 445. This Court looks at the entire record to determine whether the cumulative effect of improper conduct by the prosecutor prejudiced an appellant causing plain error. Romano v. State, 1995 OK CR 74, ¶ 54, 909 P.2d 92, 115. Having reviewed the entire record, we find neither reversal nor modification is warranted on this proposition.

Jones, 128 P.3d at 544-45.

The deferential standard of review under 28 U.S.C. § 2254(d) is required since the OCCA adjudicated Petitioner's prosecutorial misconduct claim on the merits. See Walker v. Gibson, 228 F.3d 1217, 1241 (10th Cir. 2000), abrogated on other grounds by Neill v. Gibson, 278 F.3d 1044, 1057 (10th Cir. 2001). Petitioner does not allege that the prosecutor's misconduct denied him a specific constitutional right. The appropriate standard, therefore, is "'the narrow one of due process, and not the broad exercise of supervisory power.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v.

22

DeChristoforo, 416 U.S. 637, 642 (1974)).   Accordingly, "it is not enough that the prosecutor's remarks were undesirable or even universally condemned." Darden, 477 U.S. at 181 (citation omitted).  A prosecutor's improper remarks require reversal of a conviction or sentence only if the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643.  The fundamental fairness inquiry requires an examination of the entire proceedings and the strength of the evidence against Petitioner, both as to the guilt stage and the sentencing phase. Id. at 643 (see also Littlejohn v. Trammell, 704 F.3d 817, 837 (10th Cir. 2013)).

In almost every instance identified by Petitioner of statements that are claimed to be improper, the prosecutor prefaced her argument with words such as "submit" and "contend." During the first stage of trial, the prosecutor stated: "For instance, the State of Oklahoma contends that we know Julius Jones is the shooter in this case.  How do we know that?" (Tr., Vol. X, p. 48) The statement was met with an objection and the trial court ordered the prosecutor to rephrase the statement.  It then admonished the jury: "Ladies and Gentlemen of the jury, I'll remind you that anything that the attorneys say is for purposes of persuasion only.  You are the trier of fact.  And you will determine what the facts are in this case." Id. A later statement of the prosecutor's summation of her opinion of one of defendant's contentions regarding a disputed fact was met with an objection that her statement was improper.  The prosecutor offered to and did rephrase the statement, to which no subsequent objection was raised. (Tr., Vol. X, pp. 61-62)

Petitioner next complains the prosecutor inaccurately quoted the testimony of his

23

girlfriend, Analiese Presley. These statements identified by Petitioner were the prosecutor's

summation of the testimony and were also not met with an objection. (Tr., Vol. X, pp. 81,

91) As Petitioner identifies in his Petition, "some correction of the attribution to the

girlfriend was attempted (Pet. at 28): "But as the Judge told you, what we say is not evidence.

So I'm going to tell you a few things that I remember that the State of Oklahoma apparently

remembers different from the testimony. But what I say about it, what they say about it

doesn't matter. It's what you remember being said." (Tr., Vol. X, p. 106)

Petitioner also claims the prosecutor speculated as to what the victim, Paul Howell,

would have done had he been asked, and that the statement that he would have acquiesced

in the taking of his vehicle was made as an encouragement to the jury to base its decision in

part on sympathy. The prosecutor's statement that Paul Howell was not given a chance to

give up the vehicle, that he would have done so voluntarily, and that he did not have to die

for it, was made during the explanation of the elements of felony murder to argue a taking

by force. This statement was also not met with any objection. (Tr., Vol. X, pp. 63-64) The

same is true regarding a similar statement made by the prosecutor during the second stage

closing argument. (Tr., Vol. XV, p. 47)

Petitioner last claims the prosecutor encouraged the jury to disregard mitigating

evidence and offered her opinion that the aggravating circumstances outweighed mitigation

when the prosecutor submitted: (1) that the defendant's age did not reduce his level of blame

(Tr., Vol. XV, p. 188); (2) that whether or not the killing was premeditated did not reduce

the moral culpability of the murder (Tr., Vol. XV, p. 188); (3) that the defendant's

background of high school, Sunday school, and work experience did not extenuate the manner and reason for which Paul Howell was killed (Tr., Vol. XV, p. 189); and, (4) that the aggravating circumstances far outweighed any mitigation offered by the defense. (Tr., Vol. XV, p. 188)

As determined by the OCCA, these statements were all typical of normal closing argument and were reasonable inferences based on the evidence presented at trial. Additionally, the jury was reminded that the comments of counsel were not evidence and that the jury was to rely on its own recollection as to the testimony and evidence presented at trial. Petitioner has not demonstrated that the OCCA's determination of these claims is unreasonable.

As to the prosecutor's demonstration of the shooting utilizing a juror, Petitioner has offered nothing to demonstrate the OCCA's determination on that issue is unreasonable. Taken together with all of the instances of alleged improper statements and compared to the evidence presented at trial, Petitioner has not shown the cumulative effect of these comments and of the demonstration so infected his trial with unfairness as to deprive him of a fair trial. Accordingly, Petitioner's third ground for relief is denied.

Ground 4:    Removal of Prospective Juror for Cause.

In his fourth ground for relief, Petitioner argues the trial court improperly excused prospective juror McPeak for cause in violation of Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. Respondent asserts the OCCA's determination is neither contrary to, nor an unreasonable application of, clearly established federal law.

25

The Sixth and Fourteenth Amendments prohibit the exclusion of jurors from a capital trial "simply because they voice[] general objections to the death penalty or express[] conscientious or religious scruples against its infliction." Witherspoon v. Illinois, 391 U.S. 510, 522 (1968). A dismissal of a juror contrary to Witherspoon is a constitutional error requiring vacation of a death sentence. Rivera v. Illinois, 556 U.S. 148, 161 (2009). A juror may be dismissed for cause if his "'views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, 420 (1985) (citation and emphasis omitted). A trial court's determination of a juror's ability to obey instructions and fulfill his duties is subject to deference: "[W]hen there is ambiguity in the prospective juror's statements, 'the trial court, aided as it undoubtedly is by its assessment of the venireman's demeanor, is entitled to resolve it in favor of the State.'" Uttecht v. Brown, 551 U.S. 1, 7 (2007) (alterations omitted) (quoting Wainwright, 469 U.S. at 434). In addition, a trial judge's decision on juror bias is a factual determination subject to the presumption of correctness in 28 U.S.C. § 2254(e)(1). Witt, 469 U.S. at 429; see also Cannon v. Gibson, 259 F.3d 1253, 1280 (10th Cir. 2001).

The OCCA considered Petitioner's claim on direct appeal and denied relief, concluding that while the juror's initial responses were ambiguous, upon further questioning by the trial court, the juror "clearly stated he could not and would not vote for the death penalty under any circumstances." Jones, 128 P.3d at 534. A review of the record demonstrates that the OCCA's decision is not contrary to, nor an unreasonable application

26

of, clearly established federal law.  During voir dire, the following occurred between the trial

judge and prospective juror McPeak:

THE COURT:  Alright.  And you have – have you heard me talk about these two groups of people, about these always and never groups? Mr. McPeak, do you believe you fall into either one of those categories?

PROSPECTIVE JUROR MCPEAK:  Yes, I do.

THE COURT:  All right.  Which category is it that you believe that you fall into?

PROSPECTIVE JUROR MCPEAK:  I believe I would fall into the one that I would never vote for the death penalty.

THE COURT:  Okay.  Do you understand that Oklahoma law provides that you must listen to the evidence?

PROSPECTIVE JUROR MCPEAK:  Yes, sir.

THE COURT:  And that you must be able to follow the law in this case?

PROSPECTIVE JUROR MCPEAK:  Yes, sir.

THE COURT:  Are you telling me that you would not be able to listen to the evidence and you would not be able to follow the law?

PROSPECTIVE JUROR MCPEAK:  I would be able to.

THE COURT:  Pardon me?

PROSPECTIVE JUROR MCPEAK:  I would be able to.

THE COURT:  You would be able to follow the law?

PROSPECTIVE JUROR MCPEAK:  Yes.

THE COURT:  And if the law told you that you have to consider and give consideration to all three possible punishments, including the death penalty, that you would be able to consider all three possible punishments?

27

PROSPECTIVE JUROR MCPEAK:  Yes, sir, I would.  I would consider the other two before I considered the death penalty.

THE COURT:  Can you give meaningful consideration to all three punishments?

PROSPECTIVE JUROR MCPEAK:  Yes, sir.

THE COURT:  I thought that you told me, Mr. McPeak, that you would never – that you fell into this never category, that under any circumstances after the evidence has been presented, that you would not ever vote for the death penalty.

PROSPECTIVE JUROR MCPEAK:  Well, I wouldn't vote for the death penalty, but I would vote for the other two before I voted for the death penalty, if it came to that.

THE COURT:  Okay.  Mr. McPeak, you are kind of confusing me here a little bit.

PROSPECTIVE JUROR MCPEAK:  Well, I don't – I guess what I mean is that I would not vote for the death penalty, no.

THE COURT:  After listening to the evidence?

PROSPECTIVE JUROR MCPEAK:  Yes.

THE COURT:  And if the law told you that you had to give meaningful consideration to all three possible punishments, give meaningful consideration to all three, what you're telling me that is that you would under no circumstances vote for the death penalty?

PROSPECTIVE JUROR MCPEAK:  Yes.

THE COURT:  All right.  Counsel, do you want to approach?  Let me ask you this question, are you unequivocal in your answer?

PROSPECTIVE JUROR MCPEAK:  What do you mean by that?

THE COURT:  In other words, are you firm in your answer[?]

28

PROSPECTIVE JUROR MCPEAK:  Yes, sir.

(Tr., Vol. 2(A), pp. 156-59).

As the record makes clear, the juror unequivocally and firmly stated he could not vote to impose the death penalty.  The trial court was well within its province when it excused the juror for cause, as his views on serving on a capital jury would prevent or substantially impair the performance of his duties as a juror.  See Witt, 469 U.S. at 420.  Given the substantial deference given to a trial court's excusal of prospective jurors and this Court's standard of review under the AEDPA of the OCCA's determination, Petitioner's claim fails.  See 28 U.S.C. § 2254(d); Brown, 551 U.S. at 7.

Petitioner also argues that the trial court did not give Petitioner an opportunity to question the juror regarding his responses.  However, Petitioner does not provide clearly established federal law in support of this claim.  See Brown v. Sirmons, 515 F.3d 1072, 1081 (10th Cir. 2008) (rejecting argument on habeas review that trial court was required to permit petitioner an opportunity to rehabilitate potential jurors).  Accordingly, Petitioner's fourth ground for relief is denied in its entirety.

Ground 5:     Absence From Various Stages of Proceedings.

Petitioner claims his Constitutional rights to be present at all critical stages of his trial were violated in several instances without an express personal waiver and against his wishes.  Specifically, he asserts he was not present at the following: (1) a hearing regarding which laboratory the State should use to do destructive DNA testing; (2) a hearing regarding a witness' testimony as to whether he testified truthfully on the subject of expected leniency

29

on a pending charge and whether another witness disclosed all of his pending charges; (3)

a hearing regarding possible suspicious telephone calls received by some of the jurors; (4)

a hearing regarding jury instructions; (5) an admonition by the trial court to the jurors not to

discuss the case during a break in deliberations to allow the jurors to move their cars out of

the parking garage; and, (6) a hearing regarding a possible comment made by one of the

jurors indicating that he may have already made up his mind about sentencing before hearing

all of the evidence. (Pet. at 32; Motion Hearing 3/8/01, pp. 3-8; Tr., Vol. V, pp. 127-34; Tr.,

Vol. VI, pp. 33, 88; Tr., Vol. VII, pp. 5-137; Tr., Vol. X, pp. 3-49, 184-85; Tr., Vol. XIII, pp.

27-91).[14] Respondent responds that the OCCA's determination was not unreasonable in light

of clearly established Supreme Court precedent.

Petitioner raised this claim on direct appeal.  The OCCA held:

> Jones argues, in Proposition Ten, that he is entitled to a new trial
> because he was deprived of the right to be present at all critical stages of his
> trial in violation of due process and Oklahoma statute.  Jones claims he did not
> knowingly and voluntarily waive his right to be present at various hearings
> conducted during the course of his trial.  Jones states his trial counsel
> unilaterally waived his right to be present during certain court proceedings and
> on numerous other occasions the record is silent as to Jones's presence or
> waiver by trial counsel.  Jones claims his absence on these occasions prevented
> him from consulting with counsel which constitutes a due process violation
> and a structural flaw in the proceedings against him.

> A defendant's right to be present "at the trial" is protected by statute.
> 22 O.S.2001, § 583; Dodd v. State, 2004 OK CR 31, ¶ 20, 100 P.3d 1017,
> 1027; Ryder v. State, 2004 OK CR 2, ¶ 29, 83 P.3d 856, 864; Perry v. State,

---

[14] Petitioner characterizes these instances as various court proceedings "including motion
hearings, discussions of various legal issues, discussions of mistrial requests, taking up issues of
possible jury contamination, and conferencing regarding instructions." (Pet. at 32.)

1995 OK CR 20, ¶ 25, 893 P.2d 521, 527–28. The "right to be present" that
Jones claims was violated is rooted primarily in a defendant's Sixth
Amendment right to confront the witnesses against him. Dodd, id. A
defendant's Fifth Amendment due process right is violated only if the
defendant's absence from some portion of the proceedings is shown to have
impaired his ability to defend himself. Id.; see United States v. Gagnon, 470
U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985); Snyder v.
Massachusetts, 291 U.S. 97, 105–106, 54 S.Ct. 330, 332–33, 78 L.Ed. 674
(1934). This "right to be present" has limitations, however. Dodd, id.

> An accused does not have an absolute constitutional right to be
> present at every in camera discussion between court and
> counsel, even during the trial itself. Davis v. State, 1988 OK CR
> 153, ¶ 12, 759 P.2d 1033, 1036. Nor does the statutory right to
> be present "at the trial" extend to *in camera* hearings or other
> matters outside the jury's presence. Reid v. State, 1970 OK CR
> 149, 478 P.2d 988, 999–1000, modified 507 P.2d 915.

Dodd, 2004 OK CR 31, ¶ 20, 100 P.3d at 1027–1028.

The record shows Jones was present for all critical stages. Jones was
present at all times the jury was in the courtroom, except for one occasion
when the jury was brought into the courtroom for the sole purpose being
dismissed for the day. A knowing and voluntary waiver of his presence was
not necessary for the pretrial hearings, motion hearings or the *in camera*
hearings. Dodd, id. Trial counsel for Jones was always present at these
hearings.

A defendant must be allowed to be present where his presence "bears,
or may be fairly assumed to bear, a relation, reasonably substantial, to his
opportunity to defend." Lockett v. State, 2002 OK CR 30, ¶ 9, 53 P.3d 418,
423, quoting Snyder v. Massachusetts, 291 U.S. 97, 106, 54 S.Ct. 330, 332, 78
L.Ed. 674 (1934). In Lockett, this Court said "it did not intend to hold in any
way that 'the Fourteenth Amendment assures the privilege of presence when
presence would be useless, or the benefit but a shadow.' " Id. ( quoting Snyder,
291 U.S. at 106–107, 54 S.Ct at 332). Appellant here has not specifically
shown how his presence was necessary at these various hearings or how he
was deprived of his opportunity to defend his case by his absence. We find no
statutory violation, no due process violation and no error.

Jones, 128 P.3d at 543-44.

31

A defendant has a constitutional right to be present at trial proceedings whenever his presence has a reasonably substantial relation to the fullness of his opportunity to defend against the charge. Kentucky v. Stincer, 482 U.S. 730, 745 (1987) (defendant's rights under the Confrontation Clause of the Sixth Amendment were not violated by his exclusion from a hearing to determine the competency of two child witnesses); United States v. Gagnon, 470 U.S. 522, 526 (1985) (due process rights not violated by defendant's absence during in camera discussion between trial judge and juror). A defendant's presence at proceedings "is a 'condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.'" Gagnon, 470 U.S. at 526 (quoting Snyder v. Massachusetts, 291 U.S. 97, 105-06 (1934)).

Petitioner's trial counsel was present at all of the hearings and conferences. A defendant's presence, however, is not required at a conference or hearing at which he could do nothing, such as a hearing on a motion that concerns only matters of law. Id. at 527. In the instant case, the discussions and arguments at the hearings involved either purely legal issues or factual determinations of matters outside the scope of those involving the charges against him that resulted in legal decisions by the trial judge. In each of these instances, Petitioner would have gained nothing by attending and could have contributed nothing related to the subject matter of the hearings or conferences.

Petitioner has not demonstrated his presence at these specific hearings had a reasonably substantial relation to the fullness of his opportunity to defend against the charge. His presence during these instances was not required for a fair hearing and he was not denied

32

due process. See Gagnon, 470 U.S. at 527. Nor has Petitioner demonstrated that the OCCA's determination is contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. For the foregoing reasons, Petitioner's fifth ground for relief is denied in its entirety.

Ground 6:        Ineffective Assistance of Appellate Counsel.

In his sixth ground for relief, Petitioner claims his appellate counsel was ineffective because he failed to discover a juror had "an extensive record of contacts" with the legal system, failed to discover that another person from the county jail could corroborate that Christopher Jordan confessed to the murder, and failed to argue the unconstitutionality of Oklahoma's determination of whether mitigating circumstances outweigh aggravating circumstances.

As discussed above, when considering Petitioner's claims of ineffective assistance of trial counsel, Strickland, requires Petitioner to establish both that his counsel's performance was deficient and that his defense was thereby prejudiced. Strickland's requirements for demonstrating ineffective assistance of counsel govern the ineffective assistance of appellate counsel inquiry. Neill v. Gibson, 278 F.3d 1044, 1057 (10th Cir. 2001) (citing Smith v. Robbins, 528 U.S. 259, 285 (2000)). Demonstrating deficient performance of appellate counsel for failing to raise an issue can, however, be difficult.

> A claim of appellate ineffectiveness can be based on counsel's failure to raise a particular issue on appeal, although it is difficult to show deficient performance under those circumstances because counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." Id. at 288, 120 S.Ct.

33

746 (following <u>Jones v. Barnes</u>, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)).  Thus, in analyzing an appellate ineffectiveness claim based upon the failure to raise an issue on appeal, "we look to the merits of the omitted issue," <u>Neill v. Gibson</u>, 278 F.3d 1044, 1057 (10th Cir.2001) (quotation omitted), <u>cert. denied</u>, 537 U.S. 835, 123 S.Ct. 145, 154 L.Ed.2d 54 (2002), generally in relation to the other arguments counsel did pursue.  If the omitted issue is so plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal, its omission may directly establish deficient performance; if the omitted issue has merit but is not so compelling, the case for deficient performance is more complicated, requiring an assessment of the issue relative to the rest of the appeal, and deferential consideration must be given to any professional judgment involved in its omission; of course, if the issue is meritless, its omission will not constitute deficient performance. <u>See</u>, <u>e.g.</u>, <u>Smith</u>, 528 U.S. at 288, 120 S.Ct. 746; <u>Banks v. Reynolds</u>, 54 F.3d 1508, 1515-16 (10th Cir. 1995); <u>Mayo v. Henderson</u>, 13 F.3d 528, 533 (2d Cir. 1994).

<u>Cargle v. Mullin</u>, 317 F.3d 1196, 1202-03 (10th Cir. 2003) (footnote omitted).

### 1.  Failure to Investigate Juror's Background

Petitioner first claims both trial counsel and appellate counsel "together failed to discover that juror Whitmire, despite creating the impression that he had had only minor contact with the legal system prior to be [sic] called to jury [sic], in fact had an extensive record of contacts including multiple offenses of driving under the influence of alcohol." (Pet. at 33.)[15]  This claim was raised by Petitioner in his application for post-conviction review and was denied on the merits by the OCCA:

> Petitioner also faults direct appeal counsel for failing to thoroughly investigate the juror's backgrounds.  He claims that one juror, Juror W., gave false or misleading answers in *voir dire*, chiefly about his prior dealings with the judicial system.  During *voir dire*, the trial court asked if any of the panel had appeared in a court of law under any circumstances as a witness, plaintiff,

---

[15]  This is the entire extent of Petitioner's argument on this issue.

34

or defendant.  Juror W.'s answer was "[t]raffic-related offenses."  Petitioner claims this answer was "misleading at best" because, according to documents appended to Petitioner's Application, Juror W. (1) had been a defendant in a 1986 Oklahoma County civil lawsuit; (2) had sought bankruptcy protection in 1989; (3) had been the subject of two emergency protective orders in 1999; and (4) had been convicted several times of Driving Under the Influence, including two felony convictions for that crime in 1984.  Petitioner also presents evidence suggesting that Juror W. embellished or misrepresented the nature of his employment, claiming that he was a physical therapist, when in fact he was a physical therapist's assistant.

Regarding his apparent felony driving convictions, Juror W.'s answer was literally true; as Petitioner concedes, Driving Under the Influence is defined and punished in the Oklahoma Highway Safety Code, 47 O.S. § 11-902.  Regarding his other contacts with the judicial system, the State points to the lack of evidence that Juror W. actually had to appear in court on any of them.  Whether Juror W.'s answer was deliberately intended to be misleading or untruthful is debatable.[3]  Nevertheless, Petitioner has failed to show that Juror W. could not be a fair and impartial juror in this case.

> [3]The documents Petitioner submits indicate that Juror W. did not appear in the civil action and that a default judgment was entered against him.  It is not clear whether Juror W. was ever required to appear in court on the bankruptcy matter.  As to the protective orders, emergency orders are issued *ex parte* without the subject party being required to appear.  22 O.S. 2001, § 60.3. However, in his reply brief, Petitioner includes an appearance docket for one of the protective-order cases, which suggests Juror W. did appear in court on the day the temporary order against him was rescinded.

Certain classes of persons - including, among others, practicing attorneys, law enforcement officers, and felons who have not had their civil rights fully restored - may be excused from jury service "for cause." 38 O.S. 2001, § 28; 22 O.S. 2001, § 658.  Like most jurisdictions, including the United States Supreme Court, Oklahoma has long held that statutory qualifications for jury service are not fundamental or constitutional in nature.  Rather, the overarching concern is whether the juror in question could be fair and impartial. See Kohl v. Lehlback, 160 U.S. 293, 301-03, 16 S.Ct. 304, 307, 40 L.Ed. 432 (1895); Queenan v. Territory, 11 Okl. 261, 71 P. 218, 219-220 (1901), aff'd, 190 U.S. 548, 23 S.Ct. 762, 47 L.Ed. 1175 (1903).  "[T]he

35

general rule is to the effect that statutes providing for the selection of electors for jury service have never been regarded as an essential element of the right of trial by jury, and the method of selection is entirely within the control of the Legislature, provided only that the fundamental requisite of impartiality is not violated." Brown v. State, 14 Okl. Cr. 609, 618, 174 P. 1102 (1918).

As we stated in Petitioner's direct appeal (regarding a different challenge to the jury-selection process), it is ultimately trial counsel's responsibility to use *voir dire* to determine whether those selected for the jury are acceptable to him. Jones, 2006 OK CCR 5 at ¶ 9, 128 P.3d at 533. Challenges to a juror's qualifications must be raised at the first available opportunity, or they are waived. Johnson v. State, 1988 OK CR 242, ¶ 17, 764 P.2d 197, 201; Cooper v. State, 27 Okl.Cr. 278, 282, 226 P. 1066, 1067-68 (1924). Absent evidence that the juror was biased, a trial court's decision to grant a new trial is generally reviewed for an abuse of discretion. Johnson, 1988 OK CR 242 at ¶ 19, 764 P.2d at 202. This rule applies even when the juror's answers to *voir dire* questions appear to have been deliberately misleading. Raub v. Carpenter, 187 U.S. 159, 23 S.Ct. 72, 73, 47 L.Ed. 119 (1902); McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984)("The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial"); United States v. Currie, 609 F.2d 1193, 1194 (6th Cir. 1979).

Petitioner presents no affidavits as to whether, and if so, when, either trial or appellate counsel ever became aware of Juror W.'s contacts with the judicial system. In essence, he asks this Court to presume deficient performance from a silent record. Strickland requires us to presume that counsel acted competently, exploring all reasonable avenues of inquiry. Strickland, 466 U.S. at 687, 104 S.Ct. at 2064; Jones, 2006 OK CR 5 at ¶ 78, 128 P.3d at 545. The fact that a juror may be excusable "for cause" does not necessarily mean that either party wishes to have him removed. Indeed, defense counsel may have sound strategic reasons for keeping a panelist with a criminal record. See Jackson v. State, 1998 OK CR 39, ¶¶ 14-18, 964 P.2d 875, 884 (on appeal, defendant claimed the trial court erred in excusing a prospective juror for cause, even though he was a convicted felon). However, we do not reach the issue of reasonable strategy, because we simply cannot tell, from the record before us, whether or not Petitioner's prior counsel were aware of Juror W.'s past legal affairs. We will not find counsel to have performed deficiently on such unsupported allegations. Rule 9.7(B)(2), (D), Rules of the Oklahoma Court of Criminal Appeals, 22 O.S., Ch. 18, App.

36

(2007); <u>Jones</u>, 2006 OK CR 5 at ¶ 85, 128 P.3d at 547; <u>see also</u> <u>Conover v.</u>
<u>State</u>, 1997 OK CR 39, ¶ 14, 942 P.2d 229, 233 (failure to raise juror's felony
record on direct appeal did not, standing alone, establish ineffective assistance
of appellate counsel).  Moreover, Petitioner has failed to show that Juror W.
was unable to be fair and impartial – the prejudice prong of the <u>Strickland</u>
analysis. <u>Harris</u>, 2007 OK CR 32 at ¶ 15.

<u>Jones</u>, PCD-2002-630, slip op. at 5-9 (other footnotes omitted).

In <u>McDonough Power Equipment, Inc. v. Greenwood</u>, 464 U.S. 548 (1984), the

Supreme Court held that in order to obtain a new trial based on a juror's mistaken response

to a question in voir dire, the juror's impartiality is paramount to the consideration of a fair

trial:

> We hold that to obtain a new trial in such a situation, a party must first
> demonstrate that a juror failed to answer honestly a material question on voir
> dire, and then further show that a correct response would have provided a valid
> basis for a challenge for cause. The motives for concealing information may
> vary, but only those reasons that affect a juror's impartiality can truly be said
> to affect the fairness of a trial.

<u>Id.</u> at 556.

Here, Petitioner not only has failed to demonstrate that juror Whitmire's answers were

not honest or that the questions presented to him were material, he has also failed to show

that the juror was impartial.  Petitioner does not explain how previous appearances in a court

of law would affect this juror's ability to be unbiased and to follow the law as given by the

trial court.  Most importantly for this Court's review, Petitioner has not demonstrated that the

OCCA's determination is contrary to, or an unreasonable application of, clearly established

Federal law.

37

### 2. Failure to Discover Corroborating Witness

Petitioner next summarily claims that trial counsel and appellate counsel "failed to discover that Emmanuel Littlejohn's report of a Christopher Jordan confession could be corroborated by at least one other person - Christopher Berry." (Pet. at 33.) This claim was also raised in Petitioner's application for post-conviction relief and denied by the OCCA:

> Next, Petitioner claims trial counsel was ineffective for failing to investigate and present two witnesses at trial, and that appellate counsel was ineffective for not recognizing and advancing this claim on direct appeal. Specifically, Petitioner claims the testimony of Christopher Berry and James Lawson could have made a difference in the outcome of the trial. At the time of Petitioner's trial, Berry was being held in the Oklahoma County Jail on a charge of Child Abuse Murder. He was later convicted of that charge and sentenced to life in prison without possibility of parole. Berry claims, by affidavit, that he overheard Petitioner's co-defendant, Christopher Jordan, boasting that he, not Petitioner, was the triggerman in the homicide with which they were jointly charged.

> Petitioner made a similar claim on direct appeal, alleging trial counsel was ineffective for not presenting the testimony of another jail inmate, Emmanuel Littlejohn, who also allegedly heard Jordan boast about being the triggerman. We rejected that claim, because the inmate's credibility was suspect and the details of the account were specious. Jones, 2006 OK CR 5 at ¶ 82, 129 P.3d at 546. Berry suffers from the same credibility problems that Littlejohn did. Nor do we agree with Petitioner's argument that Berry's claim necessarily "corroborates" Littlejohn's. Berry's affidavit suggests that Jordan admitted Petitioner was involved in the murder, while according to Littlejohn, Jordan denied that Petitioner had any involvement. See id. Taken together, these inmates' claims show only one thing: that Christopher Jordan changed his story to suit his own needs. Yet this much was already clear to the jury, through trial counsel's extensive cross-examination of Jordan, who testified against Petitioner at trial. See id. at ¶ 83, 128 P.2d [sic]at 546-47.

> The posture of this case requires Petitioner to demonstrate not only that trial counsel failed to conduct a reasonably thorough investigation into witnesses potentially favorable to the defense, but that appellate counsel did as well. Petitioner claims appellate counsel "failed to investigate whether

38

others heard Mr. Jordan's confessions in the jail," but he does not present specifics to show how a reasonable investigation would have uncovered Berry's current claim. Berry does not aver that he ever attempted to contact Petitioner's appellate counsel, and Petitioner does not explain how appellate counsel was supposed to find out about Berry's claims in any other way. If Berry had information he believed to be relevant to Petitioner's case, then he had a responsibility to reveal it timely. We will not find appellate counsel deficient for failing to be clairvoyant. Petitioner has failed to show either (1) that appellate counsel's investigation was not reasonable, or (2) that such investigation would have uncovered information that undermines confidence in the outcome of the trial. Strickland, 466 U.S. at 687, 104 S.Ct. at 2064.

Jones, PCD-2002-630, slip op. at 10-11.

As identified by the OCCA, trial counsel extensively cross-examined Christopher Jordan at trial and identified for the jury's consideration numerous changes in his account of the events related to the shooting. Petitioner has not demonstrated either deficient performance of trial counsel or resulting prejudice, nor that appellate counsel was ineffective for failing to raise the issue on appeal. He adds nothing more on habeas review to demonstrate the OCCA's determination was unreasonable.

### 3. Failure to Argue Unconstitutionality of Aggravating/Mitigating Weighing Scheme

Lastly, Petitioner claims appellate counsel "also failed to argue the unconstitutionality of Oklahoma's determination of whether mitigating circumstances outweigh aggravators," and that this failure constitutes ineffectiveness because the current scheme violates Apprendi v. New Jersey, 530 U.S. 466 (2000), "in that only the first fact in the chain of aggravator-mitigator factfinding is required to be found beyond a reasonable doubt under Oklahoma's current scheme." (Pet. at 33-34.) The OCCA summarily denied Petitioner's claim based on

39

its repeated rejections of previously raised claims of the same nature:

> Petitioner argues that several aspects of Oklahoma's capital trial procedure constitute structural defects in the judicial process: . . . (4) not requiring the jury to find that aggravating circumstances outweigh mitigating circumstances "beyond a reasonable doubt." Constitutional challenges to all of theses claims have been repeatedly considered and rejected by this Court. Harris, 2007 OK CR 32 at ¶ 19; Hogan v. State, 2006 OK CR 19, ¶ 84, 139 P.3d 907, 935; Rojem v. State, 2006 OKCR 7, ¶¶ 59-60, 66-67, 130 P.3d 287, 299, 300; Matthews v. State, 2002 OK CR 16, ¶ 56, 45 P.3d 907, 924. Attempting to label them as "structural error" adds nothing new to the analysis.

Jones, PCD-2002-630, slip op. at 13-14.

Petitioner's jury was instructed that it must find the existence of any aggravating circumstance beyond a reasonable doubt. The jury made the determination that Petitioner had knowingly created a great risk of death to more than one person and that there existed the probability that he would commit criminal acts of violence that would constitute a continuing threat to society. The jury's determination of the existence of those aggravating circumstances – the functional equivalent of an element of a greater offense – placed Petitioner in that class of persons eligible to receive the death penalty. All Apprendi requires is that a jury, and not a judge, determine the existence of aggravating circumstances beyond a reasonable doubt.

In Matthews v. Workman, 577 F.3d 1175 (10th Cir. 2009), the Tenth Circuit considered a claim identical to the one presented here and found it barred by its decision in United States v. Barrett, 496 F.3d 1079, 1107 (10th Cir. 2007):

> There, we explained that the jury's determination that aggravating factors outweigh mitigating factors is not a finding of fact subject to Apprendi but a "highly subjective, largely moral judgment regarding the punishment that a

40

particular person deserves." Id. at 1107 (citing Caldwell v. Mississippi, 472 U.S. 320, 340 n. 7, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)).  We are of course bound by this decision as the law of the circuit.

Matthews, 577 F.3d at 1195.

Petitioner has failed to demonstrate that his Sixth, Eighth, and Fourteenth Amendment rights were violated by either Oklahoma's sentencing procedure and requirements or the jury's determination of the prerequisites necessary for the imposition of a sentence of death. The underlying claim supporting Petitioner's assertion of ineffectiveness is without merit. As such, neither trial nor appellate counsel can be found to have performed deficiently for failing to raise and argue this claim, nor has Petitioner demonstrated the OCCA's determination to be unreasonable.  Accordingly, Petitioner's sixth ground for relief is denied.

Ground 7:    Life Without Possibility of Parole Jury Instructions.

Petitioner claims the trial court erred when it failed to give an instruction regarding the meaning or effect of the sentence of life without the possibility of parole, in violation of his Eighth and Fourteenth Amendment rights.  He contends that because of the trial court's omission of this instruction on an "issue that regularly confuses jurors," he is entitled to habeas relief. (Pet. at 35.)

On appeal, Petitioner raised a number of issues he conceded the OCCA had previously rejected.  The instant claim is one of those issues.  The OCCA declined to revisit the issues and found that prior adjudications did not have an effect on the fairness of Petitioner's trial or on his sentencing. Jones, 128 P.3d at 551 & n.11.

The Supreme Court has previously addressed this issue, albeit with fewer sentencing

41

options than the three provided by Oklahoma law:

> In Simmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), this Court held that where a capital defendant's future dangerousness is at issue, and the only sentencing alternative to death available to the jury is life imprisonment without the possibility of parole, due process entitles the defendant "to inform the jury of [his] parole ineligibility, either by jury instruction or in arguments by counsel."

Shafer v. South Carolina, 532 U.S. 36, 39 (2001) (quoting Ramdass v. Angelone, 530 U.S. 156, 165 (2000)).  In both Simmons and Shafer, the jury was only given two sentencing options, creating a false choice of either sentencing the petitioners to death or sentencing them to a limited period of incarceration. Simmons, 512 U.S. at 161; Shafer, 532 U.S. at 41.

In Mayes v. Gibson, 210 F.3d 1284 (10th Cir. 2000), the Tenth Circuit was presented with an issue identical to Petitioner's instant claim.  In Mayes, the trial court had instructed the jury to choose between life imprisonment, life imprisonment without the possibility of parole, and death.  The Tenth Circuit concluded the "three-way choice fulfills the Simmons requirement that a jury be notified if the defendant is parole ineligible," and denied relief. Id. at 1294; see also McCracken v. Gibson, 268 F.3d 970, 980-81 (10th Cir. 2001).

Subsequent to Mayes, the Tenth Circuit was presented with the argument that the Supreme Court's decision in Shafer undermined the Circuit's prior determination in Mayes. Smith v. Mullin, 379 F.3d 919 (10th Cir. 2004).  The Tenth Circuit held:

> Given the two-way choice in Shafer, and the clear evidence of jury confusion, that case is distinguishable from our decision in Mayes. Because Mr. Smith's case is identical to Mayes and suffers none of Shafer's identified short-comings, Mr. Smith is not entitled to relief from his sentence on these grounds.

42

Smith, 379 F.3d at 938.

In Welch v. Workman, 639 F.3d 980, (10th Cir. 2011), the Tenth Circuit considered

an issue on habeas review regarding two notes from the jury requesting clarification of the

meaning of the life without possibility of parole sentencing option. The trial court responded

both times that it was not allowed to answer the jury's question. In denying relief, the Tenth

Circuit stated:

> Even assuming the trial court's statement (that it was not allowed to
> answer the jury's questions) ran afoul of Oklahoma procedural law, its
> response simply could not have created a prohibited false choice under the
> United States Constitution. Failing to clarify the life without parole instruction
> cannot be "taken to mean that parole was available but that the jury, for some
> unstated reason, should be blind to this fact." Shafer, 532 U.S. at 53, 121 S.Ct.
> 1263 (quotation marks omitted). Rather, as in McCracken and McGregor, the
> state trial court's non-responsive answer simply required the jury to return to
> the instructions as its sole guidance. And those instructions properly referred
> to Oklahoma's three-option sentencing scheme, offering the jury three
> choices—death, life imprisonment without parole and life
> imprisonment—which we have previously held to be constitutionally adequate.
> Hamilton v. Mullin, 436 F.3d 1181, 1191 (10th Cir. 2006).

Id. at 1005; see also Littlejohn v. Trammell, 704 F.3d 817, 826-31 (10th Cir. 2013).

Petitioner's claim here fails in that there is no evidence of jury confusion on the issue

of the sentencing options. The Tenth Circuit has held that due process concerns arise under

Simmons only when four factors are met:

> "(1) the prosecution seeks the death penalty; (2) the prosecution places the
> defendant's future dangerousness at issue; (3) the jury asks for clarification of
> the meaning of 'life imprisonment,' or a synonymous statutory term; and (4)
> the judge's response threatens to cause a jury's misunderstanding so the jury
> will perceive a false choice of incarceration when future dangerousness is at
> issue."

43

Hamilton v. Mullin, 436 F.3d 1181, 1191 (10th Cir. 2006)(quoting Mollett v. Mullin, 348 F.3d 902, 914 (10th Cir. 2003)).  Unlike Hamilton, Petitioner's jury did not send a note to the trial court during deliberations requesting clarification of the sentencing options.  Without a note or question from the jury, and without a judge's response to such jury inquiry, there is no evidence to suggest jury confusion or that the jury was misled. Id.

The Tenth Circuit's precedent precludes the instant claim.  Petitioner does not make any argument which compels or permits this court to disregard this binding precedent. See United States v. Foster, 104 F.3d 1228 (10th Cir. 1997).  Additionally, Petitioner has failed to demonstrate that the OCCA's resolution of this claim is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. §2254(d)(1).  Accordingly, this ground for relief is denied.

Ground 8:    Challenge to Continuing Threat Aggravating Circumstance.

In his eighth ground for relief, Petitioner contends that under the current Oklahoma interpretation, there is no homicide that could not be made death-eligible through the use of the continuing threat aggravating circumstance.  The Court interprets Petitioner's argument as a claim that the aggravating circumstance is unconstitutionally vague and overbroad.  Respondent responds that the aggravating circumstance is constitutional, that the OCCA's determination regarding vagueness is neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court, and that Petitioner's

44

"overbroad" challenge is unexhausted and procedurally barred from review.[16] Alternatively, Respondent argues Petitioner's claim is foreclosed by binding Tenth Circuit precedent and must be denied.

Petitioner's constitutional challenge to the continuing threat aggravating circumstance was denied by the OCCA. The State Court held: "This Court has repeatedly upheld the constitutional validity of the continuing threat aggravator and we will not revisit the issue." Jones, 128 P.3d at 549.

In Nguyen v. Reynolds, 131 F.3d 1340 (10th Cir. 1997), the Tenth Circuit found Oklahoma's continuing threat aggravating circumstance was "nearly identical" to the aggravating factor used by Texas and approved by the Supreme Court in Jurek v. Texas, 428 U.S. 262, 274-75 (1976). In construing the constitutionality of Oklahoma's continuing threat aggravating circumstance, the Tenth Circuit held:

> [t]he fact that Oklahoma chooses to grant a sentencing jury wide discretion to make a predictive judgment about a defendant's probable future conduct does not render the sentencing scheme in general, or the continuing threat factor in particular, unconstitutional. Although this predictive judgment is not susceptible of "mathematical precision," we do not believe it is so vague as to create an unacceptable risk of randomness. To the contrary, we believe the question of whether a defendant is likely to commit future acts of violence has a "common-sense core of meaning" that criminal juries are fully capable of understanding.

Nguyen, 131 F.3d at 1354.

---

[16] The Court need not consider Respondent's exhaustion and procedural bar assertion, as Petitioner's claim may be rejected easily on the merits. 28 U.S.C. § 2254(b)(2); Neill, 278 F.3d at 1063.

Both the Tenth Circuit and the United States Supreme Court have found this aggravating circumstance to pass constitutional muster. See Johnson v. Texas, 509 U.S. 350 (1993) (Texas' capital sentencing scheme based on continuing threat to society does not violate Eighth Amendment); Revilla v. Gibson, 283 F.3d 1203, 1218 (10th Cir. 2002); Sallahdin v. Gibson, 275 F.3d 1211, 1232 (10th Cir. 2002); Medlock v. Ward, 200 F.3d 1314, 1319 (10th Cir. 2000); Hooks v. Ward, 184 F.3d 1206, 1238-39 (10th Cir. 1999); Moore v. Gibson, 195 F.3d 1152, 1177-78 (10th Cir. 1999); Ross v. Ward, 165 F.3d 793, 800 (10th Cir. 1999); Trice v. Ward, 196 F.3d 1151, 1172-73 (10th Cir. 1999); Castro v. Ward, 138 F.3d 810, 816 (10th Cir. 1998).

> Mr. Wilson first challenges the constitutionality of the continuing threat aggravator. Under Oklahoma law, this aggravator requires "[t]he existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Okla. Stat. Ann. tit. 21, § 701.12(7). He claims that this is vague and overbroad because it does not perform the appropriate narrowing function. This claim is foreclosed by our Circuit's precedent. We have repeatedly upheld the constitutionality of this aggravator. See, e.g., Sallahdin v. Gibson, 275 F.3d 1211, 1232 (10th Cir. 2002); Medlock, 200 F.3d at 1319–20; Nguyen v. Reynolds, 131 F.3d 1340, 1353–54 (10th Cir. 1997). Mr. Wilson offers no reasons for us to deviate from our prior precedent, and we decline to do so today.

Wilson v. Sirmons, 536 F.3d 1064, 1109 (10th Cir. 2008).

As in Wilson, the Tenth Circuit's precedent precludes this claim. And like his previous ground for relief, Petitioner does not make any argument which compels or permits this Court to disregard Tenth Circuit binding precedent. Petitioner has failed to demonstrate that the OCCA's resolution of this claim is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the

46

United States." 28 U.S.C.A. §2254(d)(1).  Therefore, habeas relief on Petitioner's eighth

ground for relief is denied.

## **CONCLUSION**.

After a complete review of the transcripts, trial record, appellate record, record on

post-conviction proceedings, briefs filed by Petitioner and Respondent, and the applicable

law, the Court finds Petitioner's request for relief in his *Petition For Writ of Habeas Corpus*

(Dkt. No. 22) should be denied.  ACCORDINGLY, habeas relief is DENIED on all grounds.

An appropriate judgment will be entered.

IT IS SO ORDERED this 22nd day of May, 2013.

 

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE

47

# Exhibit G

FILED
United States Court of Appeals
Tenth Circuit

November 10, 2015

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

JULIUS DARIUS JONES,

      Petitioner - Appellant,

v.

MAURICE WARRIOR, Interim Warden,
Oklahoma State Penitentiary,[*]

      Respondent - Appellee.

No. 13-6141

_____

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 5:07-CV-01290-D)**

_____

Madeline S. Cohen, Assistant Federal Public Defender, Office of the Federal Public
Defender, Denver, Colorado (Virginia L. Grady, Federal Public Defender, Denver,
Colorado, and Mark Barrett, Barrett Law Office, Norman, Oklahoma, with her on the
briefs), for Petitioner-Appellant.

Jennifer L. Crabb, Assistant Attorney General (E. Scott Pruitt, Attorney General of
Oklahoma, with her on the brief) Office of the Attorney General for the State of
Oklahoma, Oklahoma City, Oklahoma, for Respondent-Appellee.

_____

Before **MATHESON**, **BACHARACH**, and **MORITZ**, Circuit Judges.

_____

**MORITZ**, Circuit Judge.

_____

_____

     [*] Pursuant to Fed. R. App. 4(c)(2) Anita Trammell is replaced by Maurice
Warrior, as Interim Warden of the Oklahoma State Penitentiary, effective October 28,
2015.

An Oklahoma jury convicted Julius Jones of felony murder and sentenced him to death for shooting and killing Paul Howell in the course of stealing Howell's Chevrolet Suburban. After the Oklahoma Court of Criminal Appeals (OCCA) rejected his direct appeal and application for post-conviction relief, Jones filed a federal habeas petition challenging his conviction and sentence on the basis of ineffective assistance of counsel. Specifically, he complained that his trial counsel made no effort to corroborate a lead that Christopher Jordan—Jones' co-defendant and the State's main witness at Jones' trial—admitted to shooting Howell and pinning the crime on Jones to avoid the death penalty. The district court denied Jones' petition and his request for a certificate of appealability (COA). We granted Jones a COA on this one ineffective-assistance-of-counsel issue. But because Jones fails to satisfy 28 U.S.C. § 2254(d), we cannot grant relief. Accordingly, we affirm.

## BACKGROUND

In late July 1999, on returning from an evening of shopping for school supplies and eating ice cream with his two young daughters and sister, Howell was shot and killed in his parents' driveway while getting out of his Chevrolet Suburban. Howell's sister, Megan Tobey, heard a gunshot as she exited the passenger side of the vehicle. She turned to face her brother and saw a young black male standing beside the vehicle's open driver's side door. Tobey watched as the man—who wore a white T-shirt, a red bandana over his face, and a black stocking cap on his head—demanded that Howell give him the keys to the Suburban. Tobey could see "about a half an inch to an inch" of the man's hair between his stocking cap and "where his

2

ear connect[ed] to his head." Trial Tr. Vol. 4, at 117:4-5, 16. But she didn't see braids or corn rows.

Tobey quickly pulled Howell's daughters out of the Suburban's back seat. As she ran with the children through her parents' carport she heard someone yelling at her to stop, followed by a second gunshot. Howell's parents ran outside and found their son lying in the driveway. His Suburban was gone. Howell died a few hours later from a single gunshot wound to the head.

Shortly after the shooting, Jordan arrived at Ladell King's apartment driving Jordan's 1972 Oldsmobile Cutlass. Jones arrived about 15 or 20 minutes later driving Howell's Suburban and wearing a white T-shirt, a red bandana, a stocking cap, and gloves. He warned King not to touch the Suburban and asked him to find someone to buy it. King's neighbor saw Jones and King checking out the Suburban that night.

The next day, Jones drove the Suburban from King's apartment to a convenience store parking lot on the south side of Oklahoma City near Kermit Lottie's auto body shop. King hoped to sell Lottie the Suburban, but Lottie refused to buy it. The convenience store's surveillance video from that day confirmed that both King and Jones briefly entered the convenience store. Oklahoma City detectives found the Suburban in the store's parking lot the next day.

Later that night—the night after the shooting—Jones and Jordan returned to see King, and Jones confessed to shooting Howell. Jones told King that as he walked up to Howell's Suburban, a young girl in the backseat waved at him, Howell's door opened, and the gun "went off." Trial Tr. Vol. 5 at 189-90.

3

When Oklahoma City police found Howell's Suburban they canvassed the area to determine who left it there. On a hunch, officers first visited Lottie's auto body shop, just four blocks from where officers found the vehicle. Lottie told detectives that King and at least one other person attempted to sell him Howell's stolen Suburban the day after the shooting. Because Lottie recognized the Suburban from news reports describing Howell's stolen vehicle, he refused to buy it. When police tracked down King later that day, he provided them with a phone number and address for Jones at Jones' parents' house.

Upon arriving at Jones' parents' house an officer called the phone number for Jones that King had provided, and Jones answered. The officer told Jones that the Oklahoma City Police Department had surrounded the house and wanted to talk to him about Howell's murder. Jones agreed to come out and talk, but instead left the house through a second-floor window, evaded officers attempting to secure the perimeter of the house, and fled.

Officers obtained warrants to search the house and arrest Jones. In Jones' bedroom, detectives discovered a white T-shirt with black trim and a black stocking cap—items that matched both Tobey's description of the shooter's clothing and King's description of Jones' clothing shortly after the shooting. Officers also found a chrome-plated Raven .25-caliber semiautomatic pistol wrapped in a red bandana and hidden in the attic space above the ceiling of the closet in Jones' room. And hidden behind the cover of the doorbell chime, officers discovered a loaded .25-caliber magazine belonging to the gun they had just found. The gun matched Jones'

4

girlfriend's description of one she saw in Jones' possession during the summer of 1999. Both the bullet found lodged in Howell's head and the bullet shot into the Suburban's dashboard matched the bullets and the gun found in Jones' bedroom. They also matched bullets found in Jones' car.

Two days after the shooting, officers arrested Jordan. After an extensive citywide search, officers found and arrested Jones the following morning. The State of Oklahoma charged Jones and Jordan with first-degree felony murder and conspiring to commit a felony. The State also charged Jones with being a felon in possession of a firearm.

*Trial—Guilt Phase*

Jordan pleaded guilty and agreed to testify against Jones at trial in exchange for a life sentence, all but the first 30 years of which was suspended. Jordan testified that on the day of the shooting, he and Jones went cruising around a suburb of Oklahoma City in Jordan's Oldsmobile Cutlass, looking for a Suburban to steal. Jordan drove, while Jones rode in the passenger seat. The two spotted Howell's Suburban in the drive-through of a local Braum's ice cream shop.

Michael Ray Peterson was in Braum's parking lot around the time Howell went through the drive-through. Peterson and his wife were seated on the curb in front of the store eating ice cream when Peterson noticed two black males in their early twenties circling the lot in an Oldsmobile Cutlass. The driver's hair was in corn rows and one of the two men wore a white T-shirt. The Cutlass eventually backed

into a parking space, where it sat with the motor running for a few minutes before leaving in a hurry.

Jordan testified that when Jones saw someone—perhaps Peterson—"looking [their] way," the two men left Braum's parking lot and waited at a stop light for Howell's Suburban to drive past them. Trial Tr. Vol. 8, at 161. When it did, Jordan—who was still driving—followed the Suburban to Howell's parents' neighborhood. At that point, the two men possessed a clear plan: Jones would take the Suburban at gunpoint.

When it appeared Howell was about to pull into a driveway, Jordan stopped his car and Jones got out carrying a gun and wearing a stocking cap, a bandana, and gloves. Jordan heard a gunshot and ran to where he could see Howell slumped on the ground. He then heard a second shot and saw Jones patting Howell as if looking for the Suburban's keys. Jordan watched as Jones got into the Suburban and backed it out of the driveway. The two men then left the scene—Jordan in his Cutlass, Jones in Howell's Suburban—and traveled to King's apartment.

Jones' defense at trial was that Jordan shot Howell, possibly with King as his accomplice, and that Jordan was blaming Jones to save his own life. The jury convicted Jones of all three counts.

*Trial—Punishment Phase*

For the crime of first-degree felony murder, the jury imposed the death penalty after finding two aggravating circumstances: (1) Jones knowingly created a great risk of death to more than one person; and (2) "there exist[ed] the probability that [Jones]

6

would commit criminal acts of violence that would constitute a continuing threat to society." *Jones v. State*, 128 P.3d 521, 532 (Okla. Crim. App. 2006). In support of the continuing-threat aggravator, the State presented evidence of Jones' involvement in several unadjudicated crimes, including attempting to elude a police officer, unauthorized use of a motor vehicle and possession of a firearm during the commission of a felony, armed robbery of a jewelry store, two armed carjackings in July 1999 at an Oklahoma City restaurant, and a physical altercation with a detention officer.

### Direct Appeal

Jones appealed his convictions and death sentence to the OCCA. He asserted numerous claims of error, including that his trial counsel, David McKenzie, was ineffective for failing to call Emmanuel Littlejohn as a witness. Littlejohn was a "multiple felon and convicted murderer" who briefly shared a jail cell with Jordan while Littlejohn awaited resentencing in his own capital murder case. *Id.* at 546.

Before Jones' February 2002 trial, "Littlejohn told defense investigators that Jordan admitted he was falsely throwing blame on Jones, that Jordan said Jones was not involved in the Howell murder at all, and that Jordan had even gone so far as to hide the murder weapon and other incriminating evidence in the Joneses' home himself." *Id.* Littlejohn submitted to a polygraph test regarding these statements, but the results were inconclusive. After interviewing Littlejohn and speaking to Littlejohn's attorney about his credibility, McKenzie concluded Littlejohn was a

"pathological liar" who lacked credibility, and declined to call him as a witness.
McPhail Aff., Direct Appeal Mot. to Supplement, at 3, ¶ 15.

Because "defense counsel actually did investigate Littlejohn's claim before
trial," the OCCA found that Jones' argument pertained to "trial strategy which, as
*Strickland* instructs, is much more difficult to attack." *Jones*, 128 P.3d at 546.
Denying Jones' claim, the OCCA found "nothing unreasonable about counsel's
decision to forgo Littlejohn's assistance." *Id.*

After rejecting all Jones' claims of error, the OCCA affirmed his convictions
and death sentence. *Id.* at 552. The OCCA later granted Jones' motion for rehearing
but denied his request to recall the mandate. *Jones v. State*, 132 P.3d 1, 3 (Okla.
Crim. App. 2006). The United States Supreme Court denied Jones' petition for
certiorari. *Jones v. Oklahoma*, 127 S. Ct. 404 (2006).

*State Post-Conviction Proceedings*

Jones next sought post-conviction relief from his convictions and death
sentence in state court. As relevant here, Jones' application for post-conviction relief
claimed McKenzie was ineffective for failing to investigate whether anyone could
corroborate Littlejohn's assertion that Jordan had confessed to being the shooter. In
particular, Jones focused on Christopher Berry, an inmate who at the time of Jones'
trial was being held in the Oklahoma County Jail on a charge of "Child Abuse
Murder"—a crime for which he eventually received a life sentence. Opinion Denying
App. for Post-Conviction Relief & Related Motions, No. PCD-2002-630 (Okla. Crim.
App. Nov. 5, 2007) (OCCA Post-Con. Op.) at 10. Because McKenzie also

8

represented Berry at the time of Jones' trial, Jones argued it was particularly

unreasonable for McKenzie not to ask Berry if he had heard anything about Jones'

case.

In support of his ineffective-assistance-of-counsel claim, Jones submitted

affidavits from Littlejohn and Berry. Littlejohn's affidavit repeated what he told

McKenzie before Jones' trial—that while he and Jordan were cellmates, Jordan told

him, "Julius didn't do it" and "Julius wasn't there." Littlejohn Aff., Doc. 22-5, at 1, ¶

9. According to Littlejohn, Jordan confessed "that [Jordan] had wrapped the gun used

to commit the murder in his case in a bandana and hidden it in Julius Jones' house,"

and that Jordan "felt guilty because he was going to implicate his co-defendant,

Julius Jones, in a murder case to avoid getting the death penalty." *Id.* at ¶¶ 7, 8.

Berry's affidavit said that Berry met Jordan while the two were housed at the

Oklahoma County Jail, where they shared the same cell pod[1] for about two years.

Berry said he overheard Jordan tell an inmate named "Smoke" that "[Jordan] was the

actual person who shot the victim in his case," and that "because [Jordan] was the

first to talk to the police, he was getting a deal and would not get the death penalty"

while "his partner in the case was charged with capital murder." Berry Aff., Doc. 22-

6, at 1, ¶ 5. According to Berry, Jordan liked to brag about shooting Howell. Berry

admitted that he "didn't tell [his] attorney, David McKenzie," about this, but stated

---

[1] A cell pod "is an inmate housing area divided into manageable size units
typically with single occupancy cells clustered around a common area and secure
control booth." *Hill v. Curcione*, 657 F.3d 116, 118 n.1 (2d Cir. 2011).

9

that he "did try to talk to him about it," and "Mr. McKenzie didn't seem interested in it." *Id.* at 2, ¶ 7.

The OCCA rejected Jones' claim of ineffective assistance of counsel because "Berry suffer[ed] from the same credibility problems that Littlejohn did"; his statement did not "necessarily 'corroborate[]' Littlejohn's"; and the "inmates' claims show[ed] only one thing: that Christopher Jordan changed his story to suit his own needs," which "was already clear to the jury, through [McKenzie's] extensive cross-examination of Jordan." OCCA Post-Con. Op. at 10-11.

*Federal Habeas Proceedings*

Seeking federal habeas relief from his convictions and death sentence, Jones asserted eight grounds for relief, including that McKenzie was ineffective for not attempting to corroborate Littlejohn's statement, and for not investigating Berry in particular. The district court rejected all eight grounds for habeas relief, and denied Jones' request for a COA.

We granted Jones a COA on just one issue: whether Jones' trial counsel was ineffective for failing to investigate Littlejohn's claim that Jordan confessed to determine whether it could be corroborated. Our jurisdiction is therefore limited to this issue. *See* 28 U.S.C. § 1291; 28 U.S.C. § 2253(c)(1)(A); *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).

## DISCUSSION

Jones argues that McKenzie acted unreasonably in failing to attempt to corroborate Littlejohn's statement that Jordan confessed to shooting Howell. He also

10

contends McKenzie was ineffective for not investigating Berry directly because even though Berry "didn't tell" McKenzie that he overheard Jordan claiming to be the shooter, Berry "did try to talk to [McKenzie] about it." Berry Aff., Doc. 22-6, at 2, ¶ 7. Essentially, Jones argues that a reasonable attorney in McKenzie's shoes would have attempted to corroborate Littlejohn's statement and in the process of doing so, would have discovered that Berry could corroborate Littlejohn's account. Jones further postulates that a reasonable attorney, having discovered Berry, would have called him as a witness, and might have reconsidered calling Littlejohn as a witness, which would have changed the outcome of both the guilt and sentencing phases of his trial.

To establish ineffective assistance of counsel (IAC) under the Sixth and Fourteenth Amendments, a claimant must show two things: (1) deficient performance—that trial counsel's conduct was objectively unreasonable; and (2) resulting prejudice—"a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

But to obtain federal habeas relief from a state court decision rejecting an ineffective-assistance claim on the merits, a petitioner must first show that the state-court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). In determining

whether Jones is entitled to habeas relief, "'we review the district court's legal

analysis of the state court decision de novo' and its factual findings, if any, for clear

error." *Frost v. Pryor*, 749 F.3d 1212, 1223 (10th Cir. 2014) (quoting *Byrd v.

Workman*, 645 F.3d 1159, 1165 (10th Cir. 2011)). Our review is limited to the record

that was before the OCCA when it adjudicated his IAC claim. *See Cullen v.

Pinholster*, 131 S. Ct. 1388, 1398 (2011).

Jones contends the OCCA's rejection of his IAC claim satisfies § 2254(d)

because the court's analysis of *Strickland*'s performance prong is both (1) contrary to

clearly established law and (2) based upon an unreasonable determination of the

facts.[2] But we're not entirely convinced the OCCA analyzed *Strickland*'s

performance prong at all. Contrary to Jones' argument, we think it more likely the

OCCA rejected Jones' IAC claim solely under *Strickland*'s prejudice prong.

Nevertheless, even assuming Jones is correct that the OCCA based its decision on a

---

[2] The State contends Jones "waived" his contrary-to and unreasonable-determination-of-the-facts arguments because he didn't raise them below. Aplee. Br. 13, 17. While we ordinarily decline to address arguments not raised by a habeas petitioner in district court, *Jones v. Gibson*, 206 F.3d 946, 958 (10th Cir. 2000), we have discretion to consider arguments a petitioner raises for the first time on appeal. *See United States v. Jarvis*, 499 F.3d 1196, 1201 (10th Cir. 2007). We exercise that discretion here. But we draw the line at Jones' opening brief. Thus, we decline to consider Jones' counsel's suggestion, made for the first time at oral argument, that we should treat Jones' contrary-to and unreasonable-determination-of-the-facts arguments as also raising a claim under § 2254(d)(1) that the OCCA unreasonably applied clearly established law. *See Williams v. Taylor*, 529 U.S. 362, 405 (2000) (noting that the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meaning"); *Hancock v. Trammell*, 798 F.3d 1002, 1016-17 (10th Cir. 2015) (petition for rehearing pending) (refusing to consider petitioner's "unreasonable application" argument when he raised it for first time at oral argument).

finding that trial counsel's performance was not deficient, we conclude Jones fails to demonstrate the OCCA's decision is either (1) contrary to clearly established law or (2) based on an unreasonable determination of the facts.

## I.  Jones fails to demonstrate the OCCA's decision is contrary to clearly established Federal law.

A state-court decision is "contrary to" clearly established law if it (1) "applies a rule that contradicts the governing law set forth in [U.S. Supreme Court] cases" or (2) "confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [its] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Jones rests his contrary-to argument on the first prong of this definition. He argues that "a lawyer's failure to pursue a line of investigation calls for a very different analysis" than does "a lawyer's informed, strategic decision." Aplt. Br. 30. And he insists that rather than applying that "very different analysis" to his failure-to-investigate claim, the OCCA instead "applied the far more forgiving and deferential analysis that applies to counsel's informed strategic decisions." *Id.* at 30-31.

But a rule only "contradicts" governing law if it is "'diametrically different,' 'opposite in character or nature,' or 'mutually opposed'" to the Supreme Court's "clearly established precedent." *Williams*, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). The OCCA's articulation of *Strickland*'s performance prong doesn't fit this description.

13

In considering Jones' IAC claim, the OCCA correctly identified *Strickland* as the controlling legal authority. OCCA Post-Con. Op. at 2-3. And it explained that for Jones to prevail on the performance prong of his IAC claim, he had to show that "trial counsel failed to conduct a reasonably thorough investigation into witnesses potentially favorable to the defense." *Id.* at 11. This language—which focuses on the reasonableness of counsel's failure to investigate—is hardly diametrically different from the language the Court used in *Strickland*. There, the Court explained that "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 690-91. In fact, the OCCA's language doesn't even contradict Jones' own articulation of the relevant test. *See* Aplt. Br. 30 (stating that the "overarching question is whether the failure to investigate was 'reasonable' under prevailing professional norms").

The OCCA analyzed Jones' claim as follows:

> [Jones] claims trial counsel was ineffective for failing to investigate and present two witnesses at trial . . . . Specifically, [he] claims the testimony of Christopher Berry [and a longtime acquaintance of Jones'] could have made a difference in the outcome of the trial. At the time of [Jones'] trial, Berry was being held in the Oklahoma County Jail on a charge of Child Abuse Murder. He was later convicted of that charge and sentenced to life in prison without possibility of parole. Berry claims, by affidavit, that he overheard [Jones'] co-defendant, Christopher Jordan, boasting that he, not [Jones], was the triggerman in the homicide with which they were jointly charged.

> [Jones] made a similar claim on direct appeal alleging trial counsel was ineffective for not presenting the testimony of another jail inmate, Emmanuel Littlejohn, who also allegedly heard Jordan boast

14

about being the triggerman. We rejected that claim, because the inmate's credibility was suspect and the details of the account were specious. Berry suffers from the same credibility problems that Littlejohn did. Nor do we agree with [Jones'] argument that Berry's claim necessarily 'corroborates' Littlejohn's. Berry's affidavit suggests that Jordan admitted [Jones] was involved in the murder, while according to Littlejohn, Jordan denied that [Jones] had any involvement. Taken together, these inmates' claims show only one thing: that Christopher Jordan changed his story to suit his own needs. Yet this much was already clear to the jury, through trial counsel's extensive cross-examination of Jordan, who testified against [Jones] at trial.

OCCA Post-Con Op. at 10-11 (citations omitted).

In arguing this decision is contrary to clearly established law, Jones focuses solely on the OCCA's statement characterizing his post-conviction failure-to-investigate claim as "similar" to his direct-appeal failure-to-call claim. *Id.* at 10. He points out that on direct appeal the OCCA rejected his failure-to-call claim by noting that McKenzie "investigate[d] Littlejohn's claim before trial," which "reduce[d] Jones's argument to one over trial strategy," and made the decision "much more difficult to attack." *Jones*, 128 P.3d at 546, ¶ 82. According to Jones, the OCCA erred in treating counsel's failure to investigate as similarly "difficult to attack," *id.*, and as "'virtually unchallengeable,'" Aplt. Br. 28 (quoting *Strickland*, 466 U.S. at 690).

Despite characterizing the two claims as "similar," the OCCA demonstrated it understood the difference between them. It correctly described Jones' post-conviction claim as addressing whether "trial counsel was ineffective for failing to *investigate* and present two witnesses at trial." OCCA Post-Con. Op. at 10 (emphasis added). And it accurately restated Jones' direct-appeal claim as "alleging trial counsel was

15

ineffective for not presenting the testimony of another jail inmate." *Id.* Moreover, in

rejecting his post-conviction IAC claim, the OCCA made no mention of the more

deferential "virtually unchallengeable" standard Jones claims it applied. Instead, as

discussed above, the OCCA correctly framed the relevant inquiry as whether "trial

counsel failed to conduct a reasonably thorough investigation into witnesses

potentially favorable to the defense." *Id.* at 11.

Assuming the OCCA applied *Strickland*'s performance prong at all, we see no

reason to conclude it applied a test other than the correct one that it expressly stated.

Thus, Jones fails to demonstrate the OCCA's rejection of his IAC claim is contrary to

clearly established law.

### II.  Jones fails to demonstrate the OCCA's decision is based on an unreasonable determination of the facts.

For similar reasons, we reject Jones' suggestion that the OCCA "implicit[ly]"

found McKenzie made an informed strategic decision not to attempt to corroborate

Littlejohn's account. Aplt. Br. 29.

Jones relies on the OCCA's statements that "Berry suffer[ed] from the same

credibility problems that Littlejohn did," and that Berry's statement did not

"necessarily 'corroborate[]' Littlejohn's" as support for this suggestion. OCCA Post-

Con. Op. at 10. But as even Jones concedes, it's "not entirely clear from [the

OCCA's] opinion" that the OCCA made a factual finding that McKenzie made a

strategic decision not to interview Berry about Jordan. Aplt. Br. 29. Instead, we think

the OCCA's statements about Berry's lack of credibility and the inconsistencies

16

between Berry's statement and Littlejohn's go to the OCCA's determination that McKenzie's failure to discover and call Berry as a witness did not undermine the outcome of Jones' trial. *See Wong v. Belmontes*, 558 U.S. 15, 19-20 (2009) (explaining that to show prejudice based on failure to investigate, defendant must establish reasonable probability that competent attorney aware of available evidence would have introduced the evidence and jury would have returned different verdict as a result).

Because we're not convinced the OCCA made the implicit factual finding Jones argues is unreasonable, we decline to conclude the OCCA "'plainly misapprehend[ed] or misstate[d] the record'" in addressing Jones' claim that McKenzie was ineffective for not seeking to corroborate Littlejohn's statement. *Byrd v. Workman*, 645 F.3d 1159, 1171-72 (10th Cir. 2011) (quoting *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004)). Thus, Jones has not satisfied the "'daunting standard'" for showing that the OCCA based its decision on an unreasonable determination of the facts. *Id.* at 1172 (quoting *Taylor*, 366 F.3d at 1000).

## CONCLUSION

Jones' failure to establish the OCCA's decision was contrary to clearly established law or based on an unreasonable determination of the facts prevents us from granting relief. *See Hancock v. Trammell*, 798 F.3d 1002, 1010 (10th Cir. 2015) (explaining habeas courts can't grant relief "'with respect to any claim that was adjudicated on the merits in State court'" unless state court's adjudication satisfies § 2254(d)). So we need not address whether, if we applied de novo review, we would

17

conclude McKenzie's failure to investigate Berry resulted in prejudice. *See id.* at 1006, 1024 (concluding court couldn't reach merits of petitioner's IAC claim because petitioner failed to demonstrate state court unreasonably applied *Strickland*). We therefore affirm the district court's denial of habeas relief on Jones' claim that trial counsel provided ineffective assistance of counsel by failing to investigate and develop corroboration for Littlejohn's statement.

We also deny Jones' motion to expand the COA to include several additional claims of ineffective assistance of counsel and a prosecutorial misconduct claim. After reviewing the motion, we conclude that reasonable jurists would not find the district court's decision on these issues debatable or wrong. *See Miller-El*, 537 U.S. at 335-36. Finally, because Jones fails to satisfy § 2254(d), we deny his request for an evidentiary hearing. *See Pinholster*, 131 S. Ct. at 1401.

18

**UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**
**OFFICE OF THE CLERK**
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

Elisabeth A. Shumaker
Clerk of Court

November 10, 2015

Chris Wolpert
Chief Deputy Clerk

Ms. Madeline S. Cohen
Office of the Federal Public Defender
Districts of Colorado and Wyoming
633 17th Street, Suite 1000
Denver, CO 80202

Mr. Mark Barrett
Law Office of Mark H. Barrett
111 North Peters Avenue
Suite 200
Norman, OK 73069

**RE:    13-6141, Jones v. Trammell**
        Dist/Ag docket: 5:07-CV-01290-D

Dear Counsel:

Enclosed is a copy of the opinion of the court issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. Rule 40, any petition for rehearing must be filed within 14 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. If requesting rehearing en banc, the requesting party must file 12 paper copies with the clerk, in addition to satisfying all Electronic Case Filing requirements. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R. 35 and 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Elisabeth A. Shumaker
Clerk of the Court

cc:      Jennifer L. Crabb

EAS/as

2

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 10, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

JULIUS DARIUS JONES,

      Petitioner - Appellant,

v.

MAURICE WARRIOR, Interim Warden,
Oklahoma State Penitentiary, [*]

      Respondent - Appellee.

No. 13-6141
(D.C. No. 5:07-CV-01290-D)
(W.D. Okla.)

_____

### JUDGMENT
_____

Before **MATHESON**, **BACHARACH**, and **MORITZ**, Circuit Judges.
_____

     This case originated in the Western District of Oklahoma and was argued by

counsel.

     The judgment of that court is affirmed.

                          Entered for the Court

                          *Elisabeth A. Shumaker*

                          ELISABETH A. SHUMAKER, Clerk

---

[*] Pursuant to Fed. R. App. P. 43(c)(2) Anita Trammell is replaced by Maurice Warrior as Interim Warden of the Oklahoma State Penitentiary effective October 28, 2015.